**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Baltimore Division)**

| | |
|---|---|
| IN RE: | * |
| | |
| **JOHN MCDONNELL MCPHERSON,** | *   Case No.: 21-10205-MMH |
| | (Chapter 11) |
| Debtor.      . | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MOTION OF CAMAC FUND, L.P. FOR RELIEF FROM THE AUTOMATIC STAY TO PERMIT CONTINUATION OF PENDING ARBITRATION PROCEEDING

Camac Fund, L.P. ("Camac"), a creditor and party in interest, by and through its undersigned counsel, Alan M. Grochal, Richard L. Costella, and Tydings & Rosenberg LLP, hereby moves for relief from the automatic stay for cause pursuant to 11 U.S.C. § 362(d) and Bankruptcy Rule 4001(a), and to compel the continuation of certain arbitration proceedings (the "Arbitration") between the parties pursuant to 28 U.S.C. § 1334(c)(1), and 9 U.S.C. § 3. In support of its Motion, Camac states as follows:

### INTRODUCTION

1.      Central to this Motion is a Litigation Funding Agreement (the "Funding Agreement") executed by John M. McPherson (the "Debtor") and Camac on January 4, 2018, in the amount of $1 million (the "Camac Funding"). A true and correct copy of the Funding Agreement is attached hereto as **Exhibit 1.** The purpose of the Funding Agreement was to provide the Debtor with the capital necessary to fund his business operations, pursue whistleblower cases, and "extinguish outstanding liabilities;" which liabilities included years and years of unpaid taxes. *See* Ex. 1 at p. 1. The Funding Agreement includes an arbitration clause for any dispute arising thereunder.

2.      As discussed below, Debtor materially breached the Funding Agreement, and as a result, pursuant to the arbitration clause contained therein, Camac submitted a Statement of Claim

1

and Demand for Arbitration (the "Arbitration Demand") to the American Arbitration Association ("AAA") on September 30, 2020.  The Arbitration Demand asserts purely state-law claims against the Debtor as follows: breach of contract, breach of the implied duty of good faith and fair dealing, and unjust enrichment.

3.     . Notably, on January 12, 2021, after threatening to file for bankruptcy as a means to bring Camac toward a settlement, and just one day prior to a scheduling hearing in the Arbitration, the Debtor initiated this bankruptcy by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

4.     As set forth herein, the relevant caselaw and statutory authority demonstrate that the automatic stay should be lifted in order that the Arbitration may proceed.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. § 362(d).

6.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.     The issue raised in this Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A) (matters concerning administration of the estate), (G) (motions to terminate, annul, or modify the automatic stay), and (O) (other proceedings affecting the liquidation of assets of the estate).

## STATEMENT OF FACTS

**A.  The Litigation Funding Agreement.**

8.     The terms of the Funding Agreement state that in exchange for the $1 million in funding from Camac, Camac would purchase a share of proceeds from various litigation and non-

litigation matters (the "Litigation Proceeds") arising from certain whistleblower cases (the "Cases") which he was at the time, or was later to become involved in.

9.      Central to the Funding Agreement was that Bryan Wood, Esq. ("Mr. Wood"), a lawyer well known by Camac who—at the time the Funding Agreement was executed—was representing the Debtor in whistleblower submissions, including that related to the litigation in the United States District Court for the Western District of Texas captioned *SEC v. Life Partners Holdings, Inc.*, *et al.*, Case No. 12-cv-00033 (the "Life Partners Action"). Without Mr. Wood's involvement in the Life Partners Action and other matters, Camac would not have entered into the Funding Agreement. As such, in the Funding Agreement the parties expressly recognized Mr. Wood's involvement in the Life Partners Action on behalf of the Debtor. *See* Ex. 1 at p. 2.

