**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(<u>Baltimore Division</u>)**

IN RE:                                              *

**JOHN MCDONNELL MCPHERSON,**      *      **Case No.: 21-10205-MMH**
                                                          **(Chapter 11)**

      **Debtor.**          **.**                   *


*     *     *     *     *     *     *     *     *     *     *     *     *

**MOVANT'S EXHIBIT LIST FOR HEARING ON**
**<u>MOTION FOR RELIEF FROM THE AUTOMATIC STAY</u>**

| | |
|---|---|
| 1 | Litigation Funding Agreement |
| 2 | Statement of Claim and Demand for Arbitration |
| 3 | Respondent's Challenge to Arbitrability and Answer to Demand for Arbitration |
| 4 | Respondent's Counterclaim |

# **<u>EXHIBIT 1</u>**

## LITIGATION FUNDING AGREEMENT

This Funding Agreement (the "Agreement") is made and entered into as of the 1-4-18 (the "Effective Date") by and between John McPherson, a individual residing in Maryland ("John" or the "Claimant") and Camac Fund, LP, a company existing under the laws of Delaware (the "Funder") (each a "Party").

WHEREAS, the Claimant desires funding for his business and operations, as well as to extinguish outstanding liabilities; and

WHEREAS, the Funder is willing to provide such funding in exchange for a share of Litigation Proceeds (as defined below);

NOW, THEREFORE, in consideration of the promises and of the mutual covenants and promises hereinafter set forth, the parties to this Agreement do hereby agree as follows:

| | |
|---|---|
| Litigant | John McPherson |
| Cases | SEC v. Life Partners Holdings, Inc., Brian D. Pardo, R. Scott Peden and David M. Martin, Case No. 12-cv- 00033 and all affiliated persons/entities (collectively, "Life Partners") <br><br> Any and all other submissions, cases, or the like under the SEC, IRS, or CFTC whistleblower program, or under any qui tam statute. |
| Funder | Camac Fund, LP |
| Attorney | Bryan Wood, Esq. |
| Litigation Proceeds | "Litigation Proceeds" means the gross total revenues, recoveries and/or proceeds, whether monetary or non-monetary, obtained from, paid by, or paid on behalf of the Cases. This includes, but is not limited to, all whistleblower payments paid by any government agency, expert witness revenues, all damages, settlement sums, compensation, accounts of profits, restitution, licensing revenues, sums from any development and/or commercialization agreement, costs, fees and expenses received from the Cases, and all similar sums, before deduction of any taxes. |
| Committed Capital | Legal Fees: waived <br> Funding Amount: $1,000,000 <br> Origination Fee: waived <br> Total: $1,000,000 <br> The total amounts released by Funder under this Agreement shall be referred to as the "Released Funding." |
| Use of Proceeds | Litigant agrees that the Released Funding shall be used solely for the purposes of funding his business and operations, as well as extinguishment of the following liabilities in full. The amount pertaining to the extinguishment of the following liabilities shall be held in Attorney's IOLTA account until verified in writing by the litigant and then will be released from such account |

| | |
|---|---|
| | pursuant to instruction by Funder. Under no circumstances can the Committed Capital be used for any other purpose than is directly outlined below. Any violation of the use of Proceeds shall constitute a breach of the agreement.<br>Business/Operations - $310,829<br>IRS Tax - $542,457<br>State of Maryland Tax – $146,714 |
| Funder's Entitlement | Total aggregate amount due to Funder with respect to the Cases (each such amount, the "Funder's Entitlement") is:<br>$1,370,000 if Funder's Entitlement paid in full during calendar year 2018<br>$2,000,000 if Funder's Entitlement paid in full during calendar year 2019<br>$3,000,000 if Funder's Entitlement paid in full during calendar year 2020<br>$4,200,000 if Funder's Entitlement paid in full during calendar year 2021<br>$5,950,000 if Funder's Entitlement paid in full during calendar year 2022<br>$8,650,000 if Funder's Entitlement paid in full during calendar year 2023 or thereafter |
| Waterfall/Priorities | Funder recognizes that Litigant has entered into a Contingency Fee Agreement (the "Contingency Fee Agreement") with Attorney, wherein Attorney, depending on the case, is entitled to varying percentages of the Litigation Proceeds (for example, 20% of the proceeds from the Life Partners case), plus expenses, that will be attributed pari-passu to the Litigant ("Contingency Fee").<br><br>Litigation Proceeds shall be distributed as follows based on Litigant's remaining interest in the Litigation Proceeds after attorneys' fees and expenses are paid (the "Waterfall"):<br><br>    First, until such time as Funder has received its Funder's Entitlement in full, 100% to Funder, 0% to Litigant;<br><br>    Second, 100% of the remainder to Litigant. |

PURCHASE AND SALE. Subject to the terms and conditions of this Agreement, Funder agrees to purchase and Litigant agrees to sell a portion of Litigation Proceeds (Funder's Entitlement) in exchange for Funder's obligation to provide the Committed Capital.

INTEREST IN LITIGATION PROCEEDS. Litigant hereby grants Funder a first priority security interest in the Litigation Proceeds and shall take all action necessary to maintain the first priority status of such interest. Litigant shall not adversely effect or permit anything to adversely effect the priority, perfection, or validity of Funder's interest, including without limitation by creating, incurring, assuming or suffering to exist any Lien upon the Litigation Proceeds, except as otherwise provided in this Agreement. Other than the Contingency Fee, Litigant warrants that there is no charge or other encumbrance on the Litigation Proceeds.

PROCEDURE. Where the Cases are successful giving rise to the receipt by Attorney of Litigation Proceeds, Litigant shall upon receiving notice from Attorney of the receipt of said Litigation Proceeds:

1. Notify Funder of the amount of Litigation Proceeds received and obtain instructions from Funder as to how to direct Attorney to distribute the funds;

2. Within ten (10) business days of receiving instructions from Funder as to how the Litigation Proceeds are to be distributed, instruct Attorney to distribute the Funder's Entitlement pursuant to Funder's instructions.

LITIGANT OBLIGATIONS. In recognition of the fact that the Funder has an interest in the Litigation Proceeds and an interest in the efficient and effective prosecution of the cases, the Litigant irrevocably directs the Attorney to promptly respond to any reasonable request by the Funder for information related to the Proceeding, subject to applicable attorney client privileges. Notwithstanding the above, the Funder accepts that the Attorney's professional duties are owed to the Litigant and not the Funder.

BUY DOWN OF FUNDER'S ENTITLEMENT. Litigant shall have the right at any time prior to satisfying the full amount owed under the Funder's Entitlement at one time to buy down 25% or 50% of the Funder's Entitlement. In the event Litigant chooses to exercise his rights under this clause, Litigant shall pay Funder 25% or 50% of the Funder's Entitlement for that calendar year. For that and all subsequent calendar years, the Funder's Entitlement shall be reduced by the percentage of the Funder's Entitlement that Litigant paid down. For example, if Litigant buys down the Funder's Entitlement by 50% in calendar year 2019 and receives additional Litigation Proceeds in calendar year 2020, the total amount that Litigant is obligated to pay Funder shall be $2,500,000 instead of $3,000,000 ($2,000,000*50%) (50% buy down of 2019 Funder's Entitlement) + (3,000,000*50%) (2020 Funder's Entitlement reduced by 50%) = $2,500,000).

REPRESENTATONS. Litigant is not a party to any action, suit, proceeding or investigation, and there is no action, suit, proceeding or investigation pending or threatened against Litigant. There are no outstanding or unpaid judgments against Litigant.

LIMITED LIABILITY. Litigant agrees that there shall be no liability of the Funder under this Agreement, or related to its activities in connection with this Agreement, except for gross negligence, willful misconduct, fraud or reckless activity amounting to fraud. This limitation on liability is absolute and excludes liability, by way of illustration and not limitation, for negligence, and for any damages that may constitute compensatory damages, lost profit, or punitive damages. This limitation on liability extends to the Funder and its representatives, affiliates, agents, officers, directors and employees and their successors and assigns.

CONFIDENTIALITY. Information provided to Funder pursuant to this Agreement is subject to privilege and in order to maintain privilege, Funder shall strictly maintain the confidentiality of such information. The Litigant shall strictly maintain the confidentiality of all information or documents provided to him by Funder, as well as maintain the confidentiality of the Funder's identity at all times. The Parties will keep the contents of this Agreement confidential except where disclosure is required by law.

