Entered: June 2nd, 2021
Signed: June 2nd, 2021



**MICHELLE M. HARNER**
**U.S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Baltimore

In re:                                          *
                                                *
John McDonnell McPherson,       *          Case No. 21-10205-MMH
                                                *
                Debtor.                      *          Chapter 11
                                                *
*      *      *      *      *      *
Camac Fund, L.P.,                      *
                                                *
                Movant,                     *
v.                                               *
                                                *
John McDonnell McPherson,       *
                                                *
                Respondent.              *
                                                *
*    *    *    *    *    *    *    *    *    *    *    *    *

### MEMORANDUM OPINION

The filing of a chapter 11 bankruptcy case generally stops all matters affecting the debtor's

financial affairs and consolidates the resolution of those matters in one forum, the bankruptcy

court. That collective process is intended to, among other things, allow a debtor to catch its

financial breath and develop a cohesive reorganization plan; provide consistency and certainty in

the resolution of matters potentially affecting the debtor's reorganization; and ensure fair and equal

treatment of the debtor's creditors. To that end, a bankruptcy court has original and exclusive

jurisdiction over the bankruptcy case, original and non-exclusive jurisdiction over related civil

proceedings, and exclusive jurisdiction over all the debtor's property and property of the

bankruptcy estate wherever located. 28 U.S.C. § 1334. A frequent question, and one presented by this contested matter, is how these basic principles apply to an arbitration clause in a prepetition contract between the debtor and just one creditor.

Courts recognize that the Federal Arbitration Act ("FAA") creates a strong presumption in favor of arbitration. 9 U.S.C. §§ 1–14. As the Supreme Court has explained, "[t]he preeminent concern of Congress in passing the [FAA] was to enforce private agreements into which parties had entered, and that concern requires that we rigorously enforce agreements to arbitrate." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985). The enforcement of an arbitration agreement may conflict, however, with the core objectives of another statutory scheme, such as the Bankruptcy Code.[1] In those instances, courts must scrutinize the statute at hand to determine whether "Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue." *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 227 (1987).

The parties in this contested matter have very different views concerning a potential conflict between a pending prepetition arbitration proceeding and this chapter 11 case. From the debtor's perspective, all of the issues overlap with his reorganization efforts and thus should be resolved by this Court. From the creditor's perspective, the arbitrator could resolve most, if not all, issues between the parties, leaving just the treatment of any resulting claim for the chapter 11 case. Like many disputes, the Court fails to find an easy or bright line solution resolving the matter in accordance with either party's position. The dispute requires careful consideration of the language of the arbitration agreement, the FAA, and the Code.

Having reviewed all of the materials, applicable law, and the parties' arguments, the Court concludes that it must defer to the arbitration proceeding, but only as to the prepetition non-core

---

[1] 11 U.S.C. §§ 101 et seq. (the "Code").

claims asserted by the parties in that proceeding. It will, in turn, modify the automatic stay of section 362 of the Code for this limited purpose. All other issues and claims between the parties will remain subject to the automatic stay and resolution in connection with this chapter 11 case.

## I.      Relevant Background

John McDonnell McPherson, the above-captioned debtor and debtor in possession (the "Debtor"), filed this chapter 11 case on January 12, 2021. Prior to that filing, the Debtor and Camac Fund, L.P. ("Camac") entered into a Litigation Funding Agreement (the "Funding Agreement"). Under the Funding Agreement, Camac was to extend financing to the Debtor in exchange for a percentage of the Debtor's interest in certain whistleblower litigation cases. Disputes arose between the parties under the Funding Agreement, and Camac invoked its rights under the Funding Agreement's arbitration clause. The Debtor filed a response disputing, among other things, the validity of the arbitration and asserting counterclaims against Camac. A hearing was scheduled in the arbitration proceeding, but was stayed by the filing of this chapter 11 case.

The parties have since filed various papers and commenced two adversary proceedings in this case. These actions include a Motion for Relief from Stay (the "Stay Motion"), filed by Camac; a complaint asserting six counts against Camac, filed by the Debtor (the "Debtor's Complaint"); and a complaint seeking to determine certain debts nondischargeable, filed by Camac ("Camac's Complaint").[2] The Court held a hearing on the Stay Motion and Camac's motion asking this Court to abstain from or stay the adversary proceeding involving the Debtor's Complaint (the "Abstention Motion")[3] on May 5, 2021 (the "Hearing"). The Court has considered the papers and the arguments of counsel, and these matters are now ripe for resolution.

---

[2] Stay Motion, Case No. 21-10205, ECF 36; Debtor's Compl., Adv. No. 21-00035, ECF 1; Camac's Compl., Adv. No. 21-00078, ECF 1.
[3] Abstention Motion, Adv. No. 21-00035, ECF 6.

## II.    <u>Jurisdiction and Legal Standards</u>

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. Under 28 U.S.C. § 157(a) and its Local Rule 402, the United States District Court for the District of Maryland has referred this case to the Court. This matter is a statutorily core proceeding under 28 U.S.C. §§ 157(b)(1) and (b)(2).

The Stay Motion seeks relief from the automatic stay of section 362(a) of the Code. That section generally enjoins the continuation of actions or proceedings against a debtor, property of the debtor, or property of the bankruptcy estate. 11 U.S.C. § 362(a). A creditor or other party may request relief from the automatic stay by filing a motion under section 362(d) of the Code, which provides that a bankruptcy court *shall* grant a moving party relief from the automatic stay imposed by section 362(a) if, among other things, cause exists for that relief. 11 U.S.C. § 362(d)(1). Moreover, the relief mandated by section 362(d) may include "terminating, annulling, modifying, or conditioning" the automatic stay imposed by section 362(a). 11 U.S.C. § 362(d).

The Court considers Camac's request for relief from the automatic stay under this standard and in light of the particular facts of this case and applicable precedent concerning the appropriate treatment of arbitration clauses in bankruptcy.

