# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF MARYLAND
### (<u>Baltimore Division</u>)

| | | |
|---|---|---|
| **IN RE:** | * | |
| **JOHN MCDONNELL MCPHERSON,** | * | Case No.: 21-10205-MMH |
| | | (Chapter 11) |
| **Debtor.** . | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## OBJECTION OF CAMAC FUND, L.P. TO DEBTOR'S AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE

Camac Fund, L.P. ("Camac"), a creditor and party in interest, by and through its undersigned counsel, Alan M. Grochal, Richard L. Costella, and Tydings & Rosenberg LLP, objects to Debtor's Amended Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code (the "Amended Disclosure Statement"), and in support thereof, states as follows:

## BACKGROUND

1. On January 12, 2021, on the eve of an initial arbitration hearing initiated by Camac against the Debtor (the "Arbitration Proceeding"), John McDonnell McPherson ("McPherson" or the " Debtor") filed a voluntary petition under Chapter 11 of the Bankruptcy Code (the "Petition Date"), and thereafter has been managing his business as a debtor-in-possession. The bankruptcy filing by McPherson temporarily stayed the Arbitration Proceeding.

2. On February 10, 2021, McPherson, after being informed that Camac intended to file a motion seeking relief from the automatic stay to allow the Arbitration Proceeding between the parties to move forward, filed an Adversary Complaint against Camac which has been designated as Adversary No. 21-00035 (the "Turnover Action").

3. On February 19, 2021, Camac filed a Motion seeking relief from the automatic stay to allow the Arbitration Proceeding to move forward (dkt. 36)(the "Lift Stay Motion").

4. On March 25, 2021, Camac filed a Motion to Abstain from hearing Adversary No. 21-00035 (the "Abstention Motion").

5. On April 5, 2021, Camac filed a Complaint Objecting to Dischargeability of Debt which has been designated as Adversary No. 21-00078 (the "Discharge Action").

6. On April 14, 2021, the Debtor filed a proposed Disclosure Statement (dkt. 53) and a Chapter 11 Plan of Reorganization (dkt. 54).

7. On May 27, 2021, Camac filed an Objection to the Debtor's Disclosure Statement (dkt. 60) and the same day, the Office of the United States Trustee also filed an Objection (dkt. 61).

8. On June 2, 2021, this Court issued a Memorandum Opinion in connection with the Turnover Action, the Lift Stay Motion and the Abstention Motion (dkt. 67). The Court denied the Motion to Abstain but granted a temporary ninety (90) day stay of the Turnover Action which may be shortened or extended by further order of the Court (dkt. 18 in Adv. No. 21-00035). The Court also entered an Order Granting Relief from Stay to allow the Arbitration Proceeding to move forward (dkt. 64).

9. A final hearing in the Arbitration Proceeding is scheduled in less than four months, on December 15, 2021.

10. The Court held a hearing on approval of the Disclosure Statement on June 2, 2021. Simply by virtue of the fact that the Court had just ruled on the Turnover Action, the Lift Stay Motion and the Abstention Motion, a significant amount of information contained in the Disclosure Statement was out of date. The Debtor's Counsel immediately agreed to file an Amended Plan and Disclosure Statement.

11. On June 25, 2021, the Debtor filed an Amended Chapter 11 Plan (dkt. 78) and an Amended proposed Disclosure Statement (dkr. 79). On June 28, the Debtor filed redlined copies of both the Plan and Disclosure Statement (dkts. 81 and 82) as required by the Local Rules of this Court.

12. On July 22, 2021, this Court entered an Order and Notice for Hearing on Amended Disclosure Statement (dkt. 87).

13. While the Debtor has fixed a number of the problems that were highlighted in the Objections filed by Camac and the Office of the U.S. Trustee, there are still some problems that need to be addressed.

## ARGUMENT

### Standards for Approving a Disclosure Statement

Section 1125 of the Bankruptcy Code requires that the Debtor's Disclosure Statement provide:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interest in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information.

