### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MARYLAND
### (Baltimore)

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **JOHN M. MCPHERSON,** | ) | **Case No. 21-10205** |
| | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |

## DEBTOR'S AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AS MODIFIED

### I.     INTRODUCTION

John M. McPherson, the debtor and debtor-in-possession in the above-captioned case (the "Debtor"), hereby submits this Amended Disclosure Statement (the "Disclosure Statement"), pursuant to § 1125 of the Bankruptcy Code (the "Code"), to all holders of Claims against the Debtor, as a prerequisite to soliciting acceptances to the Debtor's Plan of Reorganization (the "Plan"), which was filed with the Clerk of the United States Bankruptcy Court for the District of Maryland (the "Bankruptcy Court").  The term "Disclosure Statement" as used herein shall encompass all exhibits annexed hereto as well as the Disclosure Statement document itself.

The purpose of this Disclosure Statement is to furnish information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the Debtor and the information and records available to the Debtor.

#### A.     Definitions

Unless otherwise defined herein, the capitalized terms used herein shall have the respective meaning assigned in the Plan.

**B.**    <u>Exhibits</u>

Accompanying this Disclosure Statement are copies of the following documents, which are incorporated by reference herein:

1.    **Exhibit 1**:    Plan

2.    **Exhibit 2**:    Plan Funding Projections and Assumptions

3.    **Exhibit 3**:    Summary of Claims and Distributions

4.    **Exhibit 4**:    Liquidation Analysis

5.    **Exhibit 5:**    Cash Flow Summary

**C.**    <u>Availability of Other Information</u>

The entire Court file on this Bankruptcy Case is available for review at the offices of the Clerk, United States Bankruptcy Court for the District of Maryland, 101 Lombard Street, Baltimore, Maryland 21201 during the Court's regular business hours.   Additionally, certain items may be available online through PACER, https://ecf.mdb.uscourts.gov.   Persons with questions about the Plan or this Disclosure Statement may contact the Debtor's counsel, Brent C. Strickland, Esquire, via email at bstrickland@wtplaw.com.

**D.**    <u>Voting, Disclaimer, and Supremacy of Plan Provisions</u>

After carefully reviewing the Plan, this Disclosure Statement, and all of the exhibits annexed hereto, please indicate your vote on the enclosed **Ballot**.  Please vote and return your Ballot to the following address:  *Brent C. Strickland, Esquire, Whiteford, Taylor & Preston L.L.P., 111 Rockville Pike, Suite 800, Rockville, Maryland 20850.*

NO REPRESENTATION CONCERNING THE DEBTOR, THE VALUE OF THE DEBTOR'S PROPERTY, OR THE PLAN ARE AUTHORIZED BY THE DEBTOR UNLESS SET FORTH IN THIS DISCLOSURE STATEMENT.   ACCORDINGLY, NO REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THE

PLAN, OTHER THAN THOSE CONTAINED IN THIS DISCLOSURE STATEMENT, SHOULD BE RELIED UPON IN EXERCISING THE RIGHT TO VOTE OR NOT TO VOTE ON THE ACCEPTANCE OF THE PLAN, AND ANY SUCH REPRESENTATION OR INDUCEMENT SHOULD BE REPORTED IMMEDIATELY TO COUNSEL FOR THE DEBTOR. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN THE SUBJECT OF AN AUDIT. THE RECORDS KEPT BY THE DEBTOR ARE NOT WARRANTED OR REPRESENTED TO BE ACCURATE. THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE GREATEST AND EARLIEST POSSIBLE RECOVERY TO CREDITORS. THE DEBTOR THEREFORE BELIEVES THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTEREST OF ALL CREDITORS. THE PLAN AND DISCLOSURE STATEMENT ARE COMPLEX INSOFAR AS THEY CONSTITUTE A LEGALLY BINDING COMMITMENT FOR CREDITORS AND PARTIES-IN-INTEREST. ACCORDINGLY, CREDITORS AND PARTIES-IN-INTEREST ARE URGED TO SEEK LEGAL COUNSEL IF THEY ARE UNSURE OF THE EFFECT OF THE PLAN AND DISCLOSURE STATEMENT.

The description of the Plan in this Disclosure Statement is a summary only. For a full understanding of the Plan's provisions, creditors and other parties-in-interest are urged to review this entire Disclosure Statement and its exhibits, the description of the Plan contained herein, and the Plan itself which is annexed hereto.

## II.    HISTORY AND BACKGROUND

### A.    Personal Information and Prior Work History

The Debtor is 58 years old, presently married and the father of one adult child. The Debtor is separated from his wife and is in the process of divorcing. The Debtor worked as a forensic accountant for many years with different firms, including Ernst & Young and Deloitte. For approximately the last two decades, and as of the Petition Date, the Debtor was employed

by, and a fifty percent (50%) owner of, Mihaly, McPherson Signorelli, LLC ("MMS"). MMS consists only of the Debtor and Gabe Mihaly, with no other employees or principals. As set forth in more detail below, MMS is not a retailer or manufacturer of tangible products. Rather, MMS provides consulting and other personal services by the Debtor and Mr. Mihaly and thus the Debtor's fifty percent interest in MMS has no market value.