10.      Pursuant to the Funding Agreement, Mr. Wood would manage the Litigation Proceeds from any Cases covered by the Funding Agreement. Litigation Proceeds are defined in the Funding Agreement as:

> [T]he gross total revenues, recoveries, and/or proceeds, whether monetary or non-monetary, obtained from, paid by, or paid on behalf of the Cases. This includes, but is not limited to, all whistleblower payments paid by any government agency, expert witness revenues, all damages, settlement sums, compensation, accounts of profits, restitution, licensing revenues, sums from any development and/or commercialization agreement, costs, fees and expenses received from the Cases, and all similar sums, before deduction of any taxes.

Ex. 1 at p. 1. Cases are defined as the Life Partners Action and "[a]ny and all other submissions, cases, or the like under the SEC, IRS, or CFTC whistleblower program, or under any qui tam statute." *Id.*

11.      Mr. Wood's role, defined in the Funding Agreement, was to update Camac on the status of recoveries, and serve as the escrow agent for the account that held the funding amount. The nature of whistleblower recoveries is such that nearly of the proceedings are not public record,

and without Mr. Wood conveying information to Camac, Camac would have been unable to ascertain whether the Debtor has recovered any Litigation Proceeds. Given the Debtor's longstanding history of nonpayment of taxes, Camac was concerned that it could not solely rely on the Debtor's word. For this reason, it was the most critical element of the Funding Agreement.

12.    Unfortunately Camac's concern was justified, as the Debtor removed Mr. Wood from the Life Partners Action and discontinued using him as counsel in new cases with the intent of avoiding his repayment obligations to Camac, which materially breached the Funding Agreement.  For example, Camac was informed by a third party that on or around August 2019 the Debtor received profits related to another whistleblower case covered by the Funding Agreement (General Electric), but Debtor did not inform Camac of those Litigation Proceeds, did not distribute any such proceeds to Camac, and has since denied that the proceeds are within the scope of the Funding Agreement.

13.    The Funding Agreement also called for Litigation Proceeds to be distributed first to Camac, until Camac had received the agreed-upon amount (currently $4.2 million, and that amount increases each calendar year until 2024), and that Debtor would not adversely affect the priority, perfection, or validity of Camac's security interest.  Further, the Debtor represented in the Funding Agreement that Camac shall have a first priority security interest in any Litigation Proceeds.  Debtor has broken those covenants as well—all material breaches of the Funding Agreement.

14.    The Funding Agreement includes a governing law provision which states that "any and all claims or causes of action . . . arising out of or relating to this [Funding] Agreement . . . shall be governed and construed and enforced in accordance with the internal Laws of the State of Delaware without reference to its choice of law rules."  Ex. 1 at p. 4.

15.     The Funding Agreement also includes a Dispute Resolution provision, which states that if the parties have a dispute arising from the Funding Agreement, "the [P]arties agree to submit such dispute to binding arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules …"  *Id.*

**B.  The Arbitration.**

16.     Pursuant to the Dispute Resolution clause—and due to the Debtor's breaches described above—Camac submitted the Arbitration Demand to AAA on September 30, 2020.

17.     Fifteen days later, on October 15, 2020, the Debtor responded to the Arbitration Demand with Respondent's Challenge to Arbitrability and Answer to Demand for Arbitration (the "Answer").  A true and correct copy of the Answer is attached hereto as **Exhibit 2.**

18.     Twelve days after filing the Answer, the Debtor also filed a Counterclaim (the "Counterclaim"), on October 27, 2020. A true and correct copy of the Counterclaim is attached hereto as **Exhibit 3.**

**C.  The Bankruptcy Case.**

19.     A scheduling hearing was set for January 13, 2021 but was stayed by the Debtor's filing of the instant bankruptcy case on January 12, 2021 (the "Petition Date").