GOOD FAITH DEALINGS. The Parties will act in good faith toward each other and be just and faithful in their dealings with each other in all matters arising out of or connected with this Agreement and

not do or permit to be done anything likely to deprive any Party of the benefit for which the party entered into this Agreement. If this Agreement or any part thereof is annulled, avoided, or held unenforceable, the Litigant will forthwith do all things necessary, including, without limitation, executing any further or other agreement or instrument, to ensure that the Funder received any remuneration, entitlement or other benefit to which this Agreement refers or is contemplated by this Agreement. The Litigant will not seek any order form any curt that may detrimentally affect the Funder's rights under this Agreement other than with the consent of the Funder.

ASSIGNMENT. Litigant may not assign this Agreement without the prior written consent of the Funder. Funder may sell, assign or transfer one or more interests or participations in all or any part of its rights or obligations under this Agreement in each case without the consent of the Litigant.

GOVERNING LAW. This Agreement, and any and all claims or causes of action (whether in contract or tort) based upon, arising out of or relating to this Agreement and to the transactions contemplated by this Agreement or the negotiation, execution and enforcement of this Agreement, shall be governed by and construed and enforced in accordance with the internal Laws of the State of Delaware without reference to its choice of law rules.

DISPUTE RESOLUTION. If a dispute arises under this Agreement which the parties cannot resolve within 15 business days, the dispute may be referred by any party to a mutually acceptable and neutral mediator who will be jointly instructed and who will conduct a mediation between the Parties. If the parties fail to agree upon a neutral mediator within 30 business days after a Party notifies the other of the need for mediation, or if the Parties fail in mediation to resolve the dispute, the parties agree to submit such dispute to binding arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules (including the Optional Rules for Emergency Measures of Protection), and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

NOTICE. All notices, demands and other communications given or delivered under this Agreement shall be in writing and shall be deemed to have been given when personally delivered, mailed by first class mail, return receipt requested, or delivered by express courier service or e-mail. Notices shall, unless another address is specified in writing, shall be sent to the appropriate Party's address or e-mail indicated below:

If to Litigant:
John McPherson
1414 Key Highway Suite J
Baltimore, MD 21230

If to Funder:
Eric Shahinian
Camac Fund, LP
105 W. 29th Street, 33L
New York, NY 10001

GENERAL.  The written terms of this Agreement constitute the entire agreement of the Parties. There shall be no variation or amendment to the terms of this Agreement except in writing signed by each Party.  If any provision of this Agreement, or the application thereof to any person or circumstances, is or becomes invalid or unenforceable, the remaining provisions shall not be affected and each provision shall be valid and enforceable to the full extent permitted by law.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Any signature transmitted by facsimile or other electronic transmission shall have the full force and effect of an original signature.

Litigant: John McPherson
By: John McPherson

Funder: Camac Fund, LP
By: Eric Shahinian, Managing Member of the GP

# **<u>EXHIBIT 2</u>**

Sidney S. Liebesman, Esq.
FOX ROTHSCHILD LLP
101 Park Avenue, 17th Floor
New York, New York 10178
Telephone:  (212) 878-7900
Fax:  (212)692-0940
Email: sliebesman@foxrothschild.com

Attorneys for Claimant Camac Fund, L.P.

### AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| CAMAC FUND, L.P., | Arbitration No. |
| Claimant, | |
| v. | **STATEMENT OF CLAIM and** <br> **DEMAND FOR ARBITRATION** |
| JOHN McPHERSON, | |
| Respondent. | |

Claimant, Camac Fund, L.P. ("Claimant" or "Camac"), by and through its undersigned counsel, hereby submits this Statement of Claim and Demand for Arbitration against Respondent, John McPherson ("Respondent" or "McPherson"), and in support thereof avers as follows:

### PRELIMINARY STATEMENT

1.      Camac and McPherson are the sole parties to a Litigation Funding Agreement dated as of January 4, 2018 in the amount of $1 million (the "Funding Agreement").  A copy of

the Funding Agreement is attached hereto and incorporated herein as Exhibit A.  The parties

executed the Funding Agreement because McPherson needed money for fund business

operations and "extinguish outstanding liabilities."  In exchange for that funding from Petitioner,

Respondent agreed to pay a share of the Litigation Proceeds (defined below) that Respondent

received from any and all Cases (defined below.).  Material to the Funding Agreement was that

the lawyer handling one of the main Cases who was known to Claimant was involved in that

matter as counsel to Respondent.  Due to the confidential nature of whistleblower cases, it is

imperative that Camac have knowledge of the receipt of Litigation Proceeds in order to maintain

its rights, and therefore, the lawyer receiving and disbursing such funds was critical to

underwriting the Funding Agreement.  The parties agreed to have that lawyer serve as the escrow

agent for the account holding the funding amount.  Also material to the Funding Agreement was

an agreement that Respondent will not adversely affect or permit anything to adversely affect

Claimant's priority, perfection, or validity of Claimant's interest.

2.    During the underwriting stage, Respondent informed Camac on November 12,

2017 that "I am sure you will need this information," which included "'[lawyer]'s firm gets

20%." See Exhibit A, at pp. 1-2.  Respondent breached the Funding Agreement by terminating

his relationship with the lawyer designated as the Attorney under the agreement without prior

notice or agreement with Claimant.  Respondent further breached the Funding Agreement when

he signed an engagement letter with a replacement lawyer that specifically included as part of the

scope of that representation to represent Respondent in any matter involving a third party

claiming proceeds from a case covered under the Funding Agreement.  This would notably

destroy Claimant's entitlement to money from that case and otherwise adversely impact the

priority, perfection or validity of Claimant's interest.

2

3.      Under the terms of the Funding Agreement, Respondent currently owes Claimant $3 million from Litigation Proceeds.  The amount owed increases under the terms of the Funding Agreement to $4.2 million on January 1, 2021 and then increases each next calendar year until 2024.

## PARTIES

4.      Claimant, Camac, is a hedge fund located at 350 Park Avenue, 13th Floor, New York, New York 10022.  Camac is referred to as the "Funder" in the Funding Agreement.  Camac is represented herein by the undersigned counsel.

5.      Respondent, McPherson, is an adult individual with a last known address of 1414 Key Highway, Suite J, Baltimore, Maryland 21230.  McPherson is referred to as the "Litigant" in the Funding Agreement.  McPherson is represented by Kim West, Esq. and Simon Cataldo, Esq. of the Ashcroft Law Firm, 200 State Street, 7th Floor, Boston, Massachusetts 02109.

## JURISDICTION OF THE TRIBUNAL

6.      The Funding Agreement provides for dispute resolution through the American Arbitration Association in accordance with its Commercial Arbitration Rules.  Exhibit A, at p. 4.  While the Funding Agreement permitted (but did not require) mediation as an interim option to the parties for alternative dispute resolution, Claimant opted not to mediate in favor of filing this arbitration claim.

## FACTS COMMON TO ALL CLAIMS

7.      Claimant and Respondent executed a Litigation Funding Agreement dated as of January 4, 2018 (the Funding Agreement).  The amount funded by Camac was $1 million.  The parties executed the Funding Agreement because McPherson needed money to fund business operations and to "extinguish outstanding liabilities," which included years of unpaid income tax

by McPherson.  Claimant agreed to provide the funding to Respondent under certain, express conditions as set forth in the Funding Agreement.  In return for receiving the funding from Claimant, Respondent (a whistleblower) agreed to pay Claimant a share of proceeds from various litigation and non-litigation matters arising from Cases in which Respondent was at the time or was later to become involved.

8.      Claimant and Respondent are the only parties to the Funding Agreement.  However, Bryan Wood, Esquire ("Mr. Wood"), a lawyer known to both Claimant and Respondent and who was representing Respondent in a pending litigation matter in the United States District Court for the Western District of Texas captioned *SEC v. Life Partners Holdings, Inc*. et al., Case No. 12-cv-00033 (the "*Life Partners* Action"), played a material role in connection with the parties execution of the Funding Agreement.  So material that without Mr. Wood's involvement in the funding process, Claimant would not have provided Respondent with the funding he so desperately needed and wanted.  In the Funding Agreement, the parties expressly recognized Mr. Wood's involvement in the *Life Partners* Action on behalf of Respondent.  *See* Exhibit A, Waterfall/Priorities, at p. 2 ("Funder [Claimant] recognizes that Litigant [Respondent] has entered into a Contingency Fee Agreement . . . with Attorney [Mr. Wood], wherein Attorney, depending on the case, is entitled to varying percentages of the Litigation Proceeds . . . plus expenses, that will be attributed pari-passu to the Litigant").  Claimant and Respondent both waived any conflicts by involving Mr. Wood in the negotiation and drafting of the Funding Agreement and the procedures underlying the Funding Agreement.