## III.    <u>Analysis</u>

The primary issue before the Court is the impact of the arbitration clause in the Funding Agreement and the prepetition arbitration proceeding on this chapter 11 case and the various disputes between the parties. This issue permeates the relief requested by Camac in the Stay Motion and the Abstention Motion. In sum, Camac asserts that this Court is required to enforce the arbitration clause and that such clause covers most of the parties' claims and causes of action. The Debtor views matters quite differently, acknowledging the arbitration clause but arguing its

application to this case inherently conflicts with key objectives of the Code. The Debtor posits that this Court could resolve all of the parties' disputes within the context of the Debtor's chapter 11 plan of reorganization and the related claims administration process.

The Court finds some merit to the Debtor's position. The Code and chapter 11 more specifically are designed to facilitate a timely, cost-effective resolution of all claims asserted against a debtor. This process deters gamesmanship and competition among creditors. It also provides all parties affected by the bankruptcy with ready access to the same forum, applying applicable law in a consistent manner as to all such parties' claims. Particularly in the context of a chapter 11 reorganization, consistency, certainty, and sometimes speed are critical to the debtor's success, as well as the maximization of value for all creditors.

Absent the arbitration clause in the Funding Agreement, this Court would have several alternatives available to it to accomplish the procedural objectives of chapter 11. It could, for example, consolidate all issues between the Debtor and Camac, either in connection with the plan process or separately, and then schedule those matters in a manner that allowed this chapter 11 case to continue moving forward without delay. The presence of the arbitration clause requires this Court to pause, however, and determine the appropriate forum to resolve some or perhaps all of the parties' respective claims. The Court considers these issues below, concluding that even if suboptimal for this case, applicable law requires some bifurcation of the parties' claims between this bankruptcy case and the prepetition arbitration proceeding.

A.    **Arbitration Clauses and Bankruptcy**

The FAA and the Code both are grounded in important policy considerations concerning efficiency and fairness. The FAA focuses on these notions in the context of, among other things, private contracts affecting commerce, creating a strong presumption in favor of the parties'

5

threshold agreement to arbitrate disputes. *See, e.g.,* 9 U.S.C. §§ 2, 3; *Shearson/American Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987) ("The Arbitration Act thus establishes a 'federal policy favoring arbitration,' *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983), requiring that 'we rigorously enforce agreements to arbitrate.' *Dean Witter Reynolds Inc. v. Byrd, supra,* 470 U.S., at 221, 105 S.Ct., at 1242."). This approach reflects the reality that, at least in contracts subject to negotiation, the arbitration clause may be a critical piece of the parties' bargain and integral to their cost-benefit analysis of the contract itself.

The Code, on the other hand, is not party- or contract-specific but seeks to balance the rights of many parties with many different contracts, rights, and interests involving a single debtor. As the Fourth Circuit has explained, "'Congress intended to grant comprehensive jurisdiction to bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate.'" *Moses v. CashCall, Inc.*, 781 F.3d 63, 71 (4th Cir. 2015) (per curiam) (quoting *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995)). Although the objectives of the FAA and the Code may not always conflict, they frequently do diverge, presenting the bankruptcy court with competing considerations. *See, e.g., In re White Mountain Mining Co., L.L.C.*, 403 F.3d 164, 169 (4th Cir. 2005) ("Arbitration is inconsistent with centralized decision-making because permitting an arbitrator to decide a core issue would make debtor-creditor rights 'contingent upon an arbitrator's ruling' rather than the ruling of the bankruptcy judge assigned to hear the debtor's case.") (citations omitted).

To resolve any such conflict and assess the application of the FAA in a bankruptcy case, courts generally turn to the Supreme Court's decision in *McMahon*. In that decision, the Supreme Court opined that, "[l]ike any statutory directive, the [FAA's] mandate may be overridden by a

6

contrary congressional command." *McMahon*, 482 U.S. at 226. Although a few courts have questioned the ongoing force of *McMahon* given subsequent Supreme Court decisions, most courts have continued to follow its guidance.[4] *See, e.g., Belton v. GE Capital Retail Bank (In re Belton)*, 961 F.3d 612, 616–17 (2d Cir. 2020), *cert. denied sub nom. GE Cap. Retail Bank v. Belton*, 141 S. Ct. 1513, 209 L. Ed. 2d 252 (2021); *Henry v. Educ. Fin. Serv. (In the Matter of Henry)*, 944 F.3d 587, 591–92 (5th Cir. 2019). Under this case law, "the party seeking to prevent enforcement of an arbitration agreement [must] show that 'Congress has evinced an intention to preclude waiver of judicial remedies for the statutory rights at issue.'" *CashCall*, 781 F.3d at 71 (quoting *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 90 (2000)).[5]

Some courts resolving disputes in accordance with *McMahon*'s guidance have developed a litmus test of sorts: the characterization of a claim as constitutionally core is indicative of Congressional intent to limit arbitration.[6] As the Fourth Circuit has observed, "forcing [a debtor] to arbitrate her constitutionally core claim would inherently conflict with the purposes of the Bankruptcy Code." *CashCall*, 781 F.3d at 73. Matters involving constitutionally core *and* other

---

[4] *See, e.g., Epic Sys. Corp. v. Lewis*, 138 S.Ct. 1612 (2018) (affirmatively citing *McMahon* and subsequent related case law but enforcing arbitration agreements despite statutory scheme of the National Labor Relations Act).

[5] Demonstrating Congressional intent in the absence of express statutory language can be difficult, and the party opposing arbitration bears that burden. The party often must rely on suggestions in the statutory language or other "contextual clues" concerning statutory purpose. *See, e.g., Belton*, 961 F.3d at 615–16; *Henry*, 944 F.3d at 592. "Congressional intent under these circumstances 'must be deducible from (1) the statute's text; (2) its legislative history; or (3) "an inherent conflict between arbitration and the statute's underlying purposes."'" *In re Erwin*, No. 15-06713-5-DMW, 2018 WL 1614160, at *8 (Bankr. E.D.N.C. Mar. 30, 2018) (quoting Fourth Circuit case law).