11 U.S.C. § 1125(a)(2021).

In order to have the Disclosure Statement approved by this Court, the Debtor must provide "adequate information" that clearly and succinctly informs the average creditor "what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re*

*Ferretti*, 128 B.R. 16, 19 (Bankr. D. N.H. 1991). *See also In re Monnier Bros.,* 755 F.2d 1336, 1342 (8th Cir. 1985) ("[t]he primary purpose of a disclosure statement is to give the creditors the information they need to decide whether to accept the plan"); *In re Forest Grove, LLC*, 448 B.R. 729, 737 (Bankr. D.S.C. 2011) ("[t]he purpose of a disclosure statement is to clearly provide creditors with information regarding the debtor's plan and their treatment under that plan").

"[D]isclosure requirements are crucial to the effective functioning of the federal bankruptcy system. Because creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan, the importance of full and honest disclosure cannot be overstated." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.,* 81 F.3d 355, 362 (3d Cir. 1996). *See also Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) (the court cannot overemphasize the [plan proponent's] obligation to provide sufficient data to satisfy the Code standard of `adequate information'." "The information to be provided should [comprise] all those factors presently known to the plan proponent that bear upon the success or failure of the proposals contained in the plan." *In re Stanley Hotel, Inc.,* 13 B.R. 926, 929 (Bankr. D. Colo. 1981). *See also In re Cardinal Congregate I,* 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990) (the disclosure statement must contain all pertinent information that bears on the success or failure of the proposals in the plan). "The debtor has the burden of proving that a disclosure statement is adequate, including showing that the plan is confirmable or that defects might be cured or involve material facts in dispute." *In re American Capital Equip. LLC*, 688 F.3d 145, 155 (3d Cir. 2012). *See also In re Jeppson*, 66 B.R. 269 (Bankr. D. Utah 1986) (debtor bears the burden of persuasion in establishing disclosure statement contains adequate information).

#5200288v.1

The case law interpreting § 1125 has identified the types of information that should be addressed by a disclosure statement. Such information includes (but is not limited to) the following:

1. The circumstances that gave rise to the filing of the petition.

2. A complete description of the available assets and their value.

3. The source of information provided in the disclosure statement.

4. The condition and performance of the debtor while in Chapter 11.

5. Information regarding claims against the estate.

6. A liquidation analysis setting forth the estimated return that creditors would receive under Chapter 7.

7. A summary of the plan of reorganization.

8. An estimate of all administrative expenses, including attorneys' fees and accountants' fees.

9. The collectability of any accounts receivable.

10. Any financial information, valuations, or pro forma projections that would be relevant to creditors' determination of whether to accept or reject the plan.

11. Information relevant to the risks being taken by the creditors and interest holders.

12. The actual or projected value that can be obtained from avoidable transfers.

13. The tax consequences of the plan.

*In re Sciota Valley Mortgage Co*., 88 B.R. 168, 171 (Bankr. S.D. Ohio 1988) (citations omitted). The Debtor's Disclosure Statement fails to adequately address several of the required categories of information and therefore cannot be approved.

#5200288v.1

## I. The Amended Disclosure Statement Is Still Deficient in Providing Adequate Detail Regarding Available Assets and Their Value

The Disclosure Statement goes to great lengths to discuss the Debtor's major accomplishments in pursuing whistleblower claims. Notwithstanding the Debtor's success in the Life Partners case and, to a lesser extent, in the AmTrust case, it does not appear that there are any other potential cases to fund the Plan (despite the fact that pursuing whistleblower cases is supposedly the Debtor's primary business according to several statements in the Amended Disclosure Statement). Since property of the estate is broadly defined in section 541 of the Bankruptcy, pursuing leads that could later develop into cases constitute assets that ought to be discussed. What is not abundantly clear from the Amended Disclosure Statement is whether the Debtor has abandoned his interest in pursuing whistleblower claims, notwithstanding the fact that he has allegedly dedicated his practice to pursuing them, or whether the claims that he is pursuing are too speculative to assign any value. In either scenario, the Debtor needs to clarify whether he has stopped pursing these cases or whether he is pursuing leads that he hopes will evolve into cases. More information is required so that creditors will know whether the Life Partners and AmTrust cases are the extent of the Whistleblower cases that will generate income to pay creditor claims or whether there are potentially additional sources of income.