**B.   The Whistleblower Program**

In approximately 2013, the Debtor decided to dedicate his efforts to the identification and pursuit of claims under the Whistleblower Program created by Congress and administered by the Securities and Exchange Commission (the "SEC"). The Whistleblower Program was created by Congress in 2010 as part of the Dodd-Frank Act to provide monetary incentives for individuals to come forward and report possible violations of federal securities laws to the SEC. Examples of the kinds of conduct in which the SEC is interested include:

- Ponzi schemes and Pyramid schemes
- insider trading
- manipulation of a security's price or volume
- theft or misappropriation of funds or securities
- false or misleading statements about a company
- abusive naked short selling

Under the Whistleblower Program, an individual providing "original information" that leads to a successful SEC action may be entitled to a monetary award. "Original information" is information derived from an individual's independent knowledge or analysis and that is not already known by the SEC. If this information results in the SEC taking action and that action results in a recovery, the whistleblower can apply for a monetary award in an amount up to thirty percent (30%) of the amounts the SEC is able to collect.

The Debtor determined that his forensic accounting background would be ideally suited to researching and pursuing whistleblower claims. Later, he expanded the scope of his work to include providing research on suspected accounting frauds to law firms and investment funds. Unbeknownst to the Debtor in 2013 when he elected to pursue these claims, the Whistleblower Program, though well intended, proceeds at an extremely slow pace. As a result, the Debtor was required to locate sources of funding to cover his and his company's expenses during the decade-long period while awaiting payment from the SEC whistleblower award process. In some years, the Debtor had no funds to pay taxes, causing the Debtor in some years to not file returns. The net result of this is that the Debtor has significant tax liabilities that will be addressed and paid through the Chapter 11 plan process.

C.  **The Life Partners Whistleblower Case**

In early 2010, the Debtor identified a $1.8 billion Ponzi scheme involving 22,000 individual investors in a publicly traded company called Life Partners, Inc. After conducting extensive research, the Debtor submitted a whistleblower tip to the SEC in August 2010, which was just months after the Whistleblower Program was enacted into law. Based upon the Debtor's whistleblower tip and with an enormous amount of support and assistance by the Debtor, the SEC opened and pursued an investigation against Life Partners and certain of its officers. This investigation ultimately resulted in a lawsuit filed by the SEC against Life Partners. Following a trial in federal court, in December 2014 the SEC won a $38.7 million judgment against Life Partners. In an effort to avoid the impact of this judgment, Life Partners filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas.

H. Thomas Moran, II was appointed as the Chapter 11 Trustee in the Life Partners Chapter 11 case. Following his appointment, the Debtor worked with the Trustee to maximize

5

the value of the Life Partners estate for the benefit of its more than 22,000 investors. In December 2016, the Bankruptcy Court confirmed a Chapter 11 plan for Life Partners that will ultimately yield $1.2 billion in investor recoveries.

### D.    The Life Partners Whistleblower Award

There have only been two SEC enforcement actions that will yield investor recoveries of $1 billion or more. The Bernie Madoff case is one. Life Partners is the other. A particularly insidious element of the Life Partners fraud was that of the $1.8 billion of funds it raised from unsophisticated investors, more than $1.6 billion came from those investors' IRA accounts. As a result, the Debtor's efforts to assist the SEC prevented those individuals from having their retirement savings wiped out by one of the largest frauds in Texas history.

Since the inception of the SEC's whistleblower program in 2010, 67 individuals have qualified for an award. Of those 67, only three had their assistance rated as "extraordinary" by the SEC. The Debtor is one of those three. The Debtor's assistance occurred over a five-year period, involved over 3,000 hours of his time, and required that he travel, at his own expense, to locations across the country to assist the SEC with this milestone enforcement action outcome. The Debtor submitted a whistleblower award application in 2015 relating to his actions in the Life Partners case. The initial application was supplemented in 2017 and again in 2020, at which time it was projected that $1.1 billion would be distributed from the Life Partners bankruptcy estate.

In September 2020, the SEC issued a Preliminary Determination indicating that the Debtor was entitled to an award equal to twenty-three (23%) percent of the monetary sanctions that the SEC was able to collect (out of a statutory maximum of thirty percent (30%)). However, the SEC took the position that, because the SEC agreed to subordinate its judgment to the interests of the harmed investors in the Life Partners bankruptcy case, the SEC was not able to

"collect" a monetary sanction.  The Preliminary Determination did not state an award amount, but Debtor's counsel was advised that the award amount was $18,224 as of the date of the Preliminary Determination.[1]

In February 2021, the Debtor filed a contest to the SEC's Preliminary Determination.  In his contest, the Debtor contends that the SEC's determination was in error because the SEC could have collected its judgment, but elected not to.  If the SEC agrees with the Debtor's position, the Life Partners award will increase to approximately $8.9 million (23% of $38.7 million).  If the SEC accepts the Debtor's position, the Debtor would agree with the SEC's final determination and would receive payment of the approximate $8.9 million.  In the event that the Debtor does not agree with the SEC's final determination, the Debtor has a right of direct appeal to the United States District Court for the D.C. Circuit.  There is no statutory or other deadline for the SEC to respond or rule on the Debtor's contest of the preliminary determination letter, but the Debtor is hopeful that this will occur prior to the end of 2021.  In the event that an appeal is required after the SEC makes its determination, the Debtor estimates that the appeal process would take 12-24 months to be fully resolved.

E.    **Other Claims Pursued**

Based upon the success of the Life Partners case, and the fact that this type of work furthers important social goals, the Debtor decided, in 2013, to fully dedicate his time to building a whistleblower practice within MMS.  From 2013 until 2018, those efforts created one of the premier whistleblower practices in the country.  During this period, the Debtor identified, researched, and made SEC submissions relating to ten other companies, all but one representing billion-dollar or greater frauds. Target companies included insurance companies, conglomerates,

---

[1] The Debtor assumes, but does not know, that the $18,224 is equal to 23% of the actual funds collected by the SEC from the individual defendants who were also liable on the $38.7 million judgment against Life Partners.

for-profit higher education companies, and medical testing laboratories. The SEC opened investigations for every one of these submissions by the Debtor. However, only the AmTrust Case (defined below) and the Life Partners case resulted in awards to the Debtor. The Debtor and MMS are not currently pursuing any additional whistleblower claims. However, if any future claims are identified by the Debtor and MMS during the course of their ongoing research, such claims may be pursued.