<u>**ARGUMENT**</u>

**A. There is Cause to Lift the Automatic Stay.**

20.     The Court may grant relief from the automatic stay of 11 U.S.C. §362(a) for "cause." 11 U.S.C. § 362(d)(1)(2021).  The Bankruptcy Code does not define cause so the decision to lift the automatic stay is within the discretion of the Court and should be decided on a case-by-case basis. *In re Robbins*, 964 F.2d 342, 345 (4th Cir. 1992). To determine whether cause exists, the court must balance the "potential prejudice to the bankruptcy debtor's estate against the

hardship that will be incurred by the person seeking relief from the automatic stay if relief is granted." *Id.*

21.     The Fourth Circuit's decision in *Robbins* specifically provides three factors for the Court to consider in deciding whether to lift the automatic stay so that the parties may continue with pre-bankruptcy litigation: (1) whether the issues in the pending litigation involve only state law, so the expertise of the bankruptcy court is unnecessary; (2) whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court; and (3) whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court. *See id.*

22.     In enunciating the *Robbins* factors, the Fourth Circuit relied heavily on the legislative history of section 362:

> [I]t will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from many duties that may be handled elsewhere.

964 F.2d at 345 (citing to S.Rep. No. 989, 95th Cong., 2d Sess. 50 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5836 and 2 Collier on Bankruptcy § 362.07[3], at 362-71. (15th ed. 1991) ("the liquidation of a claim may be more conveniently and speedily determined in another forum")).

23.     There can be no question that the issues raised in the Arbitration—breach of contract, breach of the implied duty to deal in good faith, and unjust enrichment—are solely state law issues. Moreover, they are issues of Delaware state law, as the Funding Agreement states that any and all claims or causes of action arising out of or relating to it "shall be governed by and

construed and enforced in accordance with the internal Laws of the State of Delaware without reference to its choice of law rules."  Ex. 1 at p. 4.

24.     Speaking to "the expertise of the bankruptcy court is unnecessary," Camac does not underestimate the expertise of this Court and its ability to get up to speed on the state-law issues, but respectfully notes that the arbitrator has been chosen specifically for his experience with, and knowledge of, Delaware law.

25.     Case law supports this factor weighing heavily towards lifting the stay, as this Court has previously found that "when issues involve only state law . . . the expertise of the bankruptcy court is not necessary."  *In re Nims*, 2011 WL 1402771 at *4 (Bankr. D. Md. 2011). *See also In re Farmland Industries, Inc.*, 309 B.R. 14, 19 (Bankr. W.D. Mo. 2004) ("enforcement of an arbitration clause arising out of litigation involving solely pre-petition contracts that are only core inasmuch as they involve seeking relief from the automatic stay to proceed to arbitration and determining the allowed amount of a proof of claim under applicable state law have been found not to conflict with the underlying provisions of the Bankruptcy Code").  The first *Robbins* factor, therefore, weighs profoundly in favor of lifting the automatic stay.

26.     To the second *Robbins* factor, lifting the stay would promote judicial economy in two ways: speed and cost.  To speed, the pre-petition arbitration forum is more convenient, as the parties have already filed the Arbitration Demand, the Answer, and the Counterclaim and were proceeding toward trial.  To cost, restarting the state-law claims in this Court would be duplicative of the work already done in the Arbitration, and result in additional expenditures of time, costs, and fees.

27.     As the Fourth Circuit noted in *Robbins*, "the liquidation of a claim may be more conveniently and speedily determined in another forum."  *Id.* (quoting 2 *Collier on Bankruptcy*

§ 362.07[3], at 362-71.  (15th ed. 1991)).  Allowing the continuation of the Arbitration would not prejudice the Debtor's estate because the Debtor will need to litigate the issues raised by Camac eventually, whether it be through the claims process, in an adversary proceeding, or in the Arbitration.

28.     Additionally, at some point the amount of Camac's claim in the bankruptcy will need to be liquidated.  In theory, this could be accomplished in this Court if the Debtor files an objection to Camac's claim, which would create a contested matter.  However, because the Arbitration has already commenced and the Debtor has filed his Answer and Counterclaim, the cause of judicial economy and the expeditious and economical determination of the parties' disputes will be best served if this Motion is granted and the parties are allowed to continue to litigate said disputes through the Arbitration.