9.      The *Life Partners* Action is not the only matter in which Respondent was or is involved that is covered by the Funding Agreement.  Indeed, the *Life Partners* Action was but one of the "Cases" covered by the Funding Agreement, which defined "Cases" as including the

4

*Life Partners* Action and "[a]ny and all other submissions, cases, or the like under the SEC, IRS or CFTC whistleblower program, or under any qui tam statute."  Exhibit A, at p. 1.  Claimant had, and continues to have, an interest in the Cases (including the *Life Partners* Action) under the terms of the Funding Agreement.

10.     The Funding Agreement also defines "Litigation Proceeds" (in which Claimant had a first priority security interest) as:

> [T]he gross total revenues, recoveries and/or proceeds, whether monetary or non-monetary, obtained from, paid by, or paid on behalf of the Cases.  This includes, but is not limited to, all whistleblower payments paid by any government agency, expert witness revenues, all damages, settlement sums, compensation, accounts of profits, restitution, licensing revenues, sums from any development and/or commercialization agreement, costs, fees and expenses received from the Cases, and all similar sums, before deduction of any taxes.

Exhibit A, at p. 1.

11.     Respondent agreed to use the money funded by Claimant "solely for the purposes of funding his business and operations, as well as extinguishment of the following liabilities in full: . . . . Business/Operations - $310,829, IRS Tax - $542,457, State of Maryland Tax - $146,714."  *See* Exhibit A, a pp. 1-2.

12.     Under the Funding Agreement, Litigation Proceeds are to be distributed first to Camac until such time as Camac has received the Funder's Entitlement in full (currently $3 million if paid by during 2020, $4.2 million if paid during 2021, $5.95 million if paid during 2022 and $8.65 million if paid during or after 2023) and then the remainder of the Litigation Proceeds to McPherson.  *See* Exhibit A, at p. 2.

13.     Under the header PROCEDURE, the Funding Agreement provides:

> Where the Cases are successful giving rise to the receipt by Attorney [Mr. Wood] of Litigation Proceeds, Litigant [McPherson] shall upon receiving notice from Attorney of the receipt of said Litigation Proceeds:
>
>     1.     Notify Funder [Camac] of the amount of Litigation Proceeds received and obtain instructions from Funder as to how to direct Attorney to distribute the funds;
>
>     2.     Within ten (10) business days of receiving instructions from Funder as to how to how the Litigation Proceeds are to be distributed, instruct Attorney to distribute the Funder's Entitlement pursuant to Funders instructions.

Exhibit A, at p. 3.

14.     Thus, the parties specifically contemplated a process by which it shall be Mr. Wood, McPherson's attorney, who is to receive the Litigation Proceeds from the Cases covered by the Funding Agreement (including the *Life Partners* Action) and then give notice of such Litigation Proceeds to McPherson who is then obligated to notify Camac of the amount of the Litigation Proceeds.

15.     Mr. Wood's active role with the procedures underlying the Funding Agreement was further expressly contemplated by the parties in the Funding Agreement.  Among Respondent's obligations and "[i]n recognition of the fact that the Funder [Camac] has an interest in the Litigation Proceeds and an interest in the efficient and effective prosecution of the Cases, the Litigant [McPherson] irrevocably directs the Attorney [Mr. Wood] to promptly respond to any reasonable request by the Funder for information related to the Proceeding, subject to applicable attorney client privileges.  Notwithstanding the above, the Funder accepts that the Attorney's professional duties are owed to the Litigant and not the Funder."  Exhibit A, at p. 3.

6

16.      Under the header INTEREST IN LITIGATION PROCEEDS, the Funding

Agreement provides:

> Litigant [McPherson] hereby grants Funder [Camac] a first priority
> security interest in the Litigation Proceeds and **shall take all
> action necessary to maintain the first priority status of such
> interest.  Litigant shall not adversely affect or permit anything
> to adversely affect the priority, perfection, or validity of
> Funder's interest**, including without limitation by creating,
> incurring, assuming or suffering to exist any Lien upon the
> Litigation Proceeds, except as otherwise provided in this
> Agreement.  Other than the Contingency Fee, Litigant warrants
> that there is no charge or other encumbrance on the Litigation
> Proceeds.

Exhibit A, at p.2 (emphasis added).

17.      Claimant and Respondent agreed to act in good faith with one another, Exhibit A

at p. 3, and Respondent agreed that there shall be no liability on the part of Claimant under the

Funding Agreement, except for gross negligence, willful misconduct, fraud or reckless activity

amounting to fraud.  Exhibit A, at p. 3 ("This limitation of liability is absolute and excludes

liability, by way of illustration and not limitation, for negligence and for any damages that may

constitute compensatory damages, lost profits, or punitive damages.").

18.      Under the header GENERAL, the parties agreed as follows:  "The written terms

of this Agreement constitute the entire agreement of the Parties.  **There shall be no variation or

amendment to the terms of this Agreement except in writing signed by each Party**."  Exhibit

A, at p. 5 (emphasis added).

19.      The Funding Agreement was never amended by a writing signed by each party.

20.      Subsequent to the execution of the Funding Agreement and Respondent's receipt

of released funding from the funding account, Respondent terminated Mr. Wood from

representing him in the *Life Partners* Action.  Moreover, Respondent signed an engagement

letter with another law firm, Buckley Sandler, dated October 26, 2018, to represent him in the *Life Partners* Action, including "engag[ing] in a letter writing campaign to defend claims" brought by Mr. Wood seeking a portion of any award Respondent receives as a whistleblower in the *Life Partners* Action and, at a discounted rate, representing Respondent "in litigation with any third party who demands or otherwise claims a portion of any award Respondent receives as a whistleblower in the *Life Partners* Action." Respondent never notified Claimant that he was terminating Mr. Wood from representing him in the *Life Partners* Action or signing the Buckley Sandler engagement letter.

21.    By signing the Buckley Sandler engagement letter, terminating Mr. Wood from representing him in the *Life Partners* Action, and agreeing to have Buckley Sandler represent Respondent if Camac demands or otherwise claims a portion of any award Respondent receives in the *Life Partners* Action when Respondent has already agreed to Camac's right to Litigation Proceeds from the *Life Partners* Action, Respondent breached the Funding Agreement.

22.    First, as was known to Respondent, Claimant agreed to provide funding to him because Mr. Wood was representing Respondent in the *Life Partners* Action. Mr. Wood was known to Claimant and considered trustworthy and fair by Claimant. Accordingly, the money funded by Claimant was paid into an IOLTA account controlled by Mr. Wood. Exhibit A, at p. 1. The funds released to Respondent were to come from that same account. In addition, Mr. Wood played an integral role in the procedures underlying the Funding Agreement as evidenced in Paragraphs 13-15 above.

23.    By removing Mr. Wood from the *Life Partners* Action, Mr. Wood would no longer receive the Litigation Proceeds which triggered Respondent's obligation to inform Claimant of such Litigation Proceeds. Moreover, by way of the Funding Agreement,

Respondent agreed to "irrevocably direct[]" Mr. Wood specifically "to promptly respond to any reasonable request by Camac for information related to the [*Life Partners* Action]." By removing Mr. Wood, there was no contractual obligation on the part of Respondent to provide an alternative source of reliable information about the generation of Litigation Proceeds from the *Life Partners* Action or any other of the Cases. The nature of the Cases is such that much of the Litigation Proceeds are not considered public information, therefore, without Mr. Wood, Camac's ability to ascertain the recovery of Litigation Proceeds is destroyed. Evidence for why this is crucial is that on or about August 2019, Camac was informed by a third party, Harry Markopolos, that he and McPherson received profits related from commercialization of a Case McPherson developed with regard to General Electric and that a whistleblower submission was made. McPherson was named as the co-author of a report that was disseminated to the public around such time period. Under the terms of the Funding Agreement, General Electric constitutes a "Case" as it involves a whistleblower submission, and therefore, any sums generated from such "commercialization agreement" must be applied as Litigation Proceeds. McPherson did not inform Camac of the Litigation Proceeds, did not distribute any such proceeds to Camac, and has denied that they are Litigation Proceeds.