[6] The Fourth Circuit discussed this approach but did not definitively adopt it in *In re White Mountain Mining Co., L.L.C.*, 403 F.3d 164, 169 (4th Cir. 2005). In that case, the Fourth Circuit found an inherent conflict between the adversary proceeding and the arbitration, irrespective of whether the underlying claims were constitutionally core. *See id.* ("We need not decide today whether the statutory text itself demonstrates congressional intent to override arbitration for core claims because this case may be decided under *McMahon*'s third line of analysis—whether congressional intent is deducible 'from an inherent conflict between arbitration and the statute's underlying purposes.' 482 U.S. at 227, 107 S.Ct. 2332."). The distinction between constitutionally core and other proceedings became more pertinent to the Fourth Circuit's analysis in *CashCall*. As one court adopting the *CashCall* approach noted, "Constitutionally core claims strike at the heart of the bankruptcy process Congress has established through the Bankruptcy Code, which is designed to 'provide debtors and creditors with "the prompt and effectual administration and settlement of the ... estate"' and 'centralize disputes over the debtor's assets and obligations in one forum.' *Id.* at 72." *In re Taylor*, 594 B.R. 643, 651 (Bankr. E.D. Va. 2018), *aff'd sub nom. Allied Title Lending, LLC v. Taylor*, 420 F. Supp. 3d 436 (E.D. Va. 2019).

claims (either statutorily core or non-core) present a more complicated analysis, requiring a careful balancing of the facts and applicable law in the particular case. *See CashCall*, 781 F.3d at 83 (Gregory, J., concurring) ("The core/non-core distinction, however, is not mechanically dispositive in deciding whether a bankruptcy judge may refuse to send a claim to arbitration.").

Thus, in many cases, the analysis begins with section 157 of title 28 of the U.S. Code, which identifies certain proceedings within a bankruptcy case as core proceedings.[7] 28 U.S.C. §§ 157(b), (c). The bankruptcy court has statutory authority to enter final judgments on core proceedings listed in section 157(c). Neither section 157(c) nor the listing of proceedings therein, however, provides the bankruptcy court with constitutional authority over a claim. Rather, "[a] cause of action is constitutionally core when it 'stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process.'" *Allied Title Lending, LLC v. Taylor*, 420 F. Supp. 3d 436, 448 (E.D. Va. 2019) (quoting *Stern v. Marshall*, 564 U.S. 462, 499 (2011)).

If a claim is a constitutionally core proceeding, the bankruptcy court has the discretion to retain the proceeding and not enforce the terms of the parties' arbitration agreement. *See, e.g., Taylor*, 420 F. Supp. 3d at 448 ("Arbitration of constitutionally core claims 'inherently conflict[s] with the purposes of the Bankruptcy Code,' and therefore a bankruptcy court is generally well within its discretion to refuse arbitration of constitutionally core claims.") (quoting *CashCall*, 781 F.3d at 72). Again, this discretion arises from the inherent conflict in allowing an arbitrator to resolve proceedings that are grounded in the Code itself or that are integral to the debtor's reorganization efforts. A bankruptcy court's discretion is far more limited with respect to non-constitutionally core or non-core proceedings. *See CashCall*, 781 F.3d 84–85 (Gregory, J.,

---

[7] Section 157(b)(1) provides that "[b]ankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title." 28 U.S.C. § 157. Section 157(c) then identifies certain claims and causes of action that are deemed statutorily core proceedings.

concurring) ("A bankruptcy judge's discretion to deny arbitration of non-core matters is thus necessarily narrow."). Indeed, some circuit courts have concluded that a bankruptcy court generally has no discretion to "refuse to arbitrate a non-core claim." *Id.* at 84 (citing relevant case law).

The Court evaluates the parties' respective arguments against this backdrop. The Court is mindful that many courts confront these issues in the context of a motion to compel arbitration. Although not the precise relief requested in this matter, Camac's requests that the Court lift the automatic stay to allow the prepetition arbitration proceeding to continue and to abstain from hearing the Debtor's Complaint are substantively similar to those framed as motions to compel. The Court thus has undertaken a broad review of the case law addressing the interplay of the FAA and the Code. Based on that review and the general principles articulated in those cases, the Court concludes that it must allow Camac to arbitrate certain state law issues in this case, despite the potential attendant delay and adverse effects on the Debtor's estate.

## B.    The Funding Agreement and this Chapter 11 Case

The Funding Agreement is the focal point of many of the parties' disputes. It is a five-page agreement purporting to document the terms of the parties' lending arrangement: Camac would provide the Debtor with certain funds and the Debtor would sell to Camac a portion of its interest in the proceeds of certain whistleblower lawsuits (the "Litigation Proceeds"). The Debtor also appears to have granted Camac a security interest in the Litigation Proceeds to secure repayment of the debt represented by the Funding Agreement. Each party alleges that, among other things, the other party breached the Funding Agreement.

The Funding Agreement contains the following arbitration clause:

If a dispute arises under this Agreement which the parties cannot resolve within 15 business days, the dispute may be referred by any party to a mutually acceptable

and neutral mediator who will be jointly instructed and who will conduct a mediation between the Parties. If the parties fail to agree upon a neutral mediator within 30 business days after a Party notifies the other of the need for mediation, or if the Parties fail in mediation to resolve the dispute, the parties agree to submit such dispute to binding arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules (including the Optional Rules for Emergency Measures of Protection), and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

Funding Agreement, at 4. Camac asserts that, under this provision, it is entitled to have its claims against the Debtor resolved by an arbitrator. The Debtor disputes this conclusion.

Bankruptcy courts evaluating requests to compel arbitration generally take the following steps:

[F]irst, it must determine whether the parties agree to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration.

*In re MF Glob. Holdings Ltd.*, 571 B.R. 80, 89–90 (Bankr. S.D.N.Y. 2017); *see also Uszak v. AT & T Mobility Services LLC*, 658 Fed.Appx. 758, 761 (6th Cir. 2016) (citing *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000)). The Court refers to this four-factor test as the "arbitrability analysis." The Court believes that the arbitrability analysis provides a useful framework for evaluating Camac's Stay Motion and Abstention Motion. The Court considers each of these four factors below.