While Camac appreciates the fact that awards in whistleblower cases are difficult to predict, the Debtor, in his financial projections, still shows a range of between $15,946 and $7,515,850 from the Life Partners case. It appears that there are actually two potential appellate levels that the Debtor needs to surmount in order to realize the high end of his projection—challenging the SEC's initial determination and possibly challenging the SEC's final determination. Because the range of recoveries in the Life Partners case means the difference between a nominal or no distribution for most creditors and a 100% distribution, further details are

#5200288v.1

imperative. The Debtor should discuss the standard of review of the SEC's preliminary determination, the standard of review of the SEC's final determination, and the standard of review for judicial review. If, for example, the standard to overturn an SEC determination is whether it was clearly erroneous, then creditors will know that the likelihood of more than a nominal distribution is small. On the other hand, if the standard is de novo review at the judicial level, that would make a huge difference. Finally, the Debtor should discuss whatever information he has regarding the frequency in which SEC initial determinations are reversed. Once again, because the Life Partners award is potentially the estate's largest asset, more details must be provided.

The Debtor also appears to ignore Mihaly, McPherson Signorelli, LLC ("MMS") as an asset with value. While summarily concluding that MMS has no market value, it does provide the Debtor with all of his current monthly income and was a recipient of half of the award, or $900,000.00, in the General Electric matter. More information is needed. There is no discussion of MMS financial information and ongoing projects that may generate increased draws for the Debtor.[1] Finally, the Amended Disclosure Statement mentions expert witness services by MMS and references a pending case in the United States District Court for the Southern District of Florida. Notwithstanding this section of the Amended Disclosure, there are no cash flow projections with respect to expert witness services.

## II. The Amended Disclosure Statement Must Provide Information Regarding Claims That Is Consistent with the Proofs of Claim on File

In Exhibit 3 to the Amended Disclosure Statement, the Summary of Claims and Distributions, the Debtor represents that IRS holds a priority tax claim in the amount of roughly

---

[1] Based upon the Debtor's monthly operating reports, he pays $6000 per month to his wife. While he indicates that he is in the process of divorcing, it is not apparent why his wife is entitled to more than 40% of his monthly income while third party creditors may be receiving a pittance if the Life Partner case does not generate more funds. Additional information on the divorce process is warranted.

$428,000. On August 19, 2021, IRS filed an Amended Proof of Claim in which its now asserts a priority tax claim in the amount of nearly $455,000 as well as a general unsecured claim in the amount of approximately $155,000. While the increase in the priority tax claim is not huge, under the low range of recoveries scenario, this would severely deplete the net available for general unsecured creditors.

Finally, the Debtor estimates the administrative priority claims due to his professionals at $250,000. Whiteford Taylor & Preston has already filed one interim fee application only covering the period through May 31, 2021 seeking roughly $125,000 less a retainer of $77,000.[2] Now that the arbitration is moving forward, Debtor's Special Counsel, the Ashcroft Law firm will begin to incur substantial fees. Furthermore, the Whiteford Fee Application did not cover the drafting and filing of the Amended Plan and Amended Disclosure Statement as well as proceedings in the Discharge Action. The Amended Disclosure Statement should provide an estimate of the fees that the Ashcroft firm will incur during the arbitration as well as the projected amount of fees that Whiteford expects to incur between now and confirmation. Once again, if the low range scenario occurs, even a small increase in the administrative priority expenses will have a drastic impact on the amount available for creditors.