F.    **The AmTrust Case**

In 2020, the SEC reached a settlement on another of the Debtor's whistleblower cases, AmTrust, for $10.3 million. The Debtor's share of the expected award proceeds is $550,000[2] (the "AmTrust Award"). The AmTrust case is yet another example of how protracted the process to receive an award under the SEC whistleblower program can be. The Debtor filed his initial tip submission in April 2013, and it will likely be another two years (2023) for the case to make it through the SEC's award adjudication process, making it almost a decade from the initial whistleblower submission to the time of award payment.

G.    **Other MMS Activity**

In order to create alternative sources of revenue to mitigate the protracted time period involved in getting paid by the SEC, in 2017 the Debtor decided to expand the revenue opportunities for his firm's research to include selling this data to private equity and hedge funds ("Research Sale Proceeds"). Based on history and expected future performance, the Debtor expects to be able to generate transactions that result in Research Sale Proceeds approximately every 24 months. The assumptions relating to these transactions are set forth in **Exhibit 2**.

---

[2] This is the projected share that the Debtor and the Debtor's estate would receive, net of attorney's contingent fees relating to the AmTrust Award.

The Debtor has also sought to expand the revenue opportunities of his firm by seeking to work with law firms to develop class action lawsuits, where MMS would be hired as expert witnesses on the case. The first such case, *Slam Dunk I v. Connecticut General*, was filed in 2019 in the U.S. District Court for the Southern District of Florida. The Court in that case granted the Defendant's motion to dismiss and the matter is currently on appeal in the U.S. Court of Appeals for the 11th Circuit. The Debtor provided the research that helped build that case and also helped to identify the lead plaintiff to file the case.

In addition to its forensic accounting practice, MMS has another practice area that specializes in assisting insurance companies mitigate surety bond losses. In this capacity, MMS was the lead accounting firm on the largest surety bond claim in history, over $1 billion, involving a prime contractor on the Boston Big Dig project. As part of this type of work, MMS frequently conducts investigations into the financial activities of surety bond claimants. When those investigations find criminal activities, MMS will work with the FBI and the Department of Justice to bring criminal actions against the offenders.

MMS's third practice area has break-even economics at best and was developed primarily to support the Baltimore community. It provides pro bono and below-cost consulting services to local charitable organizations. These projects have included assisting Catholic Charities of Baltimore redesign its back-office operations to lower overhead costs and be supportive of its charitable operations. This engagement lasted nine months, involved interviewing over 140 employees, and achieved all of its goals. MMS performed a similar engagement for the Little Sisters of the Poor, except the focus was to adapt the organization to the declining population of Sisters. MMS has also assisted the Archdiocese of Baltimore improve its back-office operations. On a much smaller scale, MMS and the Debtor have provided pro bono expert witness services

to single mothers involved in support disputes and small business owners engaged in legal disputes who are unable to afford these services.

More than a decade ago, the Debtor and his partner, Gabe Mihaly, both experienced family-related health emergencies that limited their ability to generate revenue for the firm. That financial setback was worsened by the subsequent loss of two of the firm's four partners and the departure of a key senior management consultant. The Debtor became delinquent on his tax payments. The situation was exacerbated by an uneven income stream over the ensuing years and the unexpectedly protracted SEC award adjudication and payment process.

**H.    The Funding Agreement**

The Debtor filed his first award submission on the Life Partners case in 2015. At the time, the SEC indicated that the award adjudication process would take two years. In 2017, the Debtor learned the SEC was no longer able to meet that timeline. In response, he sought litigation funding to address his tax liabilities and to provide some working capital for MMS.

The Debtor entered into a Litigation Funding Agreement (the "Funding Agreement") with Camac Fund, LP in January 2018. Pursuant to the Funding Agreement, Camac agreed to provide the Debtor with $1 million, for the following identified purposes:

| | |
|---|---|
| Business/operations: | $310,829 |
| IRS Tax: | $542,457 |
| State of Maryland Tax: | $146,714 |
| **Total Taxes:** | **$689,171** |

In exchange for its promise to provide $1 million to the Debtor, Camac was to receive a "Funder's Entitlement" from the proceeds of the Life Partners Award or any other "Cases" as defined in the Funding Agreement. Camac provided the Debtor with $310,829 during 2018 for working capital for MMS.

The Debtor's accountant developed a plan whereby the tax-allocated proceeds from the Funding Agreement would remain in an escrow account (later changed to an attorney's IOLTA account) so that the Debtor's accountant could offer the IRS an "offer in lieu of compromise" for the underlying tax liability, with the expectation that the penalties and interest would be waived as part of the agreement.

During 2018, the Debtor's efforts to broaden MMS's business activities to include selling research to private equity or hedge funds was moving forward. Consequently, the debtor decided to delay the "offer in lieu of compromise" plan in order to see if the proceeds from the sale of research would enable him to satisfy both the tax liability and the related penalties and interest. The "offer in lieu of compromise" option would become the back-up plan.

In December 2019, the Debtor paid $418,000 of his outstanding taxes using funds earned from the sale of his research. The Debtor's firm was scheduled to receive the second payment of the research sale proceeds, $425,000, during 2020, enabling the Debtor to satisfy his tax liabilities in full (including penalties and interest).