29.     The third *Robbins* factor can be easily dealt with as Camac will not execute on any monetary judgment awarded in the Arbitration, but rather must come back to this Court to assert its liquidated claims against the Debtor.

30.     Recently another court, when faced with facts similar to the ones presented here, determined that the lifting of the automatic stay was warranted to allow the parties to continue with pre-petition arbitration.  *See In re Touchstone Home Health LLC*, 572 B.R. 255 (Bankr. D. Colo. 2017).  The *Touchstone* Court noted that the ultimate issue was "whether a pre-petition claim against the debtor should be liquidated by arbitration—as mandated by contract—or by the Bankruptcy Court."  *Id.* at 258.

31.     The facts in *Touchstone are* similar to those present here as the pre-petition arbitration proceedings—based on a state-law breach of contract claim—had been initiated and was progressing toward trial. *Id.* at 283.  The *Touchstone* Court also held that it was *required to*

enforce the arbitration agreement and even if the court had any discretion, it would exercise such discretion in favor of arbitration.  *Id.* at 281.

**B.  The Federal Arbitration Act Compels Lifting the Stay.**

32.     Federal law strongly favors the arbitration of disputes in accordance with arbitration agreements.  *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983); *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220 (1987).

33.     In that regard, the Federal Arbitration Act ("FAA") is the statutory cornerstone of federal arbitration policy.  Section 2 states in pertinent part:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.
>
> 9 U.S.C. § 2.

34.     Section 2 "is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary."  *Cone Mem'l Hosp.,* 460 U.S. at 1.

35.     Section 3 of the FAA provides that a court "upon being satisfied that the issue involved . . . is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."  9 U.S.C. § 3.

36.     The FAA applies to interstate commerce, and the Arbitration clears the FAA's low interstate commerce hurdle.  *See Touchstone*, 572 B.R. at 268 ("[T]he interstate commerce hurdle under the FAA is extremely low.  Almost anything will do.").  Here, Camac is a Delaware entity and the Debtor is based in Maryland.  The agreed-upon uses of the funds in the Litigation

Agreement touched Cases in multiple states. Thus, the interstate commerce hurdle has been cleared.

37.     The FAA also applies to bankruptcy proceedings.  *See In re Nat'l Gypsum*, 118 F.3d 1056, 1065 (5th Cir. 1997).  Enforcement of the arbitration clause here, pursuant to the FAA, would not conflict with the Bankruptcy Code.  *See* 28 U.S.C. § 1334(c)(1) ("Except with respect to a case under chapter 15 of title 11, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.").

38.     The Fourth Circuit, like numerous other circuits, has applied the framework from the Supreme Court's decision in *Shearson/Am. Express,* 482 U.S. at 227; to analyze FAA arbitration issues that may arise in bankruptcy matters.  *See Moses v. CashCall, Inc.*, 781 F.3d 63 (4th Cir. 2015).  In that respect, courts must follow a two-step process in investigating whether Congress meant to preclude FAA applicability, analyzing: (1) the text and legislative history of the Bankruptcy Code, and (2) whether there is an inherent conflict between the arbitration and the underlying purpose of the Bankruptcy Code.  *Id.* at 71.

39.     As to the first step, nothing in the Bankruptcy Code or its legislative history demonstrates an intent to create an exception to the FAA.  *See*, *e.g., CashCall*, 781 F.3d at 72.  *See also In re Eber*, 687 F.3d 1123, 1129 (9th Cir. 2012) ("This [Ninth] Circuit and sister circuits applying the *McMahon* factors to the Bankruptcy Code have found no evidence in the text of the Bankruptcy Code or in the legislative history suggesting that Congress intended to create an exception to the FAA in the Bankruptcy Code.").

40.     For the second *McMahon* step, most courts start by considering whether the claims at issue in the arbitration are core or noncore claims.  Noncore claims must be arbitrated if the requirements of the FAA are met, while the analysis is more complicated for core proceedings.