      24.    Variations to the procedures set forth in the Funding Agreement required advance written approval by Claimant. Exhibit A., at p. 5. Respondent never sought Claimant's approval to remove or replace Mr. Wood. Respondent acted unilaterally, thereby breaching the Funding Agreement and by putting Claimant's clear interests in Litigation Proceeds at significant risk which is not permitted under the Funding Agreement.

      25.    Claimant attempted to resolve Respondent's clear breach of the Funding Agreement without success through a period of many months, whereby both McPherson and

Buckley Sandler did not respond to any email or phone communication from Camac.

Respondent then approached Mr. Wood on May 29, 2020, rather than Camac, to request a

release of the remaining funds under escrow.  Once Camac was notified, it informed McPherson

on June 1, 2020 through a demand letter of the continued breaches of the Funding Agreement.

See Letter from Camac to Respondent dated June 1, 2020 attached hereto as Exhibit B.  Rather

than engage in an amicable resolution of the matter, Respondent hired a separate law firm that

wrongly asserted Claimant breached the Funding Agreement further placing Claimant's security

interest in the Litigation Proceeds at risk and adversely affecting the priority, perfection and

validity of Camac's interests.  Claimant has consistently advised Respondent that if an agreement

was reached providing a cure for Respondent's breach of the Funding Agreement, additional

funding would be disbursed.

26.     Claimant has fulfilled all of its obligations under the Funding Agreement.

### FIRST CLAIM FOR RELIEF
(Breach of Contract)

27.     The foregoing assertions are incorporated by reference as if set forth at length

herein.

28.     As set forth above, Respondent breached the Funding Agreement.

29.     As a result of Respondent's breach of the Funding Agreement, Claimant has been

damaged.

30.     Pursuant to the Funding Agreement, Respondent owes Claimant a sum of money

no less than $3 million until the end of 2020.  The amount owed by Respondent to Claimant

increases each calendar year thereafter as set forth above.

## SECOND CLAIM FOR RELIEF
(Breach of Implied Duty of Good Faith and Fair Dealing)

31. The foregoing assertions are incorporated by reference as if set forth at length herein.

32. Respondent's conduct constituted a breach of the implied covenant of good faith and fair dealing under the Funding Agreement.

33. As a result of Respondent's breach of the Funding Agreement, Claimant has been damaged.

34. Pursuant to the Funding Agreement, Respondent owes Claimant a sum of money no less than $3 million until the end of 2020. The amount owed by Respondent to Claimant increases each calendar year thereafter as set forth above.

## THIRD CLAIM FOR RELIEF
(Unjust Enrichment)

34. The foregoing assertions are incorporated by reference as if set forth at length herein.

35. If Respondent is permitted to keep the monies owed to Claimant under the Funding Agreement, including the amount of the Funder's Entitlement as set forth in the Funding Agreement, Respondent will be unjustly enriched at Claimant's expense.

WHEREFORE, Claimant requests an award in its favor and against the Respondent for its losses and damages to be proven, arbitration costs, attorney's fees and costs, and such other relief to which it may be entitled by equity or law.

Dated:  September 30, 2020

Respectfully submitted,

FOX ROTHSCHILD, LLP

_____
Sidney S. Liebesman, Esq.
101 Park Avenue, 17th Floor
New York, New York 10178
Telephone:  (212) 878-7900
Fax:  (212)692-0940
Email: sliebesman@foxrothschild.com

Attorneys for Claimant Camac Fund, L.P.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 30, 2020, two copies of Claimant Camac Fund, L.P.'s Statement of Claim and Demand for Arbitration, were served upon the following *via* overnight delivery and electronic mail:

> Kim West, Esq.
> Simon Cataldo, Esq.
> Ashcroft Law Firm
> 200 State Street
> 7th Floor
> Boston, MA 02109
> kwest@ashcroftlawfirm.com
> scataldo@ashcroftlawfirm.com
>
> *Attorney for Respondent John McPherson*

Under penalty of perjury, I hereby certify that the foregoing statements made by me are true.

_____

Sidney S. Liebesman

# **EXHIBIT 3**

Kim West
Simon Cataldo
Ashcroft Law Firm
200 State Street, 7th Floor
Boston, MA 02109
Telephone: (617) 573-9400
Fax: (703) 247-5446
kwest@ashcroftlawfirm.com
scataldo@ashcroftlawfirm.com

# AMERICAN ARBITRATION ASSOCIATION

‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒

| | | |
|---|---|---|
| In the Matter of an Arbitration Between | : | |
| Camac Fund, L.P., | : | **ANSWERING STATEMENT** |
| | : | |
| *Claimant* | : | Case No. 01-20-0015-0847 |
| and | : | |
| John McPherson, | : | |
| *Respondent* | : | |
| | : | |

‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒ ‒

## RESPONDENT'S CHALLENGE TO ARBITRABILITY AND ANSWER TO DEMAND FOR ARBITRATION

Respondent John McPherson ("McPherson"), by and through undersigned counsel, submits this Challenge to Arbitrability and Answer to Claimant Camac Fund, L.P.'s ("Camac Fund") Statement of Claim and Demand for Arbitration (the "Claim").

1

## PRELIMINARY STATEMENT

Camac Fund has prematurely filed this arbitration demand not to enforce any legitimate contractual or legal rights, but as a transparent gambit to force McPherson to the bargaining table and make amendments to an Agreement whose terms Camac Fund now finds unfavorable. The Arbitrator should reject Camac Fund's vexatious claims and the bullying tactics employed by Camac Fund and its counsel.

First, the Claim should be dismissed outright because it was brought before certain procedural prerequisites to binding arbitration had been satisfied. The Agreement stipulates that, before initiating arbitration, either party is required to wait 30 days after notice of the need for mediation. That notice was provided by McPherson in writing on September 18. Rather than proceeding in good faith, Camac Fund filed its Demand and sent menacing threats to the undersigned in writing when counsel raised the issue, in an apparent attempt to force McPherson to heel.

Second, the Agreement, which McPherson signed while deep in tax debt and without the benefit of counsel, is criminally usurious. As set forth in detail below, the law is clear and unambiguous that it is a felony to charge the type of interest called for by the Agreement. The Arbitrator should not enforce interest rates that amount to a crime.

Third, the claims of breach are belied by the Agreement's language and the conduct of the parties. The Agreement did not require McPherson to retain a particular attorney in any particular whistleblower matter. Indeed, when McPherson parted ways with the attorney in question, Camac Fund's principal was made aware of the change, but made no objection until a year and a half later. In a bold and self-revealing maneuver, Camac Fund goes so far as to claim that McPherson also

2

breached the Agreement by hiring undersigned counsel to represent him in this dispute. These arguments should be summarily rejected.

Lastly, Camac Fund makes a belated attempt to argue that McPherson owes money to Camac Fund based on income McPherson's company earned in a stock sale that did not in any way stem from a whistleblower award. This farfetched argument has no basis in any language in the Agreement. Tellingly, Camac Fund knew of the relevant transaction a year and a half prior to making its claim of a breach.

For these reasons, and the reasons that follow, Camac Fund's flawed Claim warrants no action by the Arbitrator other than dismissal and an award of costs and attorney's fees to McPherson.

## SUPPLEMENTAL FACTUAL RECITATION[1]

On January 4, 2018, Camac Fund and McPherson entered a contract, entitled Litigation Funding Agreement (the "Agreement"). *See* Claim Ex. A. The original draft of the Agreement was authored by Camac Fund's principal, Eric Shahinian, and later revised prior to execution by Shahinian in coordination with Bryan Wood, an attorney who purported to represent neither party in the transaction. McPherson had no role in writing or editing the Agreement. At the time, Wood separately represented McPherson concerning McPherson's whistleblower application before the Securities and Exchange Commission in *SEC v. Life Partners Holdings, Inc.* ("*Life Partners*").

The Agreement provided for a "Funding Amount" of $1 million, to be paid by Camac Fund into an IOLTA account controlled by Wood's law firm. Agreement at 1. On January 5, 2018,

---

[1] McPherson provides the following factual recitation as context for the arguments set forth further below. These facts may not include all of the facts necessary to resolve the dispute, and McPherson retains the right to supplement the factual record as necessary. By not specifically addressing a factual allegation in the Claim, McPherson does not intend to express his agreement with it.