**1.   The Funding Agreement and the Scope of the Arbitration Clause**

The starting point for the Court's analysis is whether the parties agreed to arbitrate disputes and, if so, the scope of that arbitration agreement. Although the Debtor raises issues regarding the validity of the Funding Agreement, neither party has contested the existence of the arbitration clause in that agreement or has sought to invalidate the clause. Likewise, neither party disputes

that the Funding Agreement is "a contract evidencing a transaction involving commerce" subject to the FAA. 9 U.S.C. § 2.

The language of the Funding Agreement also is clear, providing that the parties have agreed to arbitrate disputes arising under the Funding Agreement. Although courts generally construe agreements to arbitrate broadly, they also give meaning to the words used, and not used, by the parties to describe the matters subject to arbitration.[8] Here, the Funding Agreement uses the phrase "arises under"; it does not reference or include disputes "relating to" or "in connection with" the agreement or "any disputes" between the parties. As a result, the arbitration clause does not by its plain language suggest a broad application. *See, e.g., Long v. Silver*, 248 F.3d 309, 316 (4th Cir. 2001) (providing examples of language in an arbitration clause that might support a broad interpretation potentially covering "disputes that do not arise under the governing contract [but have] a 'significant relationship' [to] the asserted claims and the contract in which the arbitration clause is contained").

The parties did not focus much, if at all, on the arbitrability of the various claims at issue under the Funding Agreement. Camac referenced section 3 of the FAA in the Stay Motion,[9] but did not address whether the parties agreed to submit questions of arbitrability to the court or to the arbitrator. In general, courts must "'engage in a limited review to ensure that the dispute is arbitrable—i.e., that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive dispute of that agreement.'" *Murray v. United Food and Comm.*

---

[8] *See, e.g., Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.*, 867 F.2d 809, 812 (4th Cir. 1989) ("Of course, 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960). Nonetheless, it is well settled that there exists a 'healthy regard for the federal policy favoring arbitration.' *Moses H. Cone Memorial Hospital v. Mercury Construction Co.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983).").

[9] Paragraph 35 of the Stay Motion reads, "Section 3 of the FAA provides that a court 'upon being satisfied that the issue involved ... is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement.' 9 U.S.C. § 3."

*Workers Int'l Union*, 289 F.3d 297, 302 (4th Cir. 2002) (quoting *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 938 (4th Cir. 1999)). The Fourth Circuit has since noted that this general rule may be overridden by parties incorporating certain arbitration rules into the arbitration agreement. *See Simply Wireless, Inc. v. T-Mobile US, Inc.*, 877 F.3d 522, 527 (4th Cir. 2017) (*abrogated on other grounds by Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S.Ct. 524, 202 L.Ed.2d 480 (2019)). The Funding Agreement does reference the American Arbitration Association's Commercial Arbitration Rules, which may be adequate to allow the arbitrator to determine arbitrability if the court determines the agreement was executed by "sophisticated parties."[10]

The Court observes that the arbitration clause in the Funding Agreement is arguably narrow in scope and may not encompass all of the claims asserted by the parties in either the prepetition arbitration proceeding or this chapter 11 case. Nevertheless, the Court finds it unnecessary to resolve this issue for at least two reasons. First, the Court does not have any evidence before it to determine the sophistication of the parties or their intent regarding who decides issues of arbitrability under the arbitration clause in the Funding Agreement. Second, regardless of arbitrability under the agreement, the Court would still need to evaluate the parties' arguments on stay relief and abstention. Those arguments focus on the nature of the parties' claims and whether Congress intended any of the claims to be nonarbitrable. The Court thus scrutinizes the third and fourth factors in the arbitrability analysis below, considering whether the federal statutory claims at issue are arbitrable and how to handle the requested relief if some but not all claims are appropriate for arbitration.

---

[10] As one court in this circuit has explained, "[T]he Fourth Circuit [in *Simply Wireless*] *expressly limited* its holding to the context of commercial contracts between sophisticated parties, and by implication appears to have reserved for later judgment whether such an incorporation of arbitration rules would be clear and unmistakable evidence in transactions involving an unsophisticated party." *In re Little*, 610 B.R. 558, 566–67 (Bankr. D.S.C. 2020) (emphasis in original).

### 2. The Federal Claims at Issue and Their Arbitrability

The parties' claims in the prepetition arbitration proceeding and in the pending adversary proceedings fall into three general categories: (i) claims concerning the parties' performance under, and alleged breaches of, the Funding Agreement (the "Contract Claims");[11] (ii) claims under the Fair Debt Collection Practices Act ("FDCPA") and state law allegedly governing the Funding Agreement (the "Non-Bankruptcy Claims");[12] and (iii) claims under sections 502, 510, 523, 543, 544, 547, and 553 of the Code (the "Bankruptcy Claims").[13] The Court must consider the nature of these claims with a particular focus on the arbitrability of the Bankruptcy Claims and the FDCPA claim.

The Bankruptcy Claims invoke different sections of the Code, but all generally relate to Camac's status as a creditor in this chapter 11 case or the impact of the Debtor's alleged claims against Camac on that status. Each of the Bankruptcy Claims arises under federal law, specifically the Code, and most of these claims would not exist absent the pendency of this chapter 11 case. More specifically, unlike some rights in bankruptcy, the majority of the Debtor's rights under sections 502, 510, 543, 547, and 553 of the Code are rights created by federal law to assist a debtor (or bankruptcy trustee) in meeting the dual objectives of the Code, namely rehabilitation of the debtor and maximization of value for creditors. The Debtor could not have asserted these claims

---

[11] Stmt. of Claim and Demand for Arbitration, Case No. 21-10205-MMH, ECF 36-2 (asserting claims for breach of contract, breach of implied duty of good faith and fair dealing, and unjust enrichment); Resp.'s Counterclaim, Case No. 21-10205-MMH, ECF 36-4 (asserting claims for breach of contract, breach of implied duty of good faith and fair dealing, unjust enrichment, and conversion).

[12] Answering Stmt., Case No. 21-10205-MMH, ECF 36-3 (alleging that the interest rate provided to Camac in the Funding Agreement amounts to a crime and that New York law should apply to the arbitration of issues relating to the interest rate under the Funding Agreement); Resp.'s Counterclaim, Case No. 21-10205-MMH, ECF 36-4 (asserting claims relating to the applicable interest rate under the Funding Agreement and FDCPA).