On the other hand, Camac has asserted a secured claim in the amount of $4,200,000. While the Debtor summarily dismisses the claim as avoidable as a preference, if the Debtor is able to attain the high range of recovery on the Life Partners case, the Debtor will be solvent and there will be no basis to set aside Camac's lien. Furthermore, in the Funding Agreement between the Debtor and Camac, the Debtor represented that he would take any actions necessary to maintain the secured status of Camac's claim. If the Debtor is not otherwise found to be in breach of the

---

[2] Shortly thereafter, Whiteford agreed to reduce its fee request by an additional nearly $6400 after discussions with the Office of the U.S. Trustee (dkt. 96).

#5200288v.1

Funding Agreement in the Arbitration Proceeding, there is no doubt that filing an avoidance action against Camac would constitute such a breach.

### III. The Amended Disclosure Statement Provides an Inadequate Discussion of Risk Factors

Despite the fact that there are still several pending litigation matters between the Debtor and Camac, the Disclosure Statement provides little discussion whatsoever regarding risk factors. Pending before the Court are: (1) the Turnover Action; (2) the Discharge Action; and (3) Camac's proof of claim asserting a secured claim in the amount of $4.2 Million. The projections accompanying the Disclosure Statement include a best-case scenario whereby not only is Camac's claim disallowed, but the Debtor is able to recover nearly $700,000 that is currently sitting in an escrow account. While the Debtor is entitled to its dream, creditors are entitled to an objective discussion of the risk factors now that the dispute between Camac and the Debtor has gone to binding arbitration, and in the event that Camac's secured claim is allowed in the full amount of $4.2 Million. The Debtor can minimize the likelihood of any of these events occurring, but he is required to apprise creditors of the possibility, which he has failed to do.

#5200288v.1

## **CONCLUSION**

For all of the foregoing reasons, Camac respectfully requests that this Court deny approval of the Amended Disclosure Statement and require the Debtor to submit a Second Amended Disclosure Statement that provides additional information in the areas enumerated above.

Dated: August 24, 2021.　　　　　　　　　　Respectfully Submitted,


　　　　　　　　　　　　　　　　　　/s/ Alan M. Grochal
　　　　　　　　　　　　　　　　　　Alan M. Grochal, Bar No.: 01477
　　　　　　　　　　　　　　　　　　Richard L. Costella, Bar No.: 14095
　　　　　　　　　　　　　　　　　　Tydings & Rosenberg LLP
　　　　　　　　　　　　　　　　　　One E. Pratt Street, Suite 901
　　　　　　　　　　　　　　　　　　Baltimore, Maryland 21202
　　　　　　　　　　　　　　　　　　Phone: (410) 752-9753
　　　　　　　　　　　　　　　　　　Fax: (410) 727-5460
　　　　　　　　　　　　　　　　　　Email: agrochal@tydings.com
　　　　　　　　　　　　　　　　　　　　　　rcostella@tydings.com

　　　　　　　　　　　　　　　　　　*Attorneys for Camac Fund, L.P.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 24th day of August, 2021, a copy of the ***OBJECTION OF CAMAC FUND, L.P. TO DEBTOR'S AMENDED DISCLOSURE STATEMENT*** was served via the Court's ECF filing system, and where indicated, by the U.S. Mail, postage prepaid, on the following:

Brent C. Strickland, Esq.
Paul M. Nussbaum, Esq.
Whiteford Taylor & Preston, LLP
111 Rockville Pike, Suite 800
Rockville, Maryland 20850
bstrickland@wtplaw.com
pnussbaum@wtplaw.com

James Daniel Ford, Jr. (UST)
Office of the U.S. Trustee
101 West Lombard Street, Suite 2625
Baltimore, Maryland 21201
j.dan.ford@usdoj.gov

　　　　　　　　　　　　　　　　　　　　　　　/s/ Alan M. Grochal
　　　　　　　　　　　　　　　　　　　　　　　Alan M. Grochal, Esquire

#5200288v.1