I.    **The Dispute with Camac**

In May 2020, the Debtor requested that Camac release $349,221 of the $689,000 being held in the attorney's escrow account as reimbursement for the taxes that the Debtor paid directly. At this point, the Debtor was being charged a 40%-plus annual interest rate on these funds (Camac advanced only $310,829 in 2018 and was asserting a claim against the Debtor for $3 million, increasing to $4.2 million in 2021). Camac refused to release the $349,221 and accused the debtor of a breach of contract as the reason for not releasing the funds.

Camac claims that the Debtor breached the Funding Agreement by changing attorneys to represent him on the Life Partners Award. The Debtor vigorously disputes this allegation, insofar as the Funding Agreement did not require that the Debtor be represented by a specific

11

attorney.  Further, the Debtor's original attorney was terminated by the Debtor for cause, for reasons solely related to the attorney's representation of the Debtor in the Life Partners matter. The Debtor obtained replacement counsel for the Life Partners matter who was a twenty-year SEC veteran and who was responsible for setting up the SEC's whistleblower office.  This change of counsel represented a significant upgrade in legal representation and involved engaging a law firm that is highly selective when taking on whistleblower cases.  The change in counsel had no impact whatsoever on the Debtor's relationship with Camac or the Funding Agreement.

At Camac's request, the Debtor sought to have his new law firm change their standard retainer agreement to incorporate the terms of the Funding Agreement.  The Debtor made a good faith effort to do so, but the new law firm declined this request.  Camac then contacted the new Debtor's attorney directly, without the Debtor's permission and in conflict with the terms of the Funding Agreement, to continue to pursue changes to the new attorney's firm's standard retainer agreement.  At that point, the Debtor ceased further contact with Camac.

Camac also contends that it is entitled to payment from the research proceeds received by MMS in 2019 and 2020.  The Debtor disputes this contention because the Funding Agreement only gives Camac rights to proceeds that arise from "Cases", which is a defined term in the Funding Agreement and which does not include other sources of income that do not derive from whistleblower proceeds.  In this instance, any whistleblower filing was ancillary to research that was specifically developed to be sold to a private equity or hedge fund.

In June 2020, the Debtor first became aware of Camac's contentions when it cited these allegations to deny the Debtor access to the remaining $689,000 in funds held in an attorney's IOLTA account.  Camac first raised these issues in June 2020, even though it was aware that the Debtor changed attorneys in February 2019.  Similarly, Camac was aware that the Debtor and

MMS would be receiving proceeds from the sale of research proceeds and did not assert that as a breach of the Funding Agreement. Camac continues to assert a claim against the Debtor of $4.2 million dollars, even though it only advanced roughly one-third of the funds that it agreed to pay to the Debtor.

The Debtor and Camac engaged in discussions to attempt to resolve their disputes. Camac disregarded the mediation provision in the Funding Agreement and filed an arbitration proceeding with the American Arbitration Association. When his efforts to resolve the Camac claim failed, the Debtor commenced his Chapter 11 case to pursue a global reorganization of his financial affairs.

The Debtor has incurred legal fees to date of approximately $170,000 in connection with his efforts to have Camac release the $689,000, paid retainers in connection with the bankruptcy of $150,000, and expects to fund an additional $150,000 in bankruptcy-related legal fees. When those legal fees, which total $470,000, are added to the $689,000 that Camac refused to release from the IOLTA account, the combined amount is almost $1.2 million, which would be sufficient to satisfy almost all of the Debtor's tax liability, including all penalties and interest, which was the Debtor's intent when he requested the release of the remainder of the funding from Camac. Camac's failure to satisfy the full $1 million funding commitment under the Funding Agreement is literally the difference between the Debtor being able to pay his outstanding tax liability and the need for the Debtor to pursue this bankruptcy proceeding.

## III.    BANKRUPTCY PROCEEDINGS

### A.    The Petition for Relief

On January 12, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Maryland (M. Harner, J.).

**B.**    **The Employment of Professionals**

On January 15, 2021, the Debtor filed an Application for Authority to Employ Whiteford, Taylor & Preston L.L.P. as Attorneys for the Debtor and Debtor in Possession (the "WT&P Application").    On February 9, 2021, the Court entered an Order approving the WT&P Application.

On February 3, 2021, the Debtor filed an Application to Employ Kimberly West and the Ashcroft Law Firm as Special Counsel to the Debtor, which was approved by the Court by order entered on February 23, 2021.

**C.**    **Operations**

The Debtor continues to manage his affairs as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

**D.**    **Pending Matters**

**1.**    *Adversary Proceeding Against Camac Fund LP*

On February 10, 2021, the Debtor filed a Complaint (the "Complaint") against Camac and the Berman Tabacco law firm, initiating Adversary Proceeding No. 21-00035 (the "Adversary Proceeding").    Pursuant to the Complaint, the Debtor, for and on behalf of his bankruptcy estate, seeks (a) a determination that a purported lien claimed by Camac on certain of the Debtor's assets is avoidable because Camac failed to perfect its purported lien at the time of execution of the Funding Agreement and only filed a Uniform Commercial Code  ("UCC") financing statement within 90 days prior to the Petition Date; (b) the avoidance and cancellation of the obligation incurred under the Litigation Funding Agreement as a constructive fraudulent conveyance; (c) the turnover of monies due to the Debtor by Camac and the Debtor's attorneys,

Berman Tabacco; (d) the disallowance of Camac's claims against the Debtor; and (e) to the extent Camac is allowed any claim against the Debtor, the reduction of said claim by setoffs due by Camac to the Debtor and the subordination of any such allowed claim to the payment of all other general unsecured creditors. In response to the Complaint, Camac filed a Motion to Abstain from Hearing Adversary Proceeding; Alternatively Motion to Stay Adversary Proceeding. On June 2, 2021, the Court entered an Order Denying Motion to Abstain but Granting Temporary Stay of Adversary Proceeding, which Order stayed the Adversary Proceeding for ninety (90) days.