41.     Here, even though the causes of action in the Arbitration may ultimately be tied to Camac's claim(s) in the bankruptcy, and the overall claims process in this bankruptcy (which potentially is a core proceeding under the Bankruptcy Code), the disputes in the Arbitration stem solely from Delaware state law and do not arise under the provisions of the Bankruptcy Code or arise in a case under the Code.  Thus, applying the second *McMahon* step, there is no inherent conflict between arbitration and the Bankruptcy Code in the context of the particular causes of action at issue here—breach of contract, breach of the implied duty to deal in good faith, and unjust enrichment.  Because there is no inherent conflict, these state law claims are the perfect subject for arbitration.

42.     Finally, in addressing a similar situation to the one at bar, the Bankruptcy Court for the Northern District of Alabama stated:

> In fact, the claims allowance process is the perfect 'core' candidate for arbitration. Arbitration is more or less designed to be a summary proceeding as is the claims allowance process in bankruptcy.  The goal of both is to determine if anything is owed and, if so how much.  In other words, to liquidate the claim. … Just because something has been referred to the bankruptcy court to be decided, or the bankruptcy court has been empowered to decide a particular issue, or has been given the duty of liquidating, allowing (or disallowing) claims does not limit the means by which the court may accomplish that objective.

*In re BFW Liquidation, LLC*, 459 B.R. 757, 778 (Bankr. N.D. Ala. 2011) (credit union granted relief from stay to compel arbitration).

43.     Pursuant to Local Bankruptcy Rule 9013-2, Camac states that no memorandum will be filed in support hereof, and it will rely solely upon this Motion.

## **CONCLUSION**

44.     For all of the foregoing reasons, Camac respectfully requests that this Court lift the automatic stay of 11 U.S.C. §362(a) and permit the pending, pre-petition Arbitration between Camac and the Debtor to continue.   As set forth herein, permitting the continuation of the Arbitration will not offend, disrupt, delay, or impede progression of this bankruptcy case.

Dated: February 19, 2021.                    Respectfully Submitted,


                                                    /s/ Alan M. Grochal
                                                    Alan M. Grochal, Bar No.: 01477
                                                    Richard L. Costella, Bar No.: 14095
                                                    Tydings & Rosenberg LLP
                                                    One E. Pratt Street, Suite 901
                                                    Baltimore, Maryland 21202
                                                    Phone: (410) 752-9753
                                                    Fax: (410) 727-5460
                                                    Email: agrochal@tydings.com
                                                             rcostella@tydings.com

                                                    *Attorneys for Camac Fund, L.P.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 19th day of February, 2021, copies of the ***MOTION OF CAMAC FUND, L.P. FOR RELIEF FROM THE AUTOMATIC STAY*** and the corresponding ***NOTICE OF MOTION*** were served via the Court's ECF filing system, and where indicated, by the U.S. Mail, postage prepaid, on the following:

Brent C. Strickland, Esq.
Paul M. Nussbaum, Esq.
Whiteford Taylor & Preston, LLP
111 Rockville Pike, Suite 800
Rockville, Maryland 20850
bstrickland@wtplaw.com
pnussbaum@wtplaw.com

James Daniel Ford, Jr. (UST)
Office of the U.S. Trustee
101 West Lombard Street, Suite 2625
Baltimore, Maryland 21201
j.dan.ford@usdoj.gov

Kimberly P. West, Esq.
Simon Cataldo, Esq.
Ashcroft Law Firm
200 State Street, 7th Floor
Boston, MA 02109
(by mail)

Bank of America
P.O. Box 15019
Wilmington, DE 19886
(by mail)

Berman Tabacco
One Liberty Square, #8A
Boston, MA 02109
(by mail)

Comptroller of Maryland
Compliance Division
301 W. Preston St., Room 409
Baltimore, MD 21201
(by mail)

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101
(by mail)


Mihaly McPherson Signorelli, LLC
1414 Key Highway, Suite J
Baltimore, MD 21230
(by mail)

/s/ Alan M. Grochal
Alan M. Grochal, Esquire