Camac Fund caused $1 million to be deposited into Wood's IOLTA account. Between January 8, 2018, and July 23, 2018, McPherson requested and received six withdrawals from the account totaling $310,000.

In September and October 2018, a conflict arose between McPherson and Wood relating to *Life Partners*. In October 2018, McPherson found and retained new counsel, a team of attorneys who specialized in whistleblower law at Buckley Sandler LLP ("Buckley"), to represent McPherson on a purely contingency fee basis. In January 2019, McPherson and Wood formally terminated Wood's representation of McPherson in *Life Partners*. On February 13, 2019, McPherson notified Shahinian by phone of the change in counsel. Shahinian did not express any objection.

Approximately a year and a half later, on May 29, 2020, McPherson wrote to Wood to request $349,221 from the IOLTA account. Agreement at 1-2; Ex. A (May 29, 2020 email from J. McPherson to B. Wood). Camac Fund, through Shahinian, refused to release the requested funds, and asserted claims of breach similar to those that appear in the Claim.

In September 2020, McPherson hired undersigned counsel to represent him in relation to the asserted breach by Camac Fund. On September 18, undersigned counsel sent counsel for Camac Fund an explanation of McPherson's position with respect to the asserted breach, and formal notice of the need for mediation, as further described below. *See* Ex. B (Sep. 18, 2020 Ltr. from K. West to S. Liebesman). On September 22, Camac Fund responded by providing the requested accounting of the IOLTA account and made a demand for disclosure of any Litigation Proceeds. Counsel did not respond to McPherson's notice of the need for mediation.

On September 25, after doing substantial due diligence with respect to the possible existence of any previously unreported Litigation Proceeds, undersigned counsel responded that

there had been none.  Ex. C (Sep. 25, 2020, Ltr. from K. West to S. Liebesman).  Undersigned counsel further proposed two specific mediators.  *Id.*  Undersigned counsel did not hear back from counsel for Camac Fund until October 1, when it received the Claim.  On October 2, undersigned counsel received by postal mail a separate letter from counsel for Camac Fund, stating, "Camac will not agree to a neutral mediator under any circumstance," and that "I trust your client will soon understand that the manner in which you choose [sic] to address his admitted breach of the Funding Agreement could not have been a bigger mistake."  Ex. D at 1 (Oct. 1, 2020, Ltr. from S. Liebesman to K. West).

On October 3, undersigned counsel emailed counsel for Camac explaining, as set forth further below, that the binding arbitration clause was only triggered 30 days after a party delivered notice of the need for mediation (if such notice was in fact delivered).  Ex. E (Oct. 3, 2020, Email from K. West to S. Liebesman).  On October 5, counsel responded by declining to honor the 30-day period, and wrote, "You and your client may continue to make the gravest of mistakes by continuing to litigate a clear breach on his part.  I suggest for your client's sake that you reverse the perverted approach you have been taking with respect to his breach before it goes much further."  Ex. F (Oct. 5, 2020, Email from S. Liebesman to K. West); *cf.* Del. Lawyers' R. of Prof. Conduct, Preamble at [5] ("A lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others.").

## <u>ARGUMENT</u>

### I.     The Prerequisite Procedural Requirements to Binding Arbitration Have Not Occurred

The parties' agreement to submit to binding arbitration is contingent upon a specific contractual procedure that has not been satisfied, and McPherson has not waived that procedure. In fact, McPherson affirmatively took steps to undertake the required procedure and raised this precise issue with counsel for Camac Fund prior to the filing of the Claim.  Camac Fund's counsel did not respond, and filed the Demand anyway. When undersigned counsel raised the issue upon receiving the Demand, Camac Fund's counsel twice levied gratuitous threats.

The question of whether the procedural steps triggering the right to arbitration have been satisfied is answered by the contract language.   The Agreement's Dispute Resolution paragraph states, in full:

> If a dispute arises under this Agreement which the parties cannot resolve within 15 business days, the dispute may be referred by any party to a mutually acceptable and neutral mediator who will be jointly instructed and who will conduct a mediation between the Parties. If the parties fail to agree upon a neutral mediator within 30 business days after a Party notifies the other of the need for mediation, or if the Parties fail in mediation to resolve the dispute, the parties agree to submit such dispute to binding arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules (including the Optional Rules for Emergency Measures of Protection), and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

Agreement at 3.

The Agreement thereby includes a specific procedure for submitting a dispute to binding arbitration.  Specifically, it states that, "***IF*** the parties fail to agree upon a neutral mediator within 30 business days ***after a Party notifies the other of the need for mediation***, or if the Parties fail in mediation to resolve the dispute, the parties agree to submit such dispute to binding arbitration[.]" *Id.* (emphasis added).   The Claim ignores this language, stating instead—without citing the

Agreement—that "[w]hile the Funding Agreement permitted (but did not require) mediation as an interim option to the parties for alternative dispute resolution, Claimant opted not to mediate in favor of filing this arbitration claim." Claim at 3. The fact that the mediation is ultimately optional completely misses the point. Although neither party is required to engage in mediation, the parties must comply with the Agreement's terms and proceed in good faith based on those terms.

McPherson, through counsel, notified Camac Fund's counsel of the need for mediation by letter on September 18, and proposed two mediators by letter on September 25. *See* Exs. B & C. While mediation may not be the manner in which this dispute is resolved, neither party, nor the Arbitrator, has the right to unilaterally waive this procedural requirement of the Agreement. McPherson respectfully requests that Camac Fund be held to its end of the bargain in this regard, and that it be required to refile its claim after conducting the 30-day due diligence period of seeking a neutral mediator in good faith.[2]

## II.    The Agreement is a Feloniously Usurious Loan Whose Interests Rates Cannot Be Enforced

The Agreement is captioned as a Litigation Funding Agreement, but a close review of its terms reveals that the Agreement bears little resemblance to the type of litigation financing arrangements that have been upheld in Delaware and elsewhere. The Agreement does not actually fund litigation. Rather, the Agreement is a criminally usurious loan that cannot be legally enforced. It is black letter law that a tribunal must look to the facts of a contract, not its purported form, to determine whether it is usurious. *See* Restatement (First) of Contracts § 529 (1932) (explaining that, with respect to determining whether a contract is usurious, "in all cases it is the substance not the form of a transaction which is important"). In New York it is a felony to charge the type of

---

[2] McPherson would not object to a waiver of Camac Fund's requirement to pay the required fee to the AAA upon reinstituting its Claim at the proper time.

interest that Camac Fund attempts to gouge from McPherson here.  The Arbitrator cannot and should not enforce it.

There are two main differences between the Agreement and the litigation funding arrangements that have been approved by courts with the purpose of financially enabling a litigant to pay the costs of litigation.  *See, e.g.*, *Charge Injection Technologies, Inc. v. E.I. DuPont De Nemours & Co.*, No. 07C-12-134-JRJ, 2016 WL 1359894, at *2 (Del. Super. Mar. 09, 2016) (upholding validity of litigation finance agreement that financed litigation).  First, the Agreement's "Use of Proceeds" provision states that McPherson may only use the proceeds "for the purposes of funding his business and operations, as well as the extinguishment" of certain enumerated debts to federal and state tax authorities, and that "[u]nder no circumstances can the Committed Capital be used for any other purpose[.]"  Agreement at 1-2.  The Agreement makes no mention of—and therefore *does not allow* McPherson to—use the Committed Capital to pay for the costs or expenses of litigation.  *See id.*  Indeed, there is no connection whatsoever between the pursuit of McPherson's whistleblower litigation efforts and the permitted uses of proceeds.

Second, the "Funder's Entitlement" amount is based solely on the amount of time that it takes McPherson to pay Camac Fund back, rather than the specific award amount McPherson may earn from litigation. The "Funder's Entitlement" provides that Camac Fund is due $3 million "if paid in full during calendar year 2020," and $4.2 million "if paid in full during calendar year 2021," with those amounts rising to $5.95 million and $8.65 million in the following years.  Accordingly, for practical purposes, McPherson could win significant whistleblower awards far greater than Camac Fund's investment, pay out the entire award to Camac Fund, and still be liable to Camac Fund for millions more in subsequent years.  By way of example, if McPherson earned a whistleblower award of $2.8 million in 2020, he would have to pay the entire sum to Camac Fund,

and would thereafter still owe Camac Fund another $1.4 million (for a total of $4.2 million) in 2021.