[13] Debtor's Compl., Adv. No. 21-00035, ECF 1 (asserting claims under 11 U.S.C. §§ 502, 510, 543 544, 547, 553; Camac's Compl., Adv. No. 21-00078, ECF 1 (asserting claims under 11 U.S.C. § 523(a)(2) and (6)). The Court includes section 523 of the Code (regarding nondischargeability of debt) in its analysis because it is the basis of claims asserted against the Debtor by Camac's Complaint in Adv. No. 21-00078 and were included in the parties' arguments at the Hearing.

against Camac prior to the petition date. They do not arise under the Funding Agreement or state law. They further are integral to the Debtor's reorganization efforts.

The Court acknowledges that the mere existence of a bankruptcy right or a claim relating to that right may not be adequate to refuse a request to arbitrate those claims. As noted above, courts carefully balance the competing policies of the FAA and the Code. The Court has closely reviewed each of the Bankruptcy Claims and considered their relation to this chapter 11 case. Admittedly, certain of the Bankruptcy Claims involve allegations relating to the Contract Claims and the parties' rights and conduct under the Funding Agreement. The Court does not read applicable case law as requiring arbitration or a refusal to arbitrate solely because claims involve overlapping facts or issues. *See, e.g., Moses v. CashCall, Inc.*, 781 F.3d 63, 85 (4th Cir. 2015) (Gregory, J., concurring) (stating that "the fact that the claims may share a question does not mean that arbitrating one of them will pose an inherent conflict with the efficient reorganization of a debtor's estate"). Rather, the Court is guided by Congressional intent concerning the objectives of the Code and the optimal result for the Debtor and *all* his creditors.

### a. The Bankruptcy Claims

Under Fourth Circuit precedent, the arbitrability of a claim in bankruptcy turns largely, but not exclusively, on the core versus non-core distinction. *See, e.g., id.* at 70–71 (per curiam). This determination requires the Court to evaluate whether the Bankruptcy Claims are constitutionally core claims. The Court notes that each such claim is a statutorily core claim under section 157(b) of title 28 of the U.S. Code.[14] The more pertinent question is, however, whether the claim "stems

---

[14] 28 U.S.C. § 157 provides that core proceedings include, but are not limited to:
　　(A) matters concerning the administration of the estate;
　　(B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;
　　…

from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Stern*, 564 U.S. at 499. The Court finds strong support for characterizing each of the Bankruptcy Claims as constitutionally core proceedings under this standard.

For example, courts consistently hold that an objection to discharge or the dischargeability of a claim in a bankruptcy case under section 523 is a constitutionally core proceeding. *See, e.g., In re Bauer*, No. AP 20-80012-DD, 2020 WL 3637902, at *6 (Bankr. D.S.C. June 8, 2020) ("A determination regarding a violation of a discharge injunction is a core bankruptcy matter pursuant to 28 U.S.C. § 157(b)(2)."); *In re Golden*, 587 B.R. 414, 423 (Bankr. E.D.N.Y. 2018) ("And a review of the applicable law makes it equally plain that the questions of the dischargeability of a debt, and whether the bankruptcy discharge has been violated, are core proceedings."). Likewise, an objection to claim under section 502, a preference claim under section 547, a turnover action under section 543, or a subordination claim under section 510 would not exist in most instances absent the Code and thus "extend from the bankruptcy itself." *See, e.g., Picacho Hills Dev. Co., Inc. v. Coll (In re Picacho Hills Util. Co., Inc.)*, No. 17-CV-1260 MV/JHR, 2019 WL 259133, at *7 (D.N.M. Jan. 18, 2019), *report and recommendation adopted,* No. AP 16-01007-T, 2019 WL 1375757 (D.N.M. Mar. 27, 2019) ("'[T]urnover claims are core matters as to which this Court has constitutional authority to enter a final judgment, because the Trustee's claims

---

(E) orders to turn over property of the estate;
(F) proceedings to determine, avoid, or recover preferences;
…
(I) determinations as to the dischargeability of particular debts;
…
(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims; and …

28 U.S.C. § 157.

for turnover stem "from the bankruptcy itself.' *In re Khan*, 2014 WL 10474969, at *6 (E.D.N.Y. Dec. 24, 2014).").[15]

The Court recognizes that a debtor may be able to plead an action in a way that transforms a pure state law claim into a claims objection under section 502 or a turnover action under section 542 or 543 of the Code. *See, e.g., In re Porter-Hayden Co.*, 304 B.R. 725, 732 (Bankr. D. Md. 2004) ("The characterization of a lawsuit as a proceeding to compel turnover, therefore, is not dispositive of whether the action constitutes a core proceeding; rather, this court must look behind the characterization to determine that in fact a turnover proceeding is warranted."). The Court generally agrees with those courts that have discouraged this practice, which largely places form over substance. But the Court does not find those concerns warranted in this case given the nature of the affirmative relief sought by the Debtor in the Debtor's Complaint and the Fourth Circuit's decision in *CashCall*. *Moses v. CashCall, Inc.*, 781 F.3d 63, 66 (4th Cir. 2015) (per curiam).