### 2.    *The Camac Lift Stay Motion*

On February 19, 2021, Camac filed a Motion for Relief from the Automatic Stay to Permit Continuation of Pending Arbitration Proceeding (the "Camac Lift Stay Motion"). The Debtor filed an opposition to the Camac Lift Stay Motion. On June 1, 2021, the Bankruptcy Court issued a Memorandum Opinion wherein the Court determined that the arbitration proceeding should continue as to "Contract Claims" and the "Non-Bankruptcy Claims", but that the "Bankruptcy Claims" would be adjudicated by the Bankruptcy Court. ~~The~~ Pursuant to the scheduling order issued by the arbitrator ~~has~~, the arbitration hearing is scheduled ~~a preliminary hearing conference call for July 9~~to take place on December 14 and 15, 2021~~, at which time the Debtor believes that a schedule will be set for completion of the arbitration~~.

### 3.    *The Complaint Objecting to Dischargeability of Debt*

On April 5, 2021, Camac filed a Complaint Objecting to Dischargeability of Debt. In Count I of its Complaint, Camac alleges that the Debtor obtained financing from Camac under false representations because the Debtor did not disclose the existence of a federal tax lien. The Debtor did not know of the existence of the federal tax lien at the time. Moreover, the federal tax lien was released in August, 2017.

15

The Debtor filed a Motion to Dismiss Count I of Camac's Complaint. A hearing on the motion to dismiss ~~is scheduled for July 20, 2021.~~ was scheduled for July 20, 2021. Prior to that hearing, Camac agreed to the dismissal of Count I of its Complaint without prejudice. A status conference in this matter is set for August 31, 2021.

## IV.    PLAN OF REORGANIZATION

### A.    Goal of Plan

The Debtor has filed his Plan as a means to maximize the value of his Estate for the benefit of his creditors and to reorganize his financial affairs and obtain a fresh start. The following is a summary of the significant provisions of the Plan.

All statements made below are general in nature and are qualified in their entirety by reference to the complete terms of the Plan attached hereto and incorporated herein as **Exhibit 1**. Creditors and parties-in-interest are urged to read the entire Plan and consult with their respective counsel, accountants, and business advisors in order to fully understand the Plan.

The Plan, upon confirmation by the Bankruptcy Court, shall be legally binding upon the Debtor, its creditors, and other parties-in-interest designated by § 1141(a) of the Bankruptcy Code. It is essential that Creditors fully understand the Plan in order to make an informed decision with respect to the treatment of their respective Claims or Interests. Unless otherwise defined herein, all capitalized terms shall have the respective meanings assigned in the Plan. In the event that any disclosure herein provided appears to conflict with an express provision of the Plan, the explicit terms of the Plan, as incorporated as an integral element of the Disclosure Statement, are controlling.

The Debtor believes the Plan provides for the greatest and earliest feasible return to the holders of Allowed Claims in a fair and equitable manner. The following is a summary of the Plan and a brief description of the treatment of the Classes of Claims and Interests.

16

**B.**     **Administrative Claims**

The holders of Allowed Administrative Claims will receive cash equal to 100% of the unpaid portion of such Allowed Administrative Claim on the later of (a) the Effective Date, (b) the date that such Claim becomes an Allowed Administrative Claim, or (c) such other date as such entity may agree to with the Debtor.  Any request for the allowance and payment of an Administrative Claim shall be filed with the Court no later than thirty (30) days after the Confirmation Date.   The Debtor believes that the only Administrative Claims will be professional fees, which will be paid from (a) retainers held by the professionals and (b) monthly disposable income ("MDI"), Research Sale Proceeds, and/or the proceeds of the AmTrust Award and Life Partners Award (after the payment of any secured claim of Camac should the Bankruptcy Court determine that Camac's asserted security interest is not avoidable).   The Debtor's best estimate of potential administrative claims is set forth in **Exhibit 3**.  The Debtor will continue to pay all fees due to the Office of the U.S. Trustee as and when due.

**C.**     **Priority Tax Claims**

The holders of all Allowed Priority Tax Claims will receive cash payments equal to 100% of the unpaid portion of such Allowed Priority Tax Claim over the term of the Plan. The source of funding for these payments shall be as follows:  the AmTrust Award remaining after payment of Administrative Claims shall be paid to the holders of Allowed Priority Tax Claims, unless Camac is allowed a secured claim in the AmTrust Award (in which case Camac would receive the proceeds of the AmTrust Award). The remaining unpaid balance of the Priority Tax Claims will be satisfied by quarterly payments from MDI, Research Sale Proceeds, and any recoveries by the Debtor from the Life Partners Award (after the payment of any allowed secured claim of Camac in the Life Partners Award).  The Debtor's best estimate of Priority Tax Claims is set forth in **Exhibit 3**.   With respect to the IRS, if the reorganized Debtor substantially

defaults on the payment of the tax due to the IRS under the Plan, the entire tax debt still owed to the IRS shall become due and payable immediately, and the IRS may collect these unpaid tax liabilities through administrative collection provisions of the Internal Revenue Code. Interest will accrue on the IRS claim until paid at the applicable rate effective on the date of confirmation.