The Agreement includes a Delaware choice of law clause, and "Delaware usury law provides no cap on interest rates, but instead allows interest to be charged in an amount pursuant to the agreement governing the debt." *Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 140 (S.D.N.Y. 2017) (citing Del. Code Ann. tit. 5 § 943; *Kaneff v. Del. Title Loans, Inc.*, 587 F.3d 616, 622 (3d Cir. 2009)).  However, this Arbitration—at Camac Fund's request—is based in New York.  Like other jurisdictions around the country, New York courts will not enforce a choice of law clause where the contract bears no "reasonable relationship to the agreement" or "the law chosen . . . violate[s] a fundamental public policy of New York."  *Finucane v. Interior Constr. Corp.*, 695 N.Y.S.2d 322, 324–25 (1st Dep't 1999) (citations and quotation marks omitted).  Here, there is no relationship whatsoever between the parties, the Agreement, and Delaware.  Camac Fund is based in New York, Shahinian lives in New York, and McPherson lives and works in Maryland.  The IOLTA account where the funds are located belong to a Massachusetts bank account.  None of the requirements for performance on either side have any connection to Delaware.  Camac Fund, which wrote the Agreement, likely chose Delaware law based on the state's absence of a usury statute.

Courts in New York, however, have universally rejected attempts by usurious lenders to evade interest limits using the law of foreign jurisdictions.  New York has a long and well-established history of applying "New York law—despite the parties' choice of another forum's law—because New York's usury prohibition constitutes a fundamental public policy."  *Madden*, 237 F. Supp. at 130; *see also Am. Equities Grp. V. Ahava Dairy Prods. Corp.*, No. 01-CV-5207, 2004 WL 870260, at *8 (S.D.N.Y. Apr. 23, 2004) ("New York has a strong public policy against

interest rates which exceed 25%, which policy must be enforced." (internal quotation marks omitted)); *In re McCorhill Publ'g, Inc.*, 86 B.R. 783, 793 (Bankr. S.D.N.Y. 1988) (holding that enforcing New Jersey law would violate New York's "strong public policy against interest rates which exceed 25%, which policy must be enforced"); *Am. Express Travel Related Servs. Co. v. Assih*, 893 N.Y.S.2d 438, 445–46 (Civ. Ct. Richmond Cty. 2009) ("New York has a strong public policy against interest rates which are excessive and this is a policy the courts must enforce."); *N. Am. Bank, Ltd. v. Schulman*, 474 N.Y.S.2d 383, 387 (Cty. Ct. Westchester Cty. 1984) ("[T]he policy underlying our state's usury laws is in fact of a fundamental nature.").

New York's civil usury statute caps loan interest at 16% annually, and its *criminal* usury statute provides for criminal penalties where loans exceed 25%.  N.Y. Gen. Oblig. Law § 5–501(1)–(2); N.Y. Banking Law § 14–a(1); N.Y. Penal Law § 190.40.  Calculated conservatively to assume repayment at year-end, the annual interest rate on the loan is 66.7% in 2020, 80% in 2021, 98% in 2022, and 127.5% in 2023. Each year's rate would be higher if the repayments occurred earlier in the year.  These rates are criminally usurious, and it is a felony to pursue the amounts called for by the Agreement.[3]

Based on the foregoing, the Agreement's "Funder's Entitlement" provision is unenforceable as usurious under New York's civil and criminal laws, notwithstanding the Delaware forum selection clause.  Any recovery to Camac Fund should be limited to the 16% cap provided by New York's civil usury statute.  However, as set forth below, even if other portions of the Agreement survive the usurious interest rate, Camac Fund is not entitled to any proceeds at

---

[3] "[W]hile private parties cannot initiate . . . prosecutions for violation of state criminal laws, defendants . . . may assert a defense of criminal usury."  *Madden*, 237 F. Supp. 3d at 146.  Relief under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* may nevertheless remain available to McPherson, and he reserves all of his rights relating to any civil or criminal claims that may be made concerning the usurious nature of the Agreement.

this point because there has been no breach by McPherson and he has yet to receive any Litigation Proceeds.

### III.    McPherson's Termination of Wood in *Life Partners* Did Not Cause a Breach

Camac Fund's first claim of breach is based on McPherson's termination of Bryan Wood as his lawyer in the *Life Partners* matter. *See* Claim at 8. Camac Fund does not point to a single contractual provision that required McPherson to continue retaining Wood during the pendency of the Agreement, because there is none. The term "Attorney," defined as Bryan Wood, is referenced in the Agreement solely in relation to (1) the IOLTA funds disbursement procedure, (2) Camac Fund's acknowledgement of Wood's entitlement to "varying percentages of the Litigation Proceeds," and (3) McPherson's direction to Wood "to promptly respond to any reasonable request by [Camac Fund] for information[.]" Agreement at 1-3. Wood remains in charge of the IOLTA account where the funds are held. There have been no requests made of Wood for information by Camac Fund of which McPherson is aware. No action by either party has prohibited Wood from serving in these or any other capacities required by the Agreement.

To support its claim, Camac Fund introduces a post-hoc sentiment that Camac Fund allegedly harbored the whole time, *i.e.*, that Mr. Wood's representation of McPherson in *Life Partners* was a material condition precedent of Shahinian's decision to enter the Agreement. If that was so, Shahinian (who authored the Agreement without McPherson's input) should have included it expressly in the contract. *See* Restatement (Second) of Contracts § 206 (1981) ("In choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds."). In fact, Shahinian first learned about the change in counsel in February 2019—*approximately a year and a half before* he claimed of a breach on this basis.

11

The newly manufactured breach allegation is therefore not only meritless based on the contract's terms, but it was waived by Shahinian's apparent acquiescence to the change in attorney.

This new assertion is also belied by the internal logic of the Agreement itself. The Agreement defines Litigation Proceeds as revenues "obtained from, paid by, or paid on behalf of the Cases." Agreement at 1. Cases, in turn, is defined to include not just *Life Partners*, but also "[a]ny and all other submission, cases, or the like under the SEC, IRS, or CFTC whistleblower program, or under any qui tam statute." *Id.* If Camac Fund's interpretation of the prohibition against terminating was accepted, so too would McPherson be required to retain Wood in any "Case." But contracts, even if their language may be reasonably understood to have varying meanings, are not to be interpreted in a manner that would lead to an absurd result. *See Axis Reins. Co. v. HLTH Corp.*, 993 A.2d 1057, 1063 (Del.2010)) ("[W]here a contract provision lends itself to two interpretations, a court will not adopt the interpretation that leads to unreasonable results, but instead will adopt the construction that is reasonable and that harmonizes the affected contract provisions").

Mr. McPherson's reasons for terminating Mr. Wood and replacing him with other counsel were valid, and the choice of counsel in *Life Partners* belonged to him personally. The very idea that Camac Fund could force McPherson to use a particular lawyer, regardless of problems that may arise during the course of the attorney-client relationship, is inimical to the concept of clients having the right to choose their own counsel. Likewise, the Agreement does not and could not bind Mr. Wood to continue to serve as McPherson's attorney in the event of a conflict. Counsel for Camac Fund treads on ethically questionable ground in pressing for the opposite outcome, and should know better than to interfere with McPherson and Wood's attorney-client relationship. *Cf. Olmoz v. Town of Fishkill*, 258 A.D.2d 447, 447, 684 N.Y.S.2d 611, 612 (1999) ("A party's

entitlement to be represented in ongoing litigation by counsel of his own choosing is a valued right . . . .").

## IV.    McPherson Did Not Breach the Contract by Hiring New Counsel

Camac Fund ventures even further afield by alleging that McPherson breached the Agreement by hiring Buckley to represent him in *Life Partners*. In so arguing, Camac Fund relies on the Agreement's requirement that McPherson "take all action necessary to maintain the first priority status of [Camac Fund's] interest," and "not adversely affect or permit anything to adversely perfect the priority, perfection, or validity of [Camac Fund's] interest." Claim at 7. But Camac Fund fails to explain how McPherson's act of hiring Buckley to represent him contradicts these obligations in any manner. The Claim likewise points to no provision of the Agreement that prohibits McPherson from hiring replacement or supplementary counsel to advocate his interests in *Life Partners*.