In *CashCall*, the debtor filed an adversary proceeding in her chapter 13 case seeking to declare a prepetition loan invalid and seeking damages under the North Carolina Debt Collection Act. The creditor responded, in part, by withdrawing its proof of claim and asking the bankruptcy court to compel arbitration under an arbitration clause in the parties' prepetition loan agreement. The Fourth Circuit affirmed the lower courts' treatment of the declaratory relief as a

---

[15] *See also, e.g., In re Connelly*, 476 B.R. 223, 232–33 (Bankr. E.D. Va. 2012) ("This Adversary Proceeding seeks turnover of estate property under § 542(b) of the Bankruptcy Code which is a core proceeding under 28 U.S.C. § 157(b)(2)(E). Neither of these provisions was impacted by the Supreme Court's narrow holding in *Stern*."); *In re Erickson Ret. Communities, LLC*, 475 B.R. 762, 764 (Bankr. N.D. Tex. 2012) ("Notwithstanding the holding in *Stern v. Marshall*, this bankruptcy court believes that it has Constitutional authority to issue a final order or judgment in this Adversary Proceeding, as the claims asserted arise under bankruptcy statutes [e.g., sections 544, 547, 548, and 550]."); *In re Se. Materials, Inc.*, 467 B.R. 337, 361 (Bankr. M.D.N.C. 2012) ('The claim satisfies the first prong of the *Stern* test because a claim for equitable subordination stems from Section 510(c) of the Bankruptcy Code. *In re USDigital, Inc.*, 461 B.R. 276, 285 (Bankr.D.Del.2011) (equitable subordination action under Section 510(c) is nonenumerated core proceeding); *Samson v. Blixseth (In re Blixseth)*, 2011 WL 3274042, at * 11 (Bankr.D.Mont. Aug. 1, 2011) ('the equitable subordination ... claim[ ] arise[s] from the Bankruptcy Code ..., therefore, this Court's jurisdiction over [the] claim[ ] is constitutionally acceptable.'). The Court has the constitutional authority to enter a final order with regard to this claim.").

16

constitutionally core claim that should be resolved by the bankruptcy court but reversed the district court's decision to refuse arbitration on the state law claim. *Id.*

The Fourth Circuit in *CashCall* recognized the key policies underlying the Code and the potential tension between those policies and the FAA. *CashCall*, 781 F.3d at 72. Focusing on the core versus non-core distinction, the Fourth Circuit determined that the debtor's declaratory relief was a constitutionally core claim "because the validity of the Loan Agreement would 'necessarily be resolved' in adjudicating Cash Call's proof of claim and Moses' objections thereto." *Id.* at 70. Like that declaratory relief, the Debtor's Bankruptcy Claims against Camac do not seek solely to augment the estate; the potential assets available to the estate if the Debtor is successful on those claims is collateral to the primary objective. Indeed, the key allegations by the Debtor challenge Camac's ability to assert an allowed claim against the Debtor and his estate. *See, e.g., id.* at 72 ("[i]t is ... apparent that resolution of [Debtor's] claim that the Loan Agreement she entered into with [creditor] was illegal could directly impact claims against her estate and her plan for financial reorganization, notwithstanding the fact that the plan [has already been confirmed].") Courts consistently recognize the critical nature of the claims administration process to a debtor's bankruptcy case. *See, e.g., id.* at 70 (citing relevant case law).

The Debtor's fraudulent transfer claim against Camac under section 544 of the Code also requires a more thorough analysis. Fraudulent transfer claims may be available to a creditor under state law or to a debtor or bankruptcy trustee (independently or standing in the shoes of a creditor) under bankruptcy law. Since the Supreme Court's decision in *Stern*, courts have disagreed concerning the characterization of fraudulent transfer claims as constitutionally core claims. *See, e.g., Kemp v. Nelson*, No. 16-CV-1546-JPS, 2016 WL 7177508, at *2 (E.D. Wis. Dec. 9, 2016) ("Courts are split [regarding constitutionally core designation], and the Seventh Circuit has offered

no clear guidance, as to whether fraudulent transfer claims fall into this category.") (collecting case law). Here, the Debtor would not be able to bring a state law fraudulent transfer claim against Camac absent sections 544 and 1107 of the Code.[16] Camac also has filed a proof of claim against the Debtor's estate, making the alleged fraudulent transfer claim part of the claims administration process and potentially subject to section 502(d) of the Code.[17] Consequently, the Court finds the facts of this case more closely aligned with cases characterizing a particular fraudulent transfer claim as a constitutionally core proceeding. *See, e.g., In re TMST, Inc.*, No. 09-17787 NVA, 2015 WL 4080077, at *7 (D. Md. July 6, 2015) ("[E]ven after *Stern,* a bankruptcy court has the authority to finally adjudicate fraudulent transfer claims if they are necessarily resolvable as part of the claims allowance process."); *Mason v. Ivey*, 498 B.R. 540, 549 (M.D.N.C. 2013) (holding that the bankruptcy court had constitutional authority to rule on fraudulent transfer claims and denying

---

[16] In general, only existing or future creditors may pursue fraudulent transfer laws against a debtor under state law. As one court explained,

> From nearly the emergence of fraudulent transfer law, existing creditors of the transferor had standing to pursue recovery of fraudulently transferred assets. As the law of fraudulent conveyances developed, subsequent creditors, meaning parties to whom the transferor later became indebted, also sought relief. Recovery was permitted where such subsequent creditors were able to show that the challenged transfer was made with intent to hinder, delay, or defraud future creditors such as themselves. *Id.* at 475-76 (citing mostly 19th Century decisions in the United States). To prove such a case, a subsequent creditor was required to show a connection between the transferor's intent and the harm to the subsequent creditor. *Id.* at 476 (citations omitted). In other words, the standing of a subsequent creditor to seek avoidance of a transfer depended in part on its ability to show a causal connection between the transfer and nonpayment of the debt owing to the subsequent creditor.

*In re Palm Beach Fin. Partners, L.P.*, 598 B.R. 885, 891 (Bankr. S.D. Fla. 2019), *aff'd sub nom. Mukamal v. Nat'l Christian Charitable Found., Inc.*, 616 B.R. 189 (S.D. Fla. 2020); *see also, e.g., RRR, Inc. v. Toggas*, 98 F. Supp. 3d 12, 19 (D.D.C. 2015) (noting that courts "have held unequivocally that the remedial nature of the UFTA means any fraudulent transfer action cannot exist independent of a valid debt" in context of expired judgments). Section 544 of the Code, in turn, allows a trustee (or debtor in possession under section 1107) to assert such creditor's claims against a debtor in bankruptcy under certain circumstances. 11 U.S.C. §§ 544, 1107.

[17] 11 U.S.C. § 502(d) provides

> (d) Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

11 U.S.C. § 502(d).

motion to withdraw reference); *Erwin*, 2018 WL 1614160, at *8 (fraudulent transfer claim under section 548 of Code not subject to arbitration).