**D.**      **Priority Non-Tax Claims**

The Debtor is not currently aware of any Priority Non-Tax Claims. No proofs of claim for any priority non-tax claims were filed by the claims bar date. However, in the event that any such claims exist, the holders of Allowed Priority Non-Tax Claims will receive (a) payments consistent with § 1129(a)(9) of the Bankruptcy Code, or (b) such other treatment as the holder of an Allowed Priority Claim may agree to with the Debtor.

**E.**      **Classes of Claims**

1.      *"Class 1 Claim"* shall consist of the Allowed Secured Claim of Santander Bank d/b/a Chrsyler Capital ("Santander Bank"). Santander holds a lien on a 2016 Jeep Cherokee owned by the Debtor.

2.      *"Class 2 Claim"* shall consist of Allowed General Unsecured Claims.

4.      *"Class 3 Claim"* shall consist of the Claim of Camac, if any.

**F.**      **Treatment of Claims**

Claims shall receive the following treatment under the Plan:

6.1      *Class 1 Allowed Secured Claim (Santander Bank)*

(a)      *Impairment*:   Santander Bank is impaired under the Plan. By the Plan, the Debtor will de-accelerate the auto loan with Santander Bank and make the monthly payments to Santander Bank under the applicable loan documents.

(b)    *Treatment*:    In full and complete satisfaction, discharge, and release of its Allowed Secured Claim, Santander Bank shall receive one hundred percent (100%) of its Allowed Secured Claim with applicable non-default rate interest in accordance with the terms and provisions of the loan documents in effect between the Debtor and Santander Bank.

(c)    *Retention of Liens*:    Santander Bank shall continue to retain any lien on its collateral securing said Claim on the Petition Date until the payment in full of its Allowed Secured Claim.

6.2    *Class 2  Allowed General Unsecured Claims*

(a)    *Impairment*:    The holders of the Class 2 Claims are impaired by the Plan.

(b)    *Treatment*:    In full and complete satisfaction, discharge, and release of the Class 2 Allowed General Unsecured Claims, the holders of the Allowed Class 2 Unsecured Claims shall receive their pro rata share of all funds remaining after the payment in full of Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims (if any), the Class 1 Claim, and the payment of any secured claim which may be allowed to Camac.

6.3    *Class 3 Claim of Camac*

(a)    *Impairment*:    The holder of the Class 3 Claim is impaired by the Plan.

(b)    *Treatment*:    Camac filed a proof of claim in the amount of $4.2 million secured by "Litigation Proceeds". The Debtor disputes Camac's status as a secured creditor because the Debtor contends that the perfection of Camac's purported lien is avoidable under Section 547 of the Bankruptcy Code. The Debtor also disputes that Camac should have any Claim against the Debtor. Camac's treatment under the Plan is dependent on the outcome of litigation claims between the Debtor and Camac. In an effort to provide as much information to

19

creditors as possible, the Debtor believes that the following potential outcomes of the Camac litigation are the most likely scenarios:

(i) <u>Camac is not allowed any unsecured or secured claim</u>. In this scenario, Camac would not receive any distribution under the plan and its claims against the Debtor will be discharged.

(ii) <u>Camac is allowed an unsecured claim</u>. In this scenario, Camac would receive payment of its allowed unsecured claim, but only to the extent of its pro rata share of the proceeds of the Life Partners Award shared with Class 3 General Unsecured Creditors.

(iii) <u>Camac is allowed a secured claim</u>. In this scenario, Camac would receive payment in full of its secured claim to the extent of its collateral as determined by the Bankruptcy Court.

(iv) <u>The $689,000 in escrow is ordered to be distributed to the Debtor's estate</u>. If this occurs, these funds shall be utilized by the Debtor to fund the payments to creditors required under the Plan in the order of priority set forth in the Plan.

(v) The Debtor and Camac resolve all litigation and disputes between them and reach an agreement for Camac to have an allowed claim and receive distributions pursuant to the Plan.

## V.    MEANS FOR EXECUTION OF THE PLAN

### A.    Sources of Funds Under Plan

The Debtor shall fund the payments required to be made to creditors under the Plan from the following sources:

(1) any funds on hand as of the Effective Date;

(2) all of the Debtor's projected MDI to be received during the five-year period beginning on the date that the first payment is due under the plan ($1,380 per month). The Debtor has historically received an annual draw of $150,000 from MMS, paid on a monthly basis, and the Debtor believes that this will continue through the term of the Plan. The Debtor believes that the continued efforts by himself and his partner to provide consulting services and generate Research Sale Proceeds will ensure that these draw proceeds are available. Due to the cycle of timing of payments, it may appear from the Debtor's monthly operating reports that the Debtor has experienced negative cash flow since the Petition Date, but this is not the case. A Cash Flow Summary is attached as **Exhibit 5**.

(3) the proceeds from the Adversary Proceeding against Camac, if so ordered by the Bankruptcy Court or arbitrator, and the proceeds of any other Causes of Action identified and pursued by the Debtor;

(4) the proceeds of the AmTrust Award and the Life Partners Award; and

(5) the Debtor's share of Research Sale Proceeds to be received by MMS over the term of the Plan.

A summary of the projected plan funding, together with assumptions relating to same, is set forth on **Exhibit 2**.

B.    **Payment of Claims and Estimation**

1.    Payment. Distributions to be made under this Plan may be made at the option of the Debtor by check drawn on a domestic bank or by wire transfer. The Debtor shall act as the disbursing agent for the purpose of making the distributions provided under the Plan.