Indeed, and as Camac Fund is well aware, McPherson's needs counsel to represent his interests in his pursuit of a whistleblower award, including with respect to so-called "nuisance" whistleblowers who may wrongly claim a portion of proceeds that should be granted to McPherson. Under the Agreement, any improvements in advocacy for a whistleblower award run directly to the benefit of Camac Fund.[4] By hiring counsel, McPherson has done nothing to affect the priority of Camac Fund's interest, to the extent it has one, in Litigation Proceeds.

In a final Hail Mary, Camac Fund alleges that McPherson breached this portion of the Agreement *by hiring counsel to defend him in the instant arbitration*. *See* Claim at 10 ("Respondent hired a separate law firm that wrongly asserted Claimant breached the Funding

---

[4] McPherson hired the former and first Director of the Office of the Whistleblower at the SEC, Thomas Sporkin, as a replacement to Mr. Wood. Mr. Sporkin, who is currently a Partner at Buckley LLP, authored the SEC's still-governing regulations himself. Mr. Wood, meanwhile, had little experience in SEC whistleblower cases at the time, outside of his representation of McPherson. This was hardly a choice of counsel that could be contested on the merits.

Agreement further placing Claimant's security interest in the Litigation Proceeds at risk and adversely affecting the priority, perfection and validity of Camac's interests"). Camac Fund would apparently have the Arbitrator find that McPherson should appear *pro se* in this proceeding and submit to the whims of any arguments made by opposing counsel, or risk being declared in breach of the Agreement. That argument is beyond the pale and should be rejected summarily.

## V.    Income from the General Electric Short Does Not Qualify as Litigation Proceeds

Lastly, Camac Fund claims that McPherson "received profits related from commercialization of a Case McPherson developed with regard to General Electric and that a whistleblower submission was made." Claim at 9. This assertion appears to be based on Camac Fund's newfound view that income McPherson's company earned from a short sale of General Electric stock somehow qualifies as "Litigation Proceeds" in the form of a "commercialization agreement." *Id.* But, as the Claim itself acknowledges, Claim at 9, Shahinian has known that McPherson's company had earned money in the short sale since at least August 2019, when the highly-publicized sale occurred. His claim that he is owed income from that transaction is belated illogical, and belied by the Agreement itself.

In the Agreement, the term Litigation Proceeds is defined as "revenues, recoveries and/or proceeds, whether monetary or non-monetary, obtained from, paid by, or paid on behalf of the Cases." Ex. A at 1. "Cases," in turn, is defined as either "SEC v. Life Partners Holdings, Inc.," or "Any and all other submissions, cases, or the like under the SEC, IRS, or CFTC whistleblower program, or under any qui tam statute." *Id.* Mr. McPherson's company's short sale of General Electric stock is not a "Case" because it did not arise from or relate to any submission to the SEC. Instead, it was a separate transaction, the income from which was totally unrelated to any whistleblower submission. McPherson's company has received no award from any whistleblower

submission in relation to General Electric.  This alone is enough to rebut any claim to the money Mr. McPherson's company earned from that sale.

On September 18, after conducting substantial due diligence on the possible existence of any Litigation Proceeds, undersigned counsel made the same representations regarding the General Electric short sale by letter to counsel for Camac Fund, and assured counsel that it would promptly make any disclosures as to the receipt of Litigation Proceeds as required under the Agreement. Counsel for Camac Fund made no attempt to engage in any discussion on the matter and instead simply recopied this meritless claim for proceeds from the short sale into its Demand.

## AFFIRMATIVE DEFENSES

McPherson sets forth the following affirmative defenses, without prejudice to any affirmative defenses or counterclaims he may make at a later date.

**I.      First Affirmative Defense**

Each claim is barred by Camac Fund's failure to satisfy the procedural conditions precedent to bringing the instant action.

**II.     Second Affirmative Defense**

The Demand fails to state a claim upon which relief can be granted.

**III.    Third Affirmative Defense**

Camac Fund has suffered no damages by reason of the acts or omission complained of in the Demand, or by any other acts or omissions by McPherson.

**IV.     Fourth Affirmative Defense**

Camac Fund has suffered no damages for which McPherson is legally responsible.

15

**V.    Fifth Affirmative Defense**

The alleged damages, if any, are speculative, hypothetical, unsupported by any reasonable methodology, and are not cognizable as a matter of law.

**VI.    Sixth Affirmative Defense**

The Agreement is unconscionable and thus unenforceable as a matter of public policy.

**VII.    Seventh Affirmative Defense**

Camac Fund is barred from recovery by the doctrines of laches, waiver, ratification and/or estoppel.

## <u>CONCLUSION</u>

For the foregoing reasons, the Claim has been improperly brought pursuant to the plain language of the Agreement, and therefore must be dismissed.  In the alternative, the Agreement should be declared usurious and void for public policy to the extent it calls for an annual interest rate above 16%.  Camac Fund's allegations of breach contradict both the contractual language and common sense.  Each is meritless and should be rejected.  McPherson requests that costs and attorneys' fees be awarded in his favor.

McPherson retains his right to file counterclaims prior to the appointment of an Arbitrator and to supplement this Answer as necessary and appropriate.

Dated: October 15, 2020                         Respectfully submitted,

<u>/s/ Kim West</u>
Kim West
Simon Cataldo
Ashcroft Law Firm
200 State Street, Floor 7
Boston, MA 02109
(617) 573.9400
kwest@ashcroftlaw.com
scataldo@ashcroftlaw.com

*Attorneys for Respondent John McPherson*

# EXHIBIT 4

Kim West
Simon Cataldo
Ashcroft Law Firm
200 State Street, 7th Floor
Boston, MA 02109
Telephone: (617) 573-9400
Fax: (703) 247-5446
kwest@ashcroftlawfirm.com
scataldo@ashcroftlawfirm.com

## AMERICAN ARBITRATION ASSOCIATION

— — — — — — — — — — — — — — — — — — — — — — — —

| | | |
|---|---|---|
| In the Matter of an Arbitration Between | : | |
| Camac Fund, L.P., | : | **RESPONDENT'S** |
| | : | **COUNTERCLAIM** |
| *Claimant* | : | Case No. 01-20-0015-0847 |
| and | : | |
| John McPherson, | : | |
| *Respondent* | : | |
| | : | |

— — — — — — — — — — — — — — — — — — — — — — — —

## RESPONDENT'S COUNTERCLAIM

Respondent John McPherson ("McPherson"), by and through undersigned counsel, respectfully submits this Counterclaim to Claimant Camac Fund, L.P.'s ("Camac Fund") Statement of Claim and Demand for Arbitration (the "Claim").

### Procedural Background

1.      On October 1, 2020, Camac Fund filed its Statement of Claim and Demand for Arbitration (the "Claim"). On October 15, McPherson responded by filing a Challenge to Arbitrability and Answer to the Claim. McPherson submits this Counterclaim as a supplement to

his Answer prior to the appointment of an Arbitrator, in the event that the Arbitrator rejects his argument that this Arbitration has been initiated prematurely by Camac Fund in violation of the Litigation Funding Agreement's ("Agreement") Dispute Resolution provision.  *See* Answer at 6–7; AAA R-6(b) (permitting a new or different counterclaim to be filed prior to the appointment of an arbitrator or with the arbitrator's consent).  This Counterclaim incorporates and assumes familiarity with the facts, arguments, and affirmative defenses set forth in McPherson's Answer.

### Factual Common to All Counterclaims

2.      Pages 3 through 5 ("Supplemental Factual Recitation") of the Answer are realleged and incorporated as if fully set forth herein.

### First Claim for Relief
(Abuse of Process)

3.       Paragraph 2 is realleged and incorporated as if fully set forth herein.

4.      On January 4, 2018, Camac Fund and McPherson entered the Agreement, which required Camac Fund, among other things, to release from the IOLTA account funds requested by McPherson.  Claim Ex. A (Agreement) at 2.

5.      On May 29, 2020, McPherson requested $349,221 from the IOLTA account to pay tax obligations that were identified in the Agreement.  Ex. A (May 29, 2020, Email from J. McPherson to B. Wood).

6.      Camac Fund, through its principal Eric Shahinian, refused to release the requested funds.  Camac Fund lacked a valid contractual basis for this refusal.