### b. The FDCPA Claim

The Debtor's FDCPA claim is different in nature from the Bankruptcy Claims. That claim arises under federal law, but at least in this particular case, is framed more as a vehicle for damages rather than as a defense to Camac's claim against the bankruptcy estate. The FDCPA claim is part of the Debtor's claims filed in the prepetition arbitration proceeding and is not included in the Debtor's Complaint. Thus, at least from the Debtor's perspective, that claim is arbitrable and may best be resolved in the context of the arbitration proceeding.

Moreover, unlike the Bankruptcy Claims, the Debtor's FDCPA claim seeks primarily to augment the Debtor's estate and, in that regard, is akin to the *CashCall* debtor's state law debt collection claims. The Fourth Circuit concluded that such claims were non-core proceedings. Under that precedent, the FDCPA claim, standing alone, does not constitute a constitutionally core claim. *See, e.g., CashCall*, 781 F.3d at 85–86 (Gregory, J., concurring); *see also In re Kiskaden*, 571 B.R. 226, 238 (Bankr. E.D. Ky. 2017) (explaining that "Counts 2 through 4 [including a claim under the FDCPA] assert claims grounded solely in state or federal non-bankruptcy law that Debtor could pursue without having filed bankruptcy" and thus declining to characterize those counts as core proceedings for purposes of arbitration analysis).[18]

---

[18] The Court's analysis and characterization might differ if the claim had been asserted as part of a claim objection under section 502 of the Code, but those are not the facts before the Court. *See, e.g., In re May*, 591 B.R. 712, 722–23 (Bankr. E.D. Ark. 2018) ("In this instant case, the entirety of the debtors' claim arose postpetition out of a purely bankruptcy centric procedure, proofs of claim, and the cause of actions would have had no existence outside of bankruptcy. This analysis also applies to the FDCPA claim as its genesis is solely the alleged fraudulent conduct in the context of asserted fraudulent representations on the proof of claim."). The Court thus does not need to address that potential scenario at this time.

### c.  The Contract Claims

Finally, although not federal in nature, the Court observes for completeness that the Contract Claims are grounded in state law and are likely non-core proceedings. Those claims further appear to fall within the arbitration clause of the Funding Agreement. Absent this chapter 11 case, the Contract Claims would be determined under state law by either the arbitrator or an appropriate non-bankruptcy court. Nonetheless, as explained above, certain of those claims intersect with several of the Debtor's Bankruptcy Claims, raising the specter of inconsistent results and potential conflicts between this chapter 11 case and the prepetition arbitration proceeding. The Court considers these potential issues below by balancing the core and non-core claims in this matter and determining the appropriate path forward for this chapter 11 case.

### 3.  The Appropriate Role for Arbitration in this Chapter 11 Case

A hybrid case such as this matter, involving constitutionally core and non-core proceedings, presents challenging issues for the Court. On the one hand, the Bankruptcy Claims and the collective nature of a chapter 11 case support resolving all claims between the parties in the bankruptcy case. That approach promotes efficiency and continuity in the claims administration process and fairness among creditors in the overall reorganization. On the other hand, the Contract Claims and arguably the Non-Bankruptcy Claims are subject to a prepetition arbitration clause that falls within the mandates of the FAA. Those claims also arguably can be separated from the Bankruptcy Claims, even if that may not be the most procedurally efficient approach for this case.

In *CashCall*, the Fourth Circuit required a bifurcation of the constitutionally core and the non-core claims. *CashCall*, 781 F.3d at 66, 88 (Gregory, J., concurring, as to second pincite). Judge Niemeyer, dissenting from this portion of the decision, expressed concern regarding such

bifurcation and its potentially adverse effect on the bankruptcy case and the objectives of the Code. As Judge Niemeyer explained, "[e]ven though non-core claims are ancillary to reorganization, it is apparent that they can nonetheless affect a debtor's efforts to reorganize and that sending non-core claims to arbitration can, in given circumstances, interfere with the debtor's chance to complete a fair and efficient … reorganization." *Id.* at 73–74 (Niemeyer, J., dissenting). Although this Court agrees with Judge Niemeyer's concerns, it is bound both by the circuit's position in *CashCall*, as well as other precedent underscoring the important role played by arbitration in the judicial system, including in bankruptcy cases. That precedent requires "more than a finding that arbitration would potentially conflict with the purposes of the Bankruptcy Code" to refuse arbitration. *Id.* at 88 (Gregory, J., concurring). "Rather, the conflict must be inherent and 'sufficient to override by implication the presumption in favor of arbitration.'" *Id.*

Having reviewed the record, balanced the competing factors, and studied the applicable case law, the Court finds that it must bifurcate the disputes in this matter, with the Bankruptcy Claims staying in the bankruptcy case and the Contract and Non-Bankruptcy Claims remaining subject to arbitration. Were the Court writing on a clean slate, or if Judge Niemeyer's position in *CashCall* had been that of the circuit, the Court likely would reach a very different conclusion. Indeed, consolidating all disputes between the parties in the context of the chapter 11 case and collective claims administration process appears not only most efficient and fair to all potentially affected parties, but also most consistent with the objectives of the Code. The Court cannot, however, ignore precedent.

### C.    The Automatic Stay and the Arbitration Proceeding

The decision to bifurcate the parties' claims does not end this Court's inquiry. It must decide the best course forward for these disputes and this chapter 11 case while resolving Camac's

request for relief. As noted above and by the Fourth Circuit in *CashCall*, a bifurcated matter presents opportunities for overlap in facts, duplication in effort, and conflicting results. *Id*. at 63. Although those potential consequences do not necessarily mandate the resolution of all matters in the same forum, they do counsel in favor of procedural mechanisms to protect the parties. They also, in this Court's view, weigh in favor of relief from stay under the particular facts of this case.