2.    Estimation. The Debtor may request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether the Debtor previously objected to such Claim. The Bankruptcy Court

shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions).

C.    **Sale of Assets Under the Plan**

Any sales, transfers, or other dispositions of assets and property by the Debtor will be free and clear of all liens, security interests, Claims, and interests unless otherwise ordered by the Court and shall be as is, where is, without representations or warranties of any kind. The implementation and enforcement of the Plan provisions transferring assets or property, and the making, delivery, and recording of any "instrument of transfer" pursuant to the Plan, shall not be taxed under any law imposing a stamp tax, transfer tax, or similar tax, pursuant to § 1146(c) of the Bankruptcy Code. The Debtor does not currently intend to pursue the sale of any estate assets.

D.    **Executory Contracts and Unexpired Leases**

All executory contracts and unexpired leases of the Estate which are not rejected or as to which the Debtor has not applied to the Court for authority to reject by the Confirmation Date shall be deemed to have been assumed as of the Effective Date.

E.  **Preservation of Causes of Action**

Unless any Causes of Action held by the Debtor are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Final Order, in accordance with Section 1123(b) of the Bankruptcy Code, the Debtor shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of

22

Action shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtor will not pursue any and all available Causes of Action against them. The Debtor expressly reserves all rights to prosecute any and all Causes of Action against any Entity for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.  Subject to an ongoing assessment of potentials Causes of Action, as of the date of filing of this Disclosure Statement, the only Causes of Action that the Debtor believes exist which have not yet been the subject of a filed action are potential claims against Bryan Wood and Berman Tabacco.  Prior to the Petition Date, the Debtor made tuition payments for his daughter.  Prior to and after the Petition Date, the Debtor made support payments to his spouse in connection with the contemplated divorce proceeding.  The Debtor does not believe that any of these payments are avoidable and would be viable causes of action.

F.    **Effect of Confirmation**

The confirmation of the Plan shall have, among many others, the following effects:

1.    Jurisdiction of the Bankruptcy Court:  Following the Confirmation Date, the Bankruptcy Court shall continue to have exclusive jurisdiction over any disputes relating to the Plan or any matters relating in any way to the Plan.

2.    Binding Effect:  Except as otherwise provided in § 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against the Debtor, and his respective successors or assigns, whether or not the

Claim of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

3.    Discharge. The Debtor will request a discharge in accordance with § 1141(d)(5) of the Bankruptcy Code.

4.    Rights of Action:  On and after the Confirmation Date, the Debtor shall have and is hereby appointed to hold the exclusive right and standing to enforce for the benefit of the Estate and its Creditors any and all present or future rights, claims, or Causes of Action against any person and rights of the Debtor.  The Debtor may settle or release any or all such rights of action as he deems appropriate.  The Debtor may offset any such claim held against a person against any Claim or distribution due such person under the Plan.  To the extent that the Debtor exercises any setoff against any Allowed Claim or the distributions to be made pursuant to this Plan, the Debtor shall provide written notice of such setoff to the holder of the Claim and shall file such notice with the Bankruptcy Court.  The holder of such Claim shall have thirty (30) days to object or otherwise respond to the amount of setoff by filing a written response with the Bankruptcy Court.  To the extent that the Debtor and holder of such Claim cannot resolve their dispute, the holder of the Claim shall schedule a hearing with the Bankruptcy Court to address the dispute.  If the holder of such Claim fails to object or respond within thirty (30) days, the setoff shall be effective.

5.    Injunction: On and after the Confirmation Date, all persons are permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively, or otherwise) on account of or respecting any claim, debt, right, or cause of action of the Debtor prior to the Confirmation Date.

## VI.    ESTIMATED VALUE OF ESTATE ASSETS

The estimated value of the Debtor's current assets are outlined in the Schedules filed with the Bankruptcy Court and as outlined in **Exhibit 4** hereto.

## VII.    ESTIMATION OF DISTRIBUTIONS TO CREDITORS

Pursuant to the Plan, the Debtor believes that all unclassified Claims and the holders of the Class 1 and Class 2 Claims will be paid in full.  Distributions to Class 3 are dependent upon, among other things, the ultimate amount received from the Life Partners Award and the outcome of the litigation with Camac and any other Causes of Action.  Based upon the Debtor's estimated values and expected outcome of litigation, estimated distributions to Class 3 are set forth on **Exhibit 3**.  In the event that all creditors do not receive payment in full of their allowed claims from the funding sources under the Plan, the Debtor believes that the Plan will contribute the sum of $25,000 from other funding sources to comply with the absolute priority rule insofar as all of the Debtor's assets are either being distributed to creditors or are exempt under Maryland law..

## VIII.    LIQUIDATION ANALYSIS – BEST INTEREST OF CREDITORS

The Debtor believes that the Plan is fair and equitable and in the best interests of all holders of Claims within the meaning of the Bankruptcy Code.  The Debtor also believes that the Plan presents the best opportunity available to maximize the value of the assets, to make prompt distributions on account of Allowed Claims, and to reduce administrative costs.  The alternative to the Plan, conversion to a case under Chapter 7 of the Bankruptcy Code, would not, in the opinion of the Debtor, result in a greater distribution to unsecured creditors.  A liquidation analysis is attached hereto as **Exhibit 4.**

If this case were to be converted to a case under Chapter 7 of the Bankruptcy Code, a Chapter 7 trustee would be appointed to take over the liquidation of the assets, to pursue claims and causes of action, to object to claims, and to carry out all of the other duties that the Plan

Agent will carry out under the Plan.  An appointed trustee, however, would be a stranger to the case and would not benefit from the experience of the Debtor and the administration of this Estate and would lack the Debtor's insight into the assets and claims and the claims asserted against the Estate.  Chapter 7 also offers less flexibility than is provided under the Plan.  Thus, it would likely be more expensive to administer this case in Chapter 7.