7.      Camac Fund then attempted to renegotiate the Agreement's terms.  As part of these attempts, Camac Fund and its counsel wrongly asserted that McPherson breached the Agreement by hiring new counsel to represent his interests as a whistleblower before the SEC in the *Life Partners* matter.  Ex. B (Aug. 31, 2020, Email from S. Liebesman to T. Sporkin).

2

8.     McPherson had no legal obligation to renegotiate the Agreement or accede to Camac Fund's choice of counsel to represent McPherson in *Life Partners*.

9.     McPherson's counsel notified Camac Fund of the need for mediation on September 18, 2020, pursuant to the Agreement's Dispute Resolution provision.  Answer Ex. B (Sep. 18, 2020, Ltr. from K. West to S. Liebesman).

10.     Camac Fund knowingly disregarded the Dispute Resolution provision and filed its claim inside of the required 30-day period for seeking mediation in good faith.

11.     Camac Fund knew that its Demand was meritless, as counsel for McPherson, during written exchanges with Camac Fund's attorney prior to the Claim, raised nearly all of the contractual defenses and arguments that appear in McPherson's Answer.  *E.g.*, *id.*

12.     Pressuring McPherson to renegotiate the Agreement under threat of being named as a respondent in an arbitration proceeding is an improper purpose or motive for filing an arbitration demand.

13.     As a result of Camac Fund's abuse of process, McPherson has suffered, and continues to suffer, damages, including the $349,221 for which Camac Fund wrongfully withheld its consent to release, any interest that has accrued on existing tax liabilities following McPherson's request, and other damages in an amount to be determined at a hearing.

**<u>Second Claim for Relief</u>**
(Breach of Contract)

14.     Paragraphs 2 through 13 are incorporated by reference as if fully set forth herein.

15.     Camac Fund breached the Agreement by refusing to instruct Wood to release from the IOLTA account $349,221 in payments for tax liabilities identified in the Agreement.  *See* Ex. A; Claim Ex. A (Agreement) at 2.

16.     Camac Fund breached the Agreement by failing to "act in good faith toward" McPherson in bringing the Claim without satisfying the Agreement's Dispute Resolution requirements.  Claim Ex. A at 3.

17.     As a result of Camac Fund's breach, McPherson has suffered, and continues to suffer, damages, including the $349,221 for which Camac Fund wrongfully withheld its consent to release, any interest that has accrued on existing tax liabilities following McPherson's request, and other damages in an amount to be determined at a hearing.

### Third Claim for Relief
(Breach of Implied Duty of Good Faith and Fair Dealing)

18.     Paragraphs 2 through 17 are incorporated by reference as if fully set forth herein.

19.     By refusing to release the requested funds, and separately by prematurely bringing its Claim without satisfying the Agreement's Dispute Resolution provisions, Camac Fund breached its implied covenants of good faith and fair dealing under the Agreement.

20.     As a result of Camac Fund's breach, McPherson has suffered, and continues to suffer, damages, including the $349,221 for which Camac Fund wrongfully withheld its consent to release, any interest that has accrued on existing tax liabilities following McPherson's request, and other damages in an amount to be determined at a hearing.

### Fourth Claim for Relief
(Unjust Enrichment)

21.     Paragraphs 2 through 20 are incorporated by reference as if fully set forth herein.

22.     If Camac Fund is permitted to maintain control over the funds in the IOLTA account, to the extent such funds are validly requested for permitted uses by McPherson, Camac Fund will be unjustly enriched at McPherson's expense.

### Fifth Claim for Relief
(Conversion)

23.     Paragraphs 2 through 22 are incorporated by reference as if fully set forth herein.

24.     McPherson has a possessory interest in the $349,221 that he has validly requested be released to him from the IOLTA account in accordance with the Agreement.

25.     Camac Fund has substantially interfered with McPherson's interest in those funds by knowingly and intentionally refusing to consent to their release from the IOLTA account, and thereby preventing McPherson from accessing such funds.

26.     As a result of Camac Fund's conversion, McPherson has suffered, and continues to suffer, damages, including the $349,221 for which Camac Fund wrongfully withheld its consent to release, any interest that has accrued on existing tax liabilities following McPherson's request, and other damages in an amount to be determined at a hearing.

**<u>Sixth Claim for Relief</u>**
(New York General Obligations Law § 5-501, *et seq.*, Declaratory Relief)

27.     Paragraphs 2 through 26 are realleged and incorporated as if fully set forth herein.

28.     On August 31, 2020, Camac Fund, through counsel, asserted by letter to McPherson's counsel that McPherson "currently owes [Camac Fund] $3,000,000," and that "[i]t is wise to resolve the issues between [Camac Fund] and [McPherson] during this calendar year before the amount [McPherson] owes to [Camac Fund] increases under the Agreement to $4,200,000." Ex. B at 3.

29.     On August 31, 2020, and continuing to today's date, Camac Fund has released to McPherson only $310,000 of the $1 million in the IOLTA account.

30.     A $3 million debt at the end of 2020 arising from a $1 million line of credit extended in January 2018 amounts to a 66.7% annual interest rate, assuming the entire line of credit is paid to McPherson prior to the debt payment.

31.     On October 1, 2020, Camac Fund, by filing the Claim, again attempted to collect $3 million from McPherson.

32.     New York General Obligations Law ("NYGOL") § 5-511 provides that, subject to certain exceptions not applicable here, contracts that provide for payments exceeding those authorized by NYGOL § 5-501 are void.

33.     Camac Fund violated New York General Obligations Law ("NYGOL") § 5-501 *et seq.* by charging, collecting, and/or attempting to collect interest of at least 66.7%, which exceeds both the civil usury limit of 16%, *see* NYGOL § 5-501; New York Banking Law § 14-a(1), and criminal usury limit of 25%, *see* New York Penal Law § 190.40, in New York.

34.     McPherson is entitled to have all debts on which Camac Fund charged or attempted to collect usurious interest declared void.

**Seventh Claim for Relief**
(Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*)

35.     Paragraphs 2 through 34 are incorporated by reference as if fully set forth herein.

36.     Congress enacted the Fair Debt Collection Practices Act ("FDCPA") to stop "the use of abusive, deceptive and unfair debt collection practices by many debt collectors." 15 U.S.C. § 1692(a).

37.     A debt collector may not "use any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Included within this prohibition is the false representation of "the character, amount, or legal status of any debt." 15 U.S.C. § 1692(e)(2)(A).

38.     A debt collector also may not "use unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f.

39.     Camac Fund violated 15 U.S.C. § 1692e and 15 U.S.C. § 1692f by charging and seeking to collect interest at an unlawfully usurious rate from McPherson by means of its letter and Claim.  *See* Ex. B; Claim.  Specifically, the letter and Claim take or threaten to take action that cannot legally be taken, *i.e.*, the charging and collection of usurious amounts, in violation of 15 U.S.C. § 1692e(5).

40.     As a direct and proximate result of Camac Fund's violations of the FDCPA, McPherson has suffered statutory and actual damages, costs, and attorneys' fees.

### Eighth Claim for Relief
(New York General Business Law § 349)

41.     Paragraphs 2 through 40 are realleged and incorporated as if fully set forth herein.

42.     Camac Fund's attempted collection of usurious amounts, including but not limited to its representations to McPherson and the AAA that it is entitled to collect such amounts and that the amount owed and corresponding interest rate continues to rise, constitutes a deceptive business practice in violation of New York General Business Law ("NYGBL") § 349.

43.     These acts were committed in the conduct of business trade, commerce, or the furnishing of a service in this state and constituted a violation of NYGBL § 349 independent of whether they also constituted a violation of any other law.

44.     As a result of these violations of NYGBL § 349, McPherson has suffered actual and statutory damages.

45.     McPherson is also entitled to punitive damages of up to $1,000, attorney's fees, and costs as a result of these violations.

WHEREFORE, McPherson requests:

A.     an award in his favor against Camac Fund for his losses and damages to be proven, including actual and statutory damages, arbitration costs, attorneys' fees, and costs;

7

      B.      a declaration that any collection or attempted collection of amounts in excess of a 16% interest rate is unlawful and usurious; and

      C.      such other relief to which he may be entitled by equity and law.

Dated: October 27, 2020

Respectfully submitted,

/s/ Kim West
Kim West
Simon Cataldo
Ashcroft Law Firm
200 State Street, Floor 7
Boston, MA 02109
(617) 573.9400
kwest@ashcroftlaw.com
scataldo@ashcroftlaw.com

*Attorneys for Respondent John McPherson*