Section 362(d) of the Code allows a party in interest to request relief from the automatic stay for cause. 11 U.S.C. § 362(d). In the context of litigation claims, the Fourth Circuit has articulated at least the following three factors as relevant to evaluating a request for relief from the automatic stay: "(1) whether the issues in the pending litigation involve only state law, so the expertise of the bankruptcy court is unnecessary; (2) whether modifying the stay will promote judicial economy and whether there would be greater interference with the bankruptcy case if the stay were not lifted because matters would have to be litigated in bankruptcy court; and (3) whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court." *In re Robbins*, 964 F.2d 342, 345 (4th Cir. 1992), *as amended* (May 27, 1992). No one factor is determinative, but a court should consider the totality of the circumstances. In addition, a court must balance to the best of its ability the interests of the Debtor's estate, the interests of all creditors asserting claims against the estate, and the potential hardship to the litigant if the requested relief is denied. *See, e.g., Myles v. Xinergy Ltd. (In re Xinergy Ltd.)*, Case No. 15-70444, 2015 WL 3643418, at *2 (Bankr. W.D. Va. Jun 11, 2015); *In re Gyro-Trac (USA), Inc.*, 441 B.R. 470, 489 (Bankr. D.S.C. 2010).

The parties' disputes, like many in bankruptcy cases, arose prepetition. Unlike some bankruptcy cases in which arbitration is requested, however, the arbitration proceeding in this matter was pending on the petition date; this is not a request to compel arbitration postpetition.

22

The Court notes that several courts in this circuit have refused to compel postpetition arbitration and stay a pending adversary proceeding. *See, e.g.*, *In re White Mountain Mining Co., L.L.C.*, 403 F.3d 164, 170 (4th Cir. 2005) (holding that lower court properly refused to compel debtor to submit claims pending in adversary proceeding to international arbitration); *Allied Title Lending, LLC v. Taylor*, 420 F. Supp. 3d 436, 448 (E.D. Va. 2019) (affirming bankruptcy court's decision refusing to stay adversary proceeding and compel arbitration); *In re Bauer*, No. AP 20-80012-DD, 2020 WL 3637902, at *8 (Bankr. D.S.C. June 8, 2020) (denying motion to dismiss adversary proceeding and compel arbitration). The Court generally agrees with that approach. Notably, in such cases, the primary claims pending at the time of the decisions were core claims being litigated in the bankruptcy.[19] The Court sees a meaningful difference between that scenario and the one before it, in which non-core claims exist and were being pursued in arbitration prior to the bankruptcy filing.[20]

With respect to the *Robbins* factors, the arbitration proceeding does involve primarily state law claims and claims that need to be resolved at some point during this chapter 11 case. The Court recognizes the overlap between the claims at issue in the arbitration proceeding and the Bankruptcy Claims at issue in this chapter 11 case. Nevertheless, on balance, the Court feels compelled to defer to the arbitrator, but solely on the resolution of the state law and non-bankruptcy claims subject to arbitration under the Funding Agreement. Had this bankruptcy case been filed prior to either party invoking the arbitration clause, the Court might reach a different conclusion and delay any

---

[19] The Court recognizes that some overlap between the arbitration demand and the bankruptcy filing was present in *White Mountain*, but the Court finds that case distinguishable given the almost identical nature of the claims asserted in both the demand and the bankruptcy and the proximity in timing between the arbitration statement and bankruptcy filing in that case. 403 F.3d at 167. Likewise, the claims at issue in *Taylor* in the context of the motion to compel were characterized as constitutionally core claims. 420 F. Supp. 3d at 445.

[20] As discussed previously, Camac invoked the arbitration clause in the Funding Agreement and, though the Debtor disagreed with that action, the Debtor did file a response and counterclaims in the arbitration proceeding. Moreover, the Debtor commenced this chapter 11 case one day before a hearing in that arbitration proceeding.

requested arbitration pending resolution of the Bankruptcy Claims. Nonetheless, under the facts presented to the Court, notions of fairness to the parties, and particularly the strong presumption in favor of arbitration, the Court will modify the automatic stay of section 362(a) of the Code to allow the prepetition arbitration proceeding to continue.[21]

In reaching this conclusion, the Court notes that none of the Bankruptcy Claims are, or should be, subject to the arbitration proceeding. Moreover, the parties may not seek to enforce any decision of the arbitrator outside of this Court; rather, all enforcement and collection actions must proceed in this Court in the context of the chapter 11 case.

The Court acknowledges that, if the arbitrator resolves the Contract Claims or the Non-Bankruptcy Claims prior to this Court addressing the Bankruptcy Claims, the parties could face conflicting results, or one forum may be bound by the other's decision under the doctrine of claim or issue preclusion. The Court is not prepared to rule on such matters at this time, but will by separate order issue a temporary stay of proceedings on the Debtor's Complaint to monitor how these matters progress and to guard against undue delay or gamesmanship. The Court dislikes the element of uncertainty introduced by this approach but, absent clear authority under the Code or case law giving this Court more discretion to refuse arbitration in the context of non-constitutionally core or non-core claims, the Court finds this approach warranted and most appropriate under the circumstances.

## IV.   <u>Conclusion</u>

The Debtor invoked chapter 11 of the Code to reorganize his financial affairs and resolve his disputes with Camac. No party has challenged the existence of the arbitration clause in the

---

[21] *See, e.g., In re Am. Classic Voyages, Co.*, 298 B.R. 222, 226 (D. Del. 2003) (reversing bankruptcy court decision denying relief from stay and explaining "that Bankruptcy Court did not engage in the balancing test necessary to determine whether the stay should be lifted for cause and did not consider whether enforcement of the arbitration clause would jeopardize the objectives of the Bankruptcy Code").

Funding Agreement or the need to resolve the parties' disputes under that agreement. The only question is whether this Court or the arbitrator resolves the claims subject to the arbitration clause. Given the need to balance the competing objectives of the FAA and the Code, the Court determines that the arbitration proceeding should continue but only as to the Contract Claims and the Non-Bankruptcy Claims subject to arbitration under the Funding Agreement. The Bankruptcy Claims are constitutionally core proceedings and properly before this Court. The Court will enter a separate order consistent with this Memorandum Opinion.

cc:    Debtor
       Debtor's Counsel
       Camac
       Camac's Counsel
       United States Trustee

**END OF MEMORANDUM OPINION**