A Chapter 7 trustee would also be required to spend a great deal of time becoming familiar with all aspects of these cases, including any ongoing litigation in which the estate is active.  A Chapter 7 trustee would be entitled to commissions on the value of assets distributed, and would likely hire new counsel and other professionals to help her or him carry out the duties and responsibilities as trustee.  Such professionals would also be faced with the time-consuming and expensive task of becoming familiar with all aspects of the Debtor's assets, liabilities, history, and claims.   The cost of the learning curve would be an administrative expense.

The Debtor believes that the expense inherent in a Chapter 7 trustee and her or his professionals gathering enough information about this case to carry out their obligations to creditors more than outweighs the cost of confirming the Debtor's proposed Plan.  The Debtor also believes that the Plan can be confirmed, and that the Plan Agent can begin to carry out the same responsibilities, sooner than a new Chapter 7 trustee could learn enough about the case to commence action on an informed basis.

Accordingly, the Debtor submits that each class of creditors and interests will receive at least as much under the Plan as they would if this case were to be converted to a case under Chapter 7 of the Bankruptcy Code and the assets were liquidated by a Chapter 7 Trustee.

## IX.   CRAMDOWN

Under § 1129(b) of the Bankruptcy Code, if one or more classes of impaired claims do not accept the Plan, then Bankruptcy Court may confirm the Plan only if the Bankruptcy Court

finds that the Plan was accepted by at least one non-insider impaired class of claims and does not discriminate unfairly against, and is fair and equitable as to, all non-accepting impaired classes. This is referred to as a cramdown. The fair and equitable test requires the Bankruptcy Court to find that, with respect to classes of secured claims, the holders of the secured claims retain their liens, that each holder of such a claim receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of such holder's interest in the estate's interest in such property, and that each holder of such a claim realize the indubitable equivalent of such claim; and, with respect to classes of unsecured claims, unless all members of a non-accepting, impaired class receive payment in full of their allowed claims, no class that is junior in priority to the non-accepting impaired class shall receive anything under the Plan. The third criterion is that all requirements of § 1129(a) of the Bankruptcy Code be met other than § 1129(a)(8) of the Bankruptcy Code. IF ANY CLASS REJECTS THE PLAN, THE DEBTOR WILL SEEK TO CONFIRM THE PLAN PURSUANT TO THE CRAMDOWN METHOD PROVIDED BY SECTION 1129(b). THE TREATMENT AFFORDED CREDITORS IN EACH CLASS IN THE EVENT OF A "CRAMDOWN" WILL BE AS INDICATED HEREIN.

## X.    FEDERAL INCOME TAX CONSEQUENCES

THE FEDERAL, STATE, LOCAL, AND OTHER GENERAL TAX CONSEQUENCES AS A RESULT OF THE PLAN TO THE HOLDERS OF CLAIMS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. THEREFORE, EACH CREDITOR SHOULD CONSULT THEIR OWN TAX ADVISOR TO DETERMINE THE TREATMENT AFFORDED THEIR RESPECTIVE CLAIMS OR BY THE PLAN UNDER FEDERAL TAX LAW, THE TAX LAW OF THE

VARIOUS STATES AND LOCAL JURISDICTIONS OF THE UNITED STATES, AND THE LAWS OF FOREIGN JURISDICTIONS.

NO STATEMENT IN THIS DISCLOSURE STATEMENT SHOULD BE CONSTRUED AS LEGAL OR TAX ADVICE. THE DEBTOR AND HIS COUNSEL DO NOT ASSUME ANY RESPONSIBILITY OR LIABILITY FOR THE TAX CONSEQUENCES A CREDITOR MAY INCUR AS A RESULT OF THE TREATMENT AFFORDED THEIR CLAIM OR INTEREST UNDER THE PLAN.

XI.    **VOTING ON THE PLAN AND CONFIRMATION OF THE PLAN**

After approval of this Disclosure Statement by the Bankruptcy Court, a copy will be mailed to all creditors, all parties-in-interest entitled to vote pursuant to § 1126 of the Bankruptcy Code, and within the manner specified by Bankruptcy Rule 3017(d), accompanied by a ballot. Approval or rejection of the Plan is measured by Classes of Claims rather than by each Claim holder. Any Class of Claims which is not impaired by the Plan is conclusively presumed to have accepted the Plan.

Pursuant to § 1128 of the Code and Bankruptcy Rule 2002(b), the Court shall conduct a hearing to consider confirmation of the Plan on twenty-five (25) days' notice to creditors and parties-in-interest, unless shortened by order of the Bankruptcy Court. A party-in-interest may object to the confirmation of the Plan. The date by which objections must be filed to the confirmation of the Plan and by which votes must be submitted shall be established at a date and in a manner as determined by the Bankruptcy Court.

Respectfully submitted,

*/s/ John M. McPherson*
John M. McPherson

28

Debtor and Debtor-in-Possession


WHITEFORD, TAYLOR & PRESTON L.L.P.

*/s/Brent C. Strickland*
Brent C. Strickland, Bar No. 22704
Paul M. Nussbaum, Bar No. 04394
111 Rockville Pike, Suite 800
(410) 347-9402
bstrickland@wtplaw.com
pnussbaum@wtplaw.com