**AMERICAN ARBITRATION ASSOCIATION**
**COMMERCIAL ARBITRATION TRIBUNAL**

_____

CAMAC FUND, L.P.,

           Claimant,

v.                                     AAA Case No. 01-20-0015-0847

JOHN McPHERSON,

           Respondent.

_____

**FINAL AWARD**

# TABLE OF CONTENTS

I.      THE PARTIES ……………………………………………………….... 1

II.     THE ARBITRATION AGREEMENT……………..……………….…..……….. 1

III.    THE PROCEDURAL HISTORY OF THE ARBITRATION……..……............ 2

IV.     THE CLAIMS AND COUNTERCLAIMS………………………………..... 5

V.      THE FACTUAL BACKGROUND TO THE DISPUTE……………………… 7

    A. The Background To The LFA ………………………………..……… 7

    B. The LFA………………………………………………………………...... 10

    C. Events After Execution of the LFA …………………………………..... 13

        1. Mr. McPherson Withdrew $310,000 From The
           LFA's Escrow Account ……………………………………… 13

        2. The Replacement of Attorney Wood As Counsel…………………... 13

        3. The General Electric Short Sale …………………………………. 14

        4. Mr. McPhersons Payment of Certain Back Taxes Owed
           To The IRS and the State of Maryland ……….……………..…. 15

        5. Mr. McPherson's Request For Release Of $349,221 From The
           Escrow Account……………………………………………….... 16

        6. The Separation Agreement……………………………………… 17

        7. Mr. McPherson Files For Bankruptcy……………………..…. 17

VI.     THE ARBITRATOR'S ANALYSIS OF THE PARTIES' CLAIMS…….…... 17

    A. The Delaware Law Of Contract Interpretation……………………….17

    B. Camac's Claims Against Mr. McPherson For Breach of Contract………. 19

        **1.** The Claim That Mr. McPherson Breached the LFA By
           Failing To Pay His Tax Obligations ……………….……..…. 19

**2.** The Claim That Mr. McPherson Breached The LFA By Terminating Mr. Wood As Attorney For the Life Partners Case……………………….…………………………..…….... 23

**3.** The Claim Mr. McPherson's Engagement Agreement With Buckley Sandler Contained Terms That Violated The LFA ……………….………………………..……. 25

**4.** The Claim That Mr. McPherson Breached The LFA By Failing To Pay Camac Alleged Litigation Proceeds Which Mr. McPherson Received From The GE Short Sale ………………………….…….. 26

**5.** The Claim That A Provision In The Separation Agreement Regarding Life Partners Breached The LFA ………..……………. 31

C. Camac's Claim Against Mr. McPherson For Unjust Enrichment…………. 33

D. Camac's Claim That Mr. McPherson Violated The Implied Covenant of Good Faith and Fair Dealing ………………………….…….. 33

E. Mr. McPherson's Counterclaims ……………………………………….... 34

VI.    REMEDY…………………………………………………………..…. 37

VII.   THE PARTIES' REQUESTS FOR AN AWARD OF ATTORNEY'S FEES… 42

VIII.  THE FINAL AWARD………………………………………………….. 42

# FINAL AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated January 4, 2018, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, hereby issue this FINAL AWARD, as follows:

## I.    THE PARTIES

Claimant Camac Fund, L.P. ("Camac") is an investment firm formed under Delaware law, with its principal office located in New York.  Mr. Eric Shahinian is the Managing Member of its General Partner.

Respondent John McPherson is an individual residing in Maryland.  Mr. McPherson is also a fifty percent owner of Mihaly, McPherson Signorelli, LLC ("MMS").  MMS is not a party to this arbitration.

## II.    THE ARBITRATION AGREEMENT

Camac and Mr. McPherson entered into a Litigation Funding Agreement, dated January 4, 2018 (the "LFA" or "Agreement").  The LFA contains a dispute resolution provision which provides, in relevant part, as follows:

> If a dispute arises under this Agreement which the parties cannot resolve within 15 business days, the dispute may be referred by any party to a mutually acceptable and neutral mediator . . . . If the parties fail to agree upon a neutral mediator within 30 business days after a Party notifies the other of the need for mediation, or if the Parties fail in mediation to resolve the dispute, the parties agree to submit such dispute to binding arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules . . . and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

1

*See* LFA, at p. 4.

The LFA also contains a governing law clause which provides that "any and all claims or causes of action (whether in contract or tort) based upon, arising out of or relating to this Agreement and to the transactions contemplated by this Agreement or the negotiation, execution and enforcement of this Agreement, shall be governed by and construed and enforced in accordance with the internal Laws of the State of Delaware without reference to its choice of law rules." *Id.*

### III.    THE PROCEDURAL HISTORY OF THE ARBITRATION

Camac, by its counsel, filed a Statement of Claim and Demand for Arbitration, dated September 30, 2020.  McPherson, by his counsel, filed Respondent's Challenge to Arbitrability and Answer to Demand for Arbitration, dated October 15, 2020 (the "Answer").[1]  Respondent separately filed Respondent's Counterclaim, dated October 27, 2020 (the "Counterlciams"), in which it asserted several counterclaims.

On January 12, 2021, Mr. McPherson filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Maryland.  *See* Exhibit 27.  As a result of the filing of the chapter 11 bankruptcy case, this arbitration was automatically stayed pursuant to section 362(a) of the Bankruptcy Code.

---

[1] In its Answer, Respondent asserted that the arbitration should be dismissed arguing that Claimant failed to comply with the alleged obligation in the LFA which required mediation as a condition precedent to arbitration.  Respondent did not pursue this objection during the arbitration by seeking dismissal of the arbitration nor did Respondent address this objection at the hearing or in its post-hearing submissions.  Accordingly, this objection has been waived.  In any event, the Arbitrator finds that this objection to arbitration is not a valid objection because the option to pursue mediation set forth in the LFA is optional, not mandatory.  The LFA provides the parties with the option to pursue mediation stating that "[i]f a dispute arises under this Agreement which the parties cannot resolve within 15 business days, the dispute *may be referred* by any party to a mutually acceptable and neutral mediator."  *See* LFA at p. 4 (emphasis added).  The objection to jurisdiction is rejected on the merits because the mediation option in the LFA is not mandatory.

On February 9, 2021, Camac filed a Motion for Relief From The Automatic Stay To Permit Continuation Of The Pending Arbitration Proceeding. On June 1, 2021, the Bankruptcy Court issued a Memorandum Opinion wherein the Court held that the arbitration should continue as to the "Contract Claims" and the "Non-Bankruptcy Claims" that are subject to arbitration under the LFA, but that any Bankruptcy law claims would be adjudicated by the Bankruptcy Court. *See In re John McDonnell McPherson, Debtor,* Case No. 21-102050-MMH, Memorandum Opinion, filed June 1, 2021 [Docket entry 62], United States Bankruptcy Court for the District of Maryland. The Bankruptcy Court further ordered that "the parties may not seek to enforce any decision of the arbitrator outside of this [Bankruptcy] Court; rather, all enforcement and collection actions must proceed in this Court in the context of the chapter 11 case." *See* Order Granting Relief from Stay For Limited Purpose of Continuing Prepetition Arbitration Proceedings, filed June 1, 2021.

On July 9, 2021, a preliminary hearing was held with the parties. On July 11, 2021, the Arbitrator issued Procedural Order No. 1, which set a schedule for this arbitration.

In Procedural Order No. 2, dated August 23, 2021, the Arbitrator (i) set a briefing schedule for the filing of a motion requested by Respondent addressing the issue of governing law and (ii) granted Respondent leave to file a motion for a protective order concerning a discovery issue.

In Procedural Order No. 3, dated October 5, 2021, the Arbitrator denied the motion for a protective order with respect to compensation Mr. McPherson earned relating to a short sale involving the stock of General Electric Company("GE"). Respondent argued that a protective order was justified because any income related to any sale of GE stock was outside the scope of

the LFA.  The Arbitrator denied the motion because whether such income was subject to the LFA was a disputed issue of fact which could not be determined based on the documents submitted on the motion.

In Procedural Order No. 4, dated November 20, 2221, the Arbitrator issued a ruling addressing the governing law.  In the Demand for Arbitration, Camac alleged that it provided $1 million to Mr. McPherson pursuant to the terms of the LFA because Mr. McPherson needed money to fund his business operations and to pay certain tax liabilities.  Mr. McPherson, as part of his response to the claims asserted in the Demand for Arbitration, raised an affirmative defense that the LFA was unenforceable because it was criminally usurious under New York law.  Camac argued, *inter alia*, that New York's usury law did not apply because the LFA was governed by Delaware law.  The Arbitrator ruled that the Delaware choice of law cause was valid and enforceable and that New York's usury law did not apply to the LFA.

In Procedural Order No. 5, dated November 24, 2021, the Arbitrator granted the parties' joint request for permission to take depositions and set a revised schedule for the arbitration.

In Procedural Order No. 6, dated March 23, 2022, the Arbitrator granted the Parties' joint request that the hearing on the merits take place in person and set the hearing for April 13, 14, and 15, 2022.  The hearing was subsequently postponed on consent to May 23-26, 2022.

On April 11, 2022, Claimant requested permission pursuant to AAA Commercial Rule 6(b) to amend its Statement of Claim to add the allegation that Respondent also breached by LFA by granting his wife in a separation agreement a 50% interest in a certain potential whistleblower award.  Claimant stated that it had only learned of the existence of the separation agreement as a result of the recent deposition of the Respondent.  With the parties' consent, this

4

matter was agreed to be addressed at the commencement of the hearing on the merits.  At the start of the hearing on the merits, the Arbitrator granted Claimant's request to add this additional claim for breach.  *See* Tr. at 7.

In Procedural Oder No. 7, dated April 30, 2022, the Arbitrator ordered that each person attending the hearing was required to confirm at the start of each day that they had taken a COVID-19 self-test within the prior 24 hours and tested negative.

The hearing on the merits took place on May 24, 25, & 26, 2022 at the offices of Fox Rothschild, LLP, 101 Park Avenue, New York, N.Y.  Claimant was represented by Sidney Liebesman, Esq. of Fox Rothschild, LLP and Respondent was represented by Kim West, Esq. of the Ashcroft Law Firm   At the hearing, testimony was heard from Mr. Eric Shahinian, Mr. John McPherson, and Bryon Wood, Esq. and 218 exhibits were received into evidence.

At the conclusion of the hearing, counsel for the Claimant and counsel for Respondent stated that each had no further evidence to present, except with respect to submissions relating to the issue of attorney's fees.  *See* Tr. at 1035-36.

The Parties agreed on a schedule for post-hearing briefs, whereby opening briefs were to filed on July 15, 2022 and reply briefs on July 29, 2022.  The Parties filed opening submissions addressing the issue of attorney's fees and costs and pre-award and post-award interest on August 11, 2022 and reply submissions on August 18, 2022.

## IV.    THE CLAIMS AND COUNTERCLAIMS

Claimant in its Statement of Claim asserted three claims for relief.  First, Claimant asserted a claim for breach of contract alleging that Respondent has committed several breaches of the LFA.  Second, Claimant asserted a claim alleging that Respondent's conduct constituted a

breach of the implied covenant of good faith and fair dealing. Third, Claimant asserted a claim for unjust enrichment alleging that if Respondent is permitted to keep the monies owed to Claimant under the LFA, that Respondent will be unjustly enriched.

Respondent in its Counterclaims asserted the following counterclaims:

First, Respondent asserted a claim for abuse of process, alleging that Claimant had pressured Mr. McPherson to renegotiate the LFA under threat of being named as a respondent in this arbitration proceeding and that this constitutes an improper purpose or motive for filing an arbitration demand.

Second, Respondent asserted a claim for breach of contract alleging that Claimant breached the LFA when it refused his request for the release of $349,221 from the LFA's escrow account.

Third, Respondent asserted a claim for breach of the implied duty of good faith and fair dealing based on Claimant's refusal to release the requested $349,221.

Fourth, Respondent asserted a claim for unjust enrichment claiming that if Claimant is permitted to maintain control over the funds in the LFA's escrow account that should be paid to Respondent that Claimant will be unjustly enriched.

Fifth, Respondent asserted a claim for conversion based on Claimant's refusal to release the requested $349,221.

Sixth, Respondent asserted a claim for declaratory judgment based on alleged violation of Section 5-501 of the New York General Obligations Law.

Seventh, Respondent asserted a claim for violation of the Fair Debt Collection Practices Act, 15 U.S.C. §1692.

6

Eighth, Respondent asserted a claim for violation of §349 of the New York General Business Law.

At the start of the hearing on the merits, Respondent stated that it was withdrawing counterclaims 6, 7 and 8 above. *See* Tr. at 6.

## V.    THE FACTUAL BACKGROUND TO THE DISPUTE

The following sections of this Final Award set forth the finding of fact and conclusions of law by the Arbitrator based on review of all of the testimonial and documentary evidence presented at the hearing and consideration of all the post-hearing submissions by the Parties.

### A.  The Background To The LFA

Camac is an investment firm formed under Delaware law by Eric Shahinian in February 2011. Tr. at 14-15. Camac has approximately $160 million in assets under management. Tr. at 15.

Mr. McPherson is a CPA and has an MBA from Duke University. Mr. McPherson is a forensic accountant and had previously been employed by Ernst & Young and Deloitte. Tr. 548-49. In about 2002, Mr. McPherson, together with two colleagues, formed Mialy, McPherson Signorelli, LLC ("MMS"), a firm focused on providing forensic accounting services. Mr. McPherson is a 50% owner in MMS. Tr. at 549-50.

In 2010, Mr. McPherson identified what he considered to be a major financial fraud being conducted by a publicly traded company called Life Partners Holding, Inc. ("Life Partners"). Mr. McPherson contacted the SEC and provided the SEC with information and analysis regarding this alleged financial fraud and also later submitted a formal "whistleblower" filing with the SEC. *See* Tr. at 393. As a result of the information and assistance he provided, the SEC

7

opened an investigation into Life Partners and in 2012 it sued Life Partners. In 2014, the SEC won a jury verdict resulting in a judgment against Life Partners in the amount of approximately $38.7 million. Tr. at 552.[2]

In general terms, the U.S. government's whistleblower programs are designed to encourage individuals to come forward and provide the government with information concerning financial fraud. The first step is for the person to file with the SEC (or such other governmental agency such as the IRS or CFTC which have their own similar programs) a confidential Tip, Complaint, or Referral Form (a "TCR") setting out the facts showing the alleged of fraud. If the SEC finds the information meritorious it will open an investigation. If the SEC decides to pursue legal action against the target company and obtains a monetary recovery, then the whistleblower becomes entitled to apply to receive a financial award of between 10% and 30% of the total monetary amount collected by the SEC from the company. *See* Tr. at 18, 408-13, 416-18.

Starting in 2013, Mr. McPherson decided to focuse his professional activity virtually fulltime on the identification and pursuit of claims under whistleblower programs administered by the SEC. Tr. at 370, 551-52. Since that time, Mr. McPherson has filed more than 11 whistleblower TCRs with the SEC. Tr. at 549. In every case, the SEC has opened an investigation. Tr. at 798. In two of these cases, the Life Partners case and the Amtrust case, the SEC has received a monetary recovery and published a notice of covered action which serves to trigger the opportunity for the whistleblower to file a request for a monetary award. However, as

---

[2] The SEC lawsuit was filed against Life Partners and its senior executives. As a result, the total judgment was in the amount of approximately $47 million. Tr. at 444-45.

8

of the date of the hearing, Mr. McPherson has not received any money from the SEC with respect to any his whistleblower cases. Tr. at 798.[3]

The whistleblower filing that Mr. McPherson made with the SEC regarding the fraud he uncovered at Life Partners is central to the issues in this arbitration. As noted above, the SEC commenced an investigation and later successfully pursued litigation against Life Partners resulting in a judgment being entered against Life Partner in 2014 of approximately $38.7 million. Tr. at 444-45. The SEC also filed a notice of covered action with respect to the Life Partners case. As a result, Mr. McPherson was able to file an application with the SEC seeking an award under the SEC's whistleblower program. Mr. McPherson stated that based on the judgment entered in the Life Partners case, that he expected to be granted a whistleblower award in the range of between $8 - $13 million, and perhaps more. Tr. at 49, 445-46.

However, the whistleblower award process by which Mr. McPherson was seeking to obtain an award regarding Life Partners became complicated because Life Partners filed for bankruptcy and the award process proceeded extremely slowly. One consequence of this substantial delay was that Mr. McPherson found himself in need of funds. As Mr. McPherson explained to one of the people he approached for money:

> I think that I may have mentioned to you sometime over the summer that we learned from the SEC that they were no longer honoring their two year commitment to processing whistleblower award applications and that they would not commit to a timeline for the LPHI [Life Partners] whistleblower award I have been carrying the whistleblower practice for seven years and another two plus years before a payout was just not financially feasible.

---

[3] In the Life Partners case, SEC has issued a preliminary determination granting him an award of $18,000. Mr. McPherson has challenged this determination as being too low. Tr. at 799.

9

Exhibit 7.

As a result, Mr. McPherson begun exploring options for obtaining an advance of funds from a third party which he would repay once he received his expected award from the Life Partners case. One of the people Mr. McPherson contacted in this regard was Mr. Shahinian. Tr. 31, 597. It was a result of these discussions that Mr. McPherson and Camac negotiated and entered into the LFA.

### B. The LFA

The full title of the LFA is Litigation Funding Agreement. The LFA recites that Mr. McPherson (referred to as the "Claimant or "Litigant") "desires funding for his business and operations, as well as to extinguish outstanding liabilities" and that Camac (defined as the "Funder") is "willing to provide such funding in exchange for a share of Litigation Proceeds (as defined below)." LFA at p. 1.[4] The LFA further provides that "[s]ubject to the terms and conditions of this Agreement, Funder agrees to purchase and Litigant agrees to sell a portion of Litigation Proceeds (Funder's Entitlement) in exchange for the Funder's obligation to provide the Committed Capital." *Id.* at 2. In the most general terms, and setting aside certain issues in dispute, the LFA provided for the advancement to Mr. McPherson of $1 million in return for the Funder being entitled to receive a portion of the funds that Mr. McPherson might be receive from the Life Partners case or from other similar whistleblower submissions he has made.

---

[4] The LFA itself does not have page numbers, but page numbers have been ascribed to its pages in order to aid references to its provisions.

10

The key provisions and definitions of the LFA relevant to this arbitration are set forth below.

The term **Cases** is defined as:

| Cases | SEC v Life Partners Holdings, Inc., Brian D. Pardo, R. Scott Peden and David M. Martin, Case No. 12-cv-0033 and all affiliated persons/entities (collectively, "Life Partners")<br><br>Any and all other submissions, cases, or the like under the SEC, IRS, or CFTC whistleblower program, or under any qui tam statute. |
|---|---|

The term **Litigation Proceeds** is defined as:

| Litigation Proceeds | "Litigation Proceeds" means the gross revenues, recoveries and/or proceeds, whether monetary or non-monetary, obtained from, paid by, or paid on behalf of the Cases. This includes, but is not limited to, all whistleblower payments paid by any government agency, expert witness revenues, all damages, settlement sums, compensation, accounts of profits, restitution, licensing revenues, sums from any development and/or commercialization agreement, costs, fees, and expenses received from the Cases, and all similar sums, before deduction of any taxes. |
|---|---|

The term **Use of Proceeds** is defined as:

| Use of Proceeds | Litigant agrees that the Released Funding shall be used solely for the purposes of funding his business and operations, as well as extinguishment of the following liabilities in full. The amount pertaining to the extinguishment of the following liabilities shall be held in Attorney's IOLTA account until verified in writing by the litigant and then will be released from such account pursuant to instruction by Funder. Under no circumstances can the Committed Capital be used for any other purpose than is directly outlined below. Any violation of the use of Proceeds shall constitute a breach of the agreement. |
|---|---|

11

|   | Business/Operations - $310,829<br>IRS Tax - $542,457<br>State of Maryland Tax - $146,714 |
|---|---|

The term **Attorney** is defined as:

| Attorney | Bryan Wood, Esq. |
|---|---|

The term **Funder's Entitlement** is defined as:

| Funder's Entitlement | Total aggregate amount due to Funder with respect to the Cases (each such amount, the "Funder's Entitlement") is:<br><br>$1,370,000 if Funders Entitlement is paid in full during the calendar year 2018<br>$2,000,000 if Funders Entitlement is paid in full during the calendar year 2019<br>$3,000,000 if Funders Entitlement is paid in full during the calendar year 2020<br>$4,200,000 if Funders Entitlement is paid in full during the calendar year 2021<br>$5,950,000 if Funders Entitlement is paid in full during the calendar year 2022<br>$8,650,000 if Funders Entitlement is paid in full during the calendar year 2023 or thereafter |
|---|---|

As will be discussed below, another provision of the LFA relevant to the issues in the arbitration is the **Buy Down Of Funder's Entitlement**, which provides as follows:

> BUY DOWN OF FUNDER'S ENTITLEMENT. Litigant shall have the right at any time prior to satisfying the full amount owed under the Funder's Entitlement at one time to buy down 25% or 50% of the Funder's Entitlement. In the event Litigant chooses to exercise his rights under this clause, Litigant shall pay Funder 25% or 50% of the Funder's Entitlement for that calendar year. For that and all subsequent calendar years, the Funder's Entitlement shall be reduced

12

> by the percentage of the Funder's Entitlement that Litigant paid
> down....

LFA at p. 3.

### C.  Events After Execution Of The LFA

There were several events that occurred after execution of the LFA that are relevant to the issues in this arbitration.

#### 1.  Mr. McPherson Withdrew $310,00 From The LFA's Escrow Account

After execution of the LFA, Camac deposited the required $1 million into the escrow account controlled by Bryan Wood's law firm.  *See* Exhibit 8; Tr. at 77-78.  Between January 8, 2018 and July 23, 2018, Mr. McPherson requested and received six withdrawals from the account totaling $310,000, all of which were used for purposes of business operations.  *See* Exhibits 8 and 160; Tr. 78, 80-81.  Mr. McPherson did not, however, request any withdrawal of the $689,171 that had been designated to be used by him to pay certain tax liabilities to the IRS and the State of Maryland.

#### 2.  The Replacement of Attorney Wood As Counsel

In late 2018, there was a disagreement between Mr. McPherson and Mr. Wood which resulted in Mr. McPherson deciding to terminate Mr. Wood as his counsel in the Life Partners case and replace him with the law firm Buckley Sandler LLP.  Tr. at 516-17, 679.  Mr. Wood continued to represent Mr. McPherson in certain other cases.  Tr. at 899.  In February 2019, Mr. McPherson notified Mr. Shahinian that he had replaced Mr. Wood.  Tr. at 270-72; 330-31; Exhibit 202.

13

### 3. The General Electric Short Sale

In early 2019, Mr. McPherson had started investigating what he considered to be a potential fraud involving the financial statements of GE. In connection with this research, Mr. McPherson, together with Harry Markopolos, began having discussions with hedge funds with respect to this research. In general terms, the project proposed to the hedge funds was that Mr. McPherson's group would prepare a research report describing the financial fraud at GE and provide this report to the hedge fund. The hedge fund would then short GE's stock. Once the short position was in place, then Mr. McPherson's group would go public with its negative report. The expectation was that the publication of the research report disclosing this alleged fraud would cause GE's stock price to fall, thereby allowing the hedge fund to earn profits from its short position.

In July 2019, Mr. Markopolos's company (Forensic Decisions PR LLC) signed a research agreement with Paloma Partners, a hedge fund, with respect to the potential short sale of GE stock. *See* Exhibits 14 & 20; Tr. at 921-23. The research work performed by Mr. McPherson's group when completed resulted in a very extensive report (which they labeled a "Whistleblower Report") setting forth the group's analysis in support of what it called "GE's $38 Billion in Accounting Fraud." *See* Exhibit 16. The research results were first provided to Paloma Partners in order for the hedge fund to short GE securities. See Tr. at 938-39; Exhibit 17. Thereafter, on August 13, 2019, Mr. McPherson's group provided a copy of the GE Whistleblower Report to the SEC under its whistleblower program. Tr. at 531-32; 926-27; Exhibit 185.

On August 14, 2019, Mr. McPherson and Mr. Markopolos went public with its GE Whistleblower Report, including television interviews and stories in major newspapers. Tr. at

930-31, 952, 954. As a result of the publication of the GE Whistleblower Report, GE's stock price fell over 10 percent. Tr. 952-53. This stock price drop allowed Paloma Partners to make a substantial profit on its short positions. Under the agreement between Paloma Partners and Forensic Decisions PR LLC, Mr. Markopolos was entitled to a percentage of the net profits. Pursuant to an agreement between Mr. Markopolos and Mr. McPherson, MMS was received a portion of this payment amounting to $1.8 million. Tr. at 973-74. Mr. McPherson personally received approximately $1 million of this payment in 2019. Tr. at 974-75.

### 4. Mr. McPherson's Payment of Certain Back Taxes Owed To The IRS And The State of Maryland

In December 2019, after having received approximately $1 million from MMS related to the GE transaction, Mr. McPherson used a portion of those funds to pay back taxes that he owed to the IRS and the State of Maryland for the years 2012-2016 in the amount of $347,000. *See* Exhibits 172 & 173; Tr. at 579.

As was noted above, the LFA had provided Mr. McPherson with access to $1 million, but specified that such funds "shall be used solely" by Mr. McPherson for certain specified purposes, those being that (i) $310,829 of such funds shall be used for funding his business and (ii) $689,171 of such funds for payment of taxes owed to the IRS and the Statement of Maryland. *See* LFA at pp. 1-2. During 2018, Mr. McPherson had withdrawn $310,000 for use in his business and operations. But he did not pay his back taxes or withdraw from the LFA's excrow account any of the funds specified and designated for payment of the back taxes owed to the IRS and the State of Maryland.

15

**5. Mr. McPherson's Request For The Release of $349,221 From The Escrow Account**

On May 29, 2020, Mr. McPherson requested the release of $349,221 from the LFA's escrow account in order to reimburse him for payments he had made for back taxes owed to the IRS and the State of Maryland for the years 2012-2016. *See* Exhibit 172. In connection with this request, Mr. McPherson included documentation showing that he had paid this amount to the IRA and the State of Maryland. *See* Exhibit 173.

On June 1, 2020, Mr. Shahinian responded to Mr. McPherson's request. *See* Exhibit 176 (Letter from Camac to McPherson, dated June 1, 2020 (the "June 1 Letter")). In the June 1 Letter, Mr. Shahinian told Mr. McPherson that Camac "will not be disbursing" the requested funds because Camac "considers you to be in breach of the Agreement." *Id.*

In the June 1 Letter Camac alleged that Mr. McPherson had committed the following breaches of the LFA:

    i.    Terminating Bryn Wood as the Attorney

    ii.    Entering into a retainer agreement with Buckley Sandler which by stating that "the Firm will agree to represent you in litigation with any third party who demands or otherwise claims a portion" of the Life Partners Litigation Proceeds, Camac alleged constituted a breach of the provision in the LFA in which Mr. McPherson had agreed that he "shall not adversely effect or permit anything to adversely effect the priority, perfection, or validity of Funder's interest;" and

    iii.    Failing to use the designated $689,171 of funds to pay his tax obligations.

*See* Exhibit 176. In the June 1 Letter, Camac also stated that "[p]ursuant to the Agreement, you currently owe Camac Fund, L.P. $3 million," and which will increase during each calendar year." Exhibit 176 at p. 2.

16

### 6. The Separation Agreement

In connection with his divorce proceedings, Mr. McPherson and his wife signed a Separation Agreement Term Sheet, which bears the date of May 6, 2020.[5] *See* Exhibit 29. One provision of this Separation Agreement Term Sheet states that Katrina McPherson shall receive "50% participation in John McPherson's share of the Life Partners whistleblower award, which is capped at a maximum payment of $2 million to Katrina McPherson." *Id.*

### 7. Mr. McPherson Files For Bankruptcy

On January 12, 2021, Mr. McPherson filed a petition under Chapter 11 of the Bankruptcy Code. *See* Exhibit 27. According to the petition filed with the Bankruptcy Court, at the time of the bankruptcy filing Mr. McPherson owed the IRS and the State of Maryland back taxes and penalties in the amount of $1.4 million. *See* Exhibit 27 at 29; Tr. at 578.

## VI. THE ARBITRATOR'S ANALYSIS OF THE CLAIMS OF THE PARTIES

### A. The Delaware Law of Contract Interpretation

As previously noted, the LFA provides that this "Agreement, and any and all claims or causes of action (whether in contract or tort) based upon, arising out of or relating to this Agreement, and to the transactions contemplated by this Agreement" shall be governed by "the laws of the State of Delaware." LFA at p. 4. In Procedural Order No. 4, in response to a motion filed by Respondent, the Arbitrator ruled that the Delaware choice of law cause was valid and enforceable and that New York's usury law did not apply to the LFA.

---

[5] It was admitted at the hearing that this document was back dated.

The legal rules governing the interpretation of contracts under Delaware law are well-established and clear. "Under standard rules of contract interpretation, a court must determine the intent of the parties from the language of the contract." *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014). Delaware adheres to the objective theory of contacts, meaning "that a contract's construction should be that which would be understood by an objective, reasonable third party." *Id.*

Accordingly, "when the language of a . . . contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented." *AT&T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. 2008). Delaware law instructs that Courts "will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty," because the "true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

A contract is not rendered ambiguous simply "because the parties do not agree upon its proper construction." *AT&T Corp.*, 953 A.2d at 252. Also, "extrinsic evidence may not be used . . . to create an ambiguity." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997). Rather, a contract will be found to be ambiguous "when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Lorillard*, 903 A.2d at 739. If "there is more than one reasonable interpretation of a disputed contract term, consideration of extrinsic evidence is required to determine the meanings the parties intended." *AT&T Corp.*, 953 A.2d at 253.

18

Extrinsic evidence may include evidence of "prior agreement and communications of the parties as well as trade usage or course of dealing." *Eagle*, 702 A.2d at 1233. If a contact is ambiguous, Delaware courts "will apply the doctrine of *contra proferentem* against the drafting party and interpret the contract in favor of the non-drafting party." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010).

### B. Camac's Claims Against Mr. McPherson For Breach Of Contract

The elements of a claim for breach of contract under Delaware law are (i) the existence of a contract; (ii) the breach of the contract; and (iii) proof of resulting damages. *See VLIW Tech, LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

Camac claims Mr. McPherson has committed several breaches of the LFA. Each claim of breach will be addressed below.

### 1. The Claim That Mr. McPherson Breached the LFA By Failing To Pay His Tax Obligations

Camac claims that Mr. McPherson breached the LFA because he failed to use the $689,191 in funds specifically designated in the LFA for payment of his taxes. The fact that Mr. McPherson did not use the designated funds to pay his taxes is not in dispute.

What the facts show is that Mr. McPherson during the negotiation of the LFA disclosed to Camac a remarkable fact. Mr. McPherson, who is a CPA and forensic account, had at the time of the negotiations of the LFA failed to file tax returns or pay his federal and state taxes for 17 years. *See* Tr. 563-65, 571-77, 828, 838. This was an extraordinary disclosure. As a result, Mr. McPherson's accountant estimated that Mr. McPherson owed back taxes to the IRS of $542,457 and to the State of Maryland of $146,714. *See* Exhibit 112.

19

At the time of the negotiation of the LFA, Mr. McPherson disclosed that he owed these back taxes and told Camac that he would use a portion of the $1 million he was seeking to pay these back taxes in full. This is reflected in the LFA, which in the Use of Proceeds section provides that $542,457 of such funds would be used to pay the "IRS Tax" and that $146,714 would be used to pay the "State of Maryland Tax." LFA at pp. 1-2. These amounts, of course, are exactly the amounts for back taxes that Mr. McPherson told Camac that he owed. *See* Exhibit 112.

It was an express purpose of Mr. McPherson in seeking funding and entering into the LFA to gain access to funds so that he could enter into a negotiated settlement with the IRS and the Maryland tax authorities to resolve these tax liabilities. *See* Tr. at 805-06, 838-39; Exhibit 31. The Tribunal expressly finds that Mr. McPherson told Camac that he would use these funds to pay his tax liabilities. *See* Tr. 805-06, 839. Camac, of course, wanted and expected that the funds would be so used. Tr. at 67-70. As Mr. Shahinian testified, "we wanted him to pay the taxes and that's why we wanted to very clearly say these amounts need to be paid" in full. Tr. at 67-68.

However, just before the LFA was finalized and signed, Mr. McPherson changed his mind. This is evident from an email Mr. McPherson sent to his accountant, dated December 5, 2017, where Mr. McPherson stated that "paying the tax in full . . . makes the funder happy," but that he had become concerned that in approaching the tax authorities "we run the risk the IRS would want more than simply the payment of the unpaid taxes" and also seek payment of penalties and interest. Exhibit 31. "This led me to the thought that it may be better to do nothing at all with the IRS at this point in time." *Id.* In short, Mr. McPherson changed his

20

mind about using the requested funds to pay the IRS and State of Maryland for fear that approaching the tax authorities to negotiate a resolution would wake a sleeping tiger.

Mr. McPherson did not, however, disclose his change of mind to Camac because he understood that doing so "would have killed" the deal. As Mr. McPherson testified:

> Q:  Okay.  Did you ever tell Eric that you were thinking it was better off – you're better off doing nothing with the IRS?
>
> A:  Well, I think that would have killed Eric's deal, wouldn't it.  Because we were escrowing $600,000 for the IRS. …

Tr. at 623:11-17.  In other words, Mr. McPherson deceived Camac about his intention to pay the back taxes he owed to the IRS and the State of Maryland in order to get access to the $1 million in funding, and from which he withdrew the designated $310,000 for use in his business.  As Mr. McPherson told another person from whom he was seeking a loan at that time, "I really only need $250,000 right now."  Exhibit 7.

Mr. McPherson argues that his failure to use the designated funds to pay his back taxes was not a breach of the LFA because the "LFA does *not* include any timetable or deadlines in the 'Use of Proceeds' provision."  Respondent's Post-Hearing Brief, at 20.  He acknowledges that the "LFA allocated a figure for payment of taxes."  *Id.*  But he contends that the LFA "did not dictate the timing of payment."  *Id.* at 20-21.  Accordingly, Mr. McPherson argues that the LFA should be interpreted as allowing him an indefinite and unlimited period of time within which to pay his back taxes. Therefore, he contends that his failure to use the $689,171 to pay his back taxes is not a breach of the LFA.

The Tribunal rejects Mr. McPherson's proposed interpretation of the LFA.  Under Delaware law, "[w]hen a contract is silent as to time of performance, the court will imply a reasonable period of time under the circumstances."  *AFH Holding Advisory LLC v. Emmaus*

21

*Life Scis., Inc.*, 2013 WL 2149993 at *10 (Del. Super. Ct. May 15, 2013). As the court in *Comet Sys., Inc. Shareholders' Agent v. MIVA*, Inc., 980 A.2d 1024, 1034 (Del. Ch. 2008) explained:

> Despite MIVA's contention that the Comet shareholders cannot maintain an action for breach because they cannot cite a provision of the agreement which is breached by the purported delay in payment or failure to pay interest, "[i]n every contract there is implied a promise or duty to perform with reasonable expediency the thing agreed to be done; a failure to do so is a breach of contract." (citation omitted)

When "a contract fails to specify a time for performacer, performance must occur within a reasonable time." *Duncan v. Garvin*, 2021 WL 2550656, at *4 (Del. Super. Ct. June 21, 2021); *accord HIFN, Inc. v. Intel Corp.*, 2007 WL 1309376, at *11 (Del. Ch. May 2, 2007) (Even in cases where "time is not of the essence in a contract, a party still commits a material breach when it fails to perform within a reasonable time.")

Here, Mr. McPherson requested that Camac provide him with $1 million in financing which was to be repaid only out of proceeds from the Cases, such as his expected award in Life Partners. As is obvious, Mr. McPherson's failure to have paid his taxes for 17 years provided a clear risk that the IRS or Maryland tax authorities would come after him for payment of back taxes, interest and penalties. This could easily have led to a very substantial judgment being entered against Mr. McPherson and a lien on all of his current assets and future income. Mr. McPherson, so long as this tax issue remained unresolved, also remained at risk for criminal penalties. So long as this tax liability remained unpaid, it created a very serious threat and risk to Camac that it would not be repaid. *See* Tr. at 67-68 (Shahinian: "I was very concerned about that").

Under these circumstances, the Tribunal finds as a matter of contract interpretation that Mr. McPherson had an obligation to promptly use the full amount of the funds allocated to pay the taxes owed to the IRS and the State of Maryland. As the Use of Proceeds provision states, the funds "shall be used solely for the purpose of funding his business and operations, *as well as extinguishment of the following [tax] liability in full.*" LFA at p. 1. Mr. McPherson failed to act promptly to use the designated funds to pay his tax liabilities. Indeed, Mr. McPherson failed to make any attempt to pay any of these taxes for a period of two years after he signed the LFA. The Effective Date of the LFA was January 4, 2018. Mr. McPherson did not make any attempt to pay any of these back taxes until December 31, 2019, at which time he made only a partial payment in the total amount of $349,221. *See* Exhibit 172.[6] Nor did Mr. McPherson introduce any evidence of any plan he ever had to pay the remaining taxes that were owed.

Accordingly, it is the conclusion of the Tribunal that Mr. McPherson breached the LFA by failing to promptly use the $689,171 in the funds specifically designated in the LFA to be used to pay the taxes owed to the IRS and the State of Maryland.

### 2. The Claim That Mr. McPherson Breached the LFA By Terminating Mr. Wood As Attorney For the Life Partners Case

Camac contends that having Mr. Wood serve as the attorney for the Life Partners case "was a material part of Camac agreeing to the LFA" and that "[b]ut for Woods' involvement as the Attorney on the LFA and McPherson's attorney in the Life Partners Case, Shahinian would

---

[6]  As previously noted, when Mr. McPherson on May 29, 2020 requested the release of $349,221 from the escrow account to reimburse him for this payment, Camac refused this request because by that time Mr. McPherson was already in breach of the LFA by having failed to pay his back taxes in full as he had said he would do. *See* Exhibit 176.

not have agreed to provide funding to McPherson."  Claimants Post-Hearing Opening Brief at 37.

The LFA defines "Attorney" as it is defined as "Bryan Wood, Esq."  It is not disputed that Mr. McPherson terminated Mr. Wood as his attorney in the Life Partners case and replaced him with the Buckley Sandler law firm.  Camac contends that Mr. McPherson's replacement of Mr. Wood as his attorneys for the Life Partners case is a breach of the LFA.

According to Mr. Shahinian, having Mr. Wood as the Attorney for the Cases under the LFA, and for the Life Partners case in particular, was critical to Camac's decision to agree to the LFA because of the need for "transparency," which he explained as meaning that he trusted Mr. Wood to "keep him informed of any developments in McPherson's whistleblower cases" and the payment of any Litigation Proceeds, "especially Litigation Proceeds in connection with the Life Partners Case."  Claimants Post-Hearing Br. at 38; Tr. at 36-38.

Mr. McPherson argues that Camac is attempting to read into the LFA a mandate that Mr. Wood must be retained as the Attorney for all the Cases, but that no such provision appears in the contract.  *See* Respondent's Post-Hearing Br. at 25.  While Camac now argues that Wood's involvement and retention was critical, Mr. McPherson points out that there is no language in the LFA which so requires.

Moreover, Mr. McPherson argues that it would be wrong to imply any such obligation for two reasons.  First, he argues that it would be contrary to Delaware law to add to a contract a provision that does not appear in the agreement.  *See Murfey v. WHC Ventures, LLC*, 236 A.3d 337, 350 (Del. 2020) ("Implying terms that the parties did not expressly include risks upsetting the economic balance of rights and obligations that the contracting parties bargained for in their

agreement.")  Second, he argues that the insertion of any such obligation should be avoided because it would interfere with the right of a client to choose their own counsel."  *See* McPherson's Pre-Hearing Br. at 5.

The Tribunal finds that the LFA does not mandate that Mr. Wood must be retained as counsel for the Life Partners case.  While Mr. Shahinian had great trust and confidence in Mr. Wood, the transparency that he said was critical to his entering into the LFA could be equally provided by replacement counsel.  Moreover, not only is there no such express mandate in the LFA, it is questionable whether any such mandate would be enforceable since it would conflict with Mr. McPherson's right to be represented by counsel of his own choosing.

Accordingly, Camac's claim that Mr. McPherson breached the LFA by replacing Mr. Wood as the Attorney for the Life Partners case is denied.

### 3.  The Claim That Mr. McPherson's Engagement Agreement With Buckley Sandler Contained Terms That Violated the LFA

Camac contends that certain terms contained in the agreement by which Mr. McPherson retained Buckley Sandler as counsel for the Life Partners case violated one of the LFA's provisions.  More specifically, Camac notes that the LFA contains a provision that required Mr. McPherson to "take all action necessary to maintain the first priority status of [Claimant's security interest in the Litigation Proceeds] and prohibited" Mr. McPherson from "adversely affect[ing] the priority, perfection, or validity of Funder's interest, including without limitation by creating, incurring, assuming or suffering to exist a Lien on the Litigation Proceeds."  *See* Claimant's Post-Hearing Opening Br. at 40.

Camac contends that the provision in the Buckley Sandler engagement letter wherein the firm agreed "to represent [Mr. McPerson] in litigation with any third party who demands or

otherwise claims a portion of the Financial Award" in the Life Partner case violates this above referenced provision of the LFA.

The Tribunal finds that the referenced provision in the Buckley Sandler engagement letter is not a violation of any provision of the LFA. Accordingly, the claim that Mr. McPherson breached the LFA by entering into the retention agreement with Buckley Sandler is rejected.

### 4. The Claim That Mr. McPherson Breached The LFA By Failing To Pay Camac The Alleged Litigation Proceeds That Mr. McPherson Received From The GE Short Sale

As previously noted, MMS received $1.8 million and of which Mr. McPherson received at least about $1 million for work that Mr. McPherson performed regarding the research report about GE. As noted, in July 2019, Mr. Markopolos's company Forensic Decisions PR LLC signed a research agreement with Paloma Partners, a hedge fund, with respect to a potential short sale of GE stock. *See* Exhibits 14 & 20. The work Mr. McPherson performed resulted in the creation of report labeled the GE Whistleblower Report. *See* Exhibit 16. The GE Whistleblower Report was first provided privately to Paloma Partners, who in reliance on such report established a short position in GE securities. The report was also filed with the SEC under the SEC's whistleblower program. *See* Exhibit 185. Thereafter, the report was made public and as a result the stock price of GE fell about 10%, which allowed Paloma Partners to make substantial profits on its short positions in GE securities.

Camac contends that all of the proceeds received by Mr. McPherson related to the GE short sales are Litigation Proceeds under the LFA and were therefore required to be paid to Camac. More specifically Camac contends that the agreement between Mr. McPherson and Mr. Markopolos pursuant to which Mr. Markopolos agreed to provide him with a share of the

26

payments received from Paloma Partners with regard to the GE short sales was a

"commercialization agreement" under the definition of Litigation Proceeds in the LFA.  *See*

Claimants Post-Hearing Br. at 42.

Resolution of this claim requires interpretation of the LFA, particularly the relationship

between the terms Cases and Litigation Proceeds.

The term **Cases** is defined as:

> SEC v Life Partners Holdings, Inc., Brian D. Pardo, R. Scott Peden
> and David Martin, Case No. 12-cv-0033 and all affiliated
> persons/entities (collectively, "Life Partners")
>
> Any and all other submissions, cases, or the like under the SEC, IRS,
> or CFTC whistleblower program, or under any qui tam statute.

The term **Litigation Proceeds** is defined as:

> "Litigation Proceeds" means the gross revenues, recoveries and/or
> proceeds, whether monetary or non-monetary, obtained from, paid
> by, or paid on behalf of the Cases.  This includes, but is not limited
> to, all whistleblower payments paid by any government agency,
> expert witness revenues, all damages, settlement sums.
> compensation, accounts of profits, restitution, licensing revenues,
> sums from any development and/or **commercialization agreement**,
> costs, fees, and expenses received from the Cases, and all similar
> sums, before deduction of any taxes.

(emphasis added).

Camac contends that the GE short sales profits are covered because they are monetary

"proceeds" paid "on behalf of Cases" pursuant to a "commercialization agreement."  Mr.

McPherson disagrees, arguing that the LFA only applies to payments which Mr. McPherson may

receive from whistleblower submissions.  In the case of GE, the money paid to Mr. McPherson

was paid by a hedge fund and was compensation for research Mr. McPherson helped perform

and which led to the hedge fund to being able to profit from taking a short position in GE

securities.

27

The Tribunal concludes based on a reading of the language of the LFA that Cases does not include any work that Mr. McPherson performed for the hedge fund with respect to the shorting of GE securities.  The term Cases is defined as "Life Partners" and "[a]ny and all other submissions, cases, or the like *under the SEC, IRS, or CFTC whistleblower program, or under any qui tam statute[7]."*  There is nothing ambiguous about this language.  In order to qualify as a Case under the LFA, the matter must have been a submission, case or the like "*under the SEC, IRS, or CFTC whistleblower program, or under any qui tam statute."*  The payments received by Mr. McPherson were from a hedge fund and were not a "submission, case or the like" under a government whistleblower program or qui tam statute.

It is important to note that Mr. McPherson also filed the GE Whistleblower Report with the SEC pursuant to the SEC's whistleblower program.  *See* Exhibit 185.  The filing of the GE Whistleblower Report is a "submission" under a government whistleblower program and therefore does qualify as a Case under the LFA.  As of the date of the hearing, Mr. McPherson has not received any award from the SEC with respect to the GE matter.  However, if Mr. McPherson were to receive any compensation from the SEC with respect to the whistleblower submission he made with respect to GE, then such compensation would be Litigation Proceeds under the LFA.

---

[7]  A qui tam statute is a statute which authorizes a private party to file a lawsuit on behalf of the government against a party alleged to have violated the statute and provides for such private party to receive a portion of any recovery. For example, the False Claims Act has a qui tam provision which allows a person with evidence of fraud against federal programs or government contracts to file a lawsuit against the wrongdoer on behalf of the United States Government and receive between 15 and 30 percent of the total recovery paid to the United States from the defendant.

Moreover, while resort to extrinsic evidence is not necessary, this Tribunal notes that its conclusion is further strongly supported by the statements of the parties themselves during the negotiation of the LFA. During the negotiations, Mr. McPherson requested that a provision be added to the LFA which would allow him reduce the full amount of the Funder's Entitlement by making a "buy-down" payment. This provision provides as follows:

> BUY DOWN OF FUNDER'S ENTITLEMENT. Litigant shall have the right at any time prior to satisfying the full amount owed under the Funder's Entitlement at one time to buy down 25% or 50% of the Funder's Entitlement. In the event Litigant chooses to exercise his rights under this clause, Litigant shall pay Funder 25% or 50% of the Funder's Entitlement for that calendar year. For that and all subsequent calendar years, the Funder's Entitlement shall be reduced by the percentage of the Funder's Entitlement that Litigant paid down....

LFA at p. 3.

Under this provision, Mr. McPherson could reduce the Funder's Entitlement (*i.e.* the amount to be paid to the Funder) by 25% or 50% by paying the Funder 25% or 50% of the Funder's Entitlement for that calendar year. For example, the LFA provides that the total amount due to Funder as the Funder's Entitlement was $2 million if paid during the calendar year 2019. If Mr. McPherson paid 50% of that amount during 2019, this would carry forward as a 50% reduction applied to the higher Funder's Entitlements that were due for payments made in 2020 or thereafter.[8]

---

[8] As an example, a buy-down payment made by Mr. McPherson of $1 million in 2019 would reduce all further Funder's Entitlement s by 50%. This means that if the full amount owed were paid in 2020, then the Funder's Entitlement would be reduced from $3 million to $1.5 million. The $1 million "buy down" payment in 2019 would save Mr. McPherson $1.5 million in 2020 and even more if repayment was made in later years.

The key to this buy-down being able to work is that Mr. McPherson must make the "buy-down" payment from funds which are not Litigation Proceeds under the LFA. Under the LFA, Mr. McPherson is required to turn over 100% of any Litigation Proceeds to the Funder until such time as the Funder's Entitlement is paid in full. *See* LFA, Waterfall/Priorities, at p. 2 ("First until such time as Funder has received its Funder's Entitlement in full, 100% to Funder, 0% to Litigant"). Therefore, Mr. McPherson could only make a "buy-down" payment if he had funds that were not Litigation Proceeds.

This was exactly the conversation the Mr. McPherson had with Mr. Shahinian during the negotiation of the LFA. At the time the parties were negotiating the LFA, Mr. Shahinian, Mr. McPherson, and Mr. Markopolos were involved with a potential transaction involving CNO Financial Group, Inc. ("CNO"), which in its structure was exactly the same as the later GE transaction. *See* Tr. at 430-31. Mr. Shahinian, Mr. McPherson, and Mr. Markopolos were engaged in investigating of a potential financial fraud by CNO. As reflected in their joint engagement letter with the law firm Grant & Eisenhofer P.A, the project involving CNO had two independent components. *See* Exhibit 104. First, the parties contemplated entering into an agreement with a hedge fund which would involve the short selling of CNO securities. Second, the parties would file a whistleblower submission with the SEC. *Id.*

Mr. McPherson during the negotiation of the buy down provision of the LFA expressly referenced the profits that he might earn related to the short selling of CNO securities as an example of his receipt of funds that could be used by him to make the buy down payment. In an e-mail, dated December 27, 2017, Mr. McPherson wrote "[l]et's say, for example, I net $750K from CNO and would like to use those funds to 'buy back' that portion" of the LFA. Exhibit

192. Mr. Shahinian responded that should be workable but wanted to limit the buy back to "either 25% or 50% of the funder's entitlement." *Id.* Moreover, in an email to Mr. McPherson, dated June 8, 2020, Mr. Shahinian wrote that the "buy down provision of the funding agreement was added in the event that there were earnings to you that did not involve a 'Case', *such as CNO.*" Exhibit 25 (emphasis added). These exchanges between the parties are compelling extrinsic evidence that the parties did not consider proceeds that they may earn related to short selling to be Litigation Proceeds under the LFA.[9]

According, the Tribunal rules that Camac's claim that that Mr. McPherson breached the LFA by failing to pay Camac the earning that Mr. McPherson received relating the short sale of GE securities is denied.[10] The earning received by Mr. McPherson related to the short sale of GE securities are not Litigation Proceeds under the LFA.

### 5. The Claim That A Provision In the Separation Agreement Regarding Life Partners Was A Breach Of The LFA

Mr. McPherson and his wife signed a Separation Agreement Term Sheet, which bears the date of May 6, 2020. *See* Exhibit 29. One provision of this Separation Agreement Term Sheet states that Katrina McPherson shall receive "50% participation in John McPherson's share of the

---

[9] The CNA and GE projects also included the filing of a whistleblower submission with the SEC. The filing of these submission with the SEC would be a Case as defined in the LFA and any monetary award received from the SEC with respect to such submission would Litigation Proceeds.

[10] Mr. McPherson requests that this Tribunal include in this Final Award a finding that the scope of the LFA is limited to Life Partners and the other whistleblower cases identified in Mr. McPherson's email to Mr. Shahinian, dated November 12, 2017, and does not encompass any future whistleblower cases that were not pending at the time the LFA was executed. *See* Respondent's Post-Hearing Br. at 20. This claim is rejected. There is no reason to read the LFA as limited to cases pending at the time the LFA was signed.

Life Partners whistleblower award, which is capped at a maximum payment of $2 million to Katrina McPherson." *Id.*

Camac claims that this provision regarding any Life Partners whistleblower award is a breach of the Interest In Litigation Proceeds provision of the LFA. See Claimant's Post-Heariing Opening Br. at 43. More specifically, Camac notes that the Interest In Litigation Proceeds provision of the LFA states that Mr. McPherson "hereby grants Funder a first priority security interest in the Litigation Proceeds and shall take all action necessary to maintain the first priority status of such interest" and "shall not adversely effect or permit anything to adversely effect the priority, perfection, or validity of Funder's Interest." LFA at p. 2.

Camac argues that Mr. McPherson's grant to his wife of a "50% participation in [Mr. McPherson's] share of the Life Partners whistleblower award" is a breach of the above quoted provision. *See* Claimant's Post-Hearing Opening Br. at 42. Camac supports this argument by noting that the Separation Agreement "does not say that his wife in entitled to 50% of McPherson's *net* share from an award from the Life Partners case," and from this argues that the "right given to his wife is 50% of McPherson's *gross* whistleblower award." *Id.*

The Tribunal rejects Camac's argument because it finds that the proper interpretation of the provision granting Katrina McPherson a "50% participation in John McPherson's share of the Life Partners whistleblower award" is that this is a grant to her of 50% of Mr. McPherson's net share of any Life Partners award, calculated after full payment to Camac of its interest in the Life Partners award pursuant to the LFA. Indeed, Mr. McPherson so testified at the hearing. *See* Tr. at 544:19-21 ("Whatever I'm left with, that gets in my bank account, she's entitled to half of

it.")  This admission is binding on Mr. McPherson and the Tribunal finds that Mr. McPherson should be estopped from ever contending to the contrary.

Accordingly, the claim that the provision regarding Life Partners in the Separation Agreement Term Sheet is a breach of the LFA is denied.

### C.  Camac's Claim Against Mr. McPherson for Unjust Enrichment

Camac argues that Mr. McPherson "took $310,000 from the LFA escrow account without justification and has failed to pay any of it back to Claimant" and that as a result that he has been unjustly enriched.  *See* Claimant's Post-Hearing Opening Br. at 44.  Camac contends that "absent a remedy at law," that Mr. McPherson should be required to pay back such funds.  *Id.*

As a matter of law, a claim for unjust enrichment must be dismissed if the same conduct is covered by an enforceable contract.  In this case, Mr. McPherson lawfully withdrew the $310,000 from the LFA escrow account pursuant to the terms of the LFA and his obligations to Camac are set forth in and governed by the LFA.  Indeed, the Tribunal has already determined that Mr. McPherson has breached the LFA, and a later section of this Final Award will address the issue of damages to Camac for such breach.  Accordingly, the Tribunal rules that the claim for unjust enrichment is denied.

### D.  Camac's Claim That Mr. McPherson Violated the Implied Covenant of Good Faith and Fair Dealing

Camac argues that Mr. McPhersons actions have "violated the covenant of good faith and fair dealing implied in every contract under Delaware law" and that he therefore "should be ordered to return the $310,000 taken from the escrow account and the balance of the escrow account be returned to Camac.  This Tribunal has already determined that Mr. McPherson's failure to promptly use the funds designated in the LFA to pay the back taxes was a breach of the

33

LFA and will address in a later section of this Final Award the issue of remedy for such breach. Accordingly, the claim for breach of the implied covenant of good faith is denied as moot.

### E.  Mr. McPhersons Counterclaims

At the commencement of this arbitration, Mr. McPherson asserted eight counterclaims. See Counterclaims, dated October 27, 2020.  At the start of the hearing on the merits, Counsel for Respondent stated that she was withdrawing three of these counterclaims.  *See* Tr. at 6.

Thereafter, however, Respondent in its opening Post-Hearing Brief failed, without explanation, to present any argument at all or even mention any of its remaining counterclaims. Nor did Respondent address any of its counterclaims in its Post-Hearing Reply Brief. Accordingly, the Tribunal considers each of the counterclaims to be abandoned.  For the avoidance of doubt, the Tribunal further rules that each of the counterclaims is denied.

Respondent in its opening Post-Hearing Brief has, however, purported to assert a new claim for relief requesting the Tribunal order recission of the LFA.  *See* Respondent's Post-Hearing Br. at 34.  Mr. McPherson argues that the "record before the Tribunal readily supports a finding that the LFA is the product of mutual mistake, the continued performance of the LFA is not feasible and would lead to further disagreement, and that grounds exist to apply a remedy of recission." *Id.*

The claim for recission is denied.  First, this claim is denied because no counterclaim for recission was asserted by the Respondent in its Answer or Counterclaims.  A new counterclaim may not be added to an arbitration by simply asserting such a claim for the first time in a post-hearing brief.  Rule 6(b) of the AAA's Commercial Arbitration rules governs changes of claim. Rule 6(b) provides in pertinent part as follows:

> Any new or different claim or counterclaim, as opposed to an
> increase or decrease in the amount of a pending claim or
> counterclaim, shall be made in writing and filed with the AAA, and a
> copy shall be provided to the other party, who shall have a period of
> 14 calendar days from the date of such transmittal within which to
> file an answer to the proposed change of claim or counterclaim with
> the AAA. After the arbitrator is appointed, however, no new or
> different claim may be submitted except with the arbitrator's
> consent.

Respondent has not complied with Rule 6(b). Moreover, it would be fundamentally unfair to the

Claimant to allow such a claim to be introduced into this arbitration simply by inserting such a

claim in an opening post-hearing brief.

The claim for recission is also denied on the merits. Respondent "requests that the

Tribunal issue an award which rescinds the LFA, directing the unused $690,000 and applicable

interest to be returned to Camac and finding that McPherson's liability under the LFA is limited

to the $310,000 amount withdrawn in 2018. Respondent's Opening Br. at 36-37. Respondent

argues that recission should be ordered because "the LFA is the product of mutual mistake."

Respondent's Opening Br. at 34, 36.

Rescission "seeks to 'unmake' or 'cancel' an agreement and to return the parties to the

status quo ante." *Kane v. NVR, Inc.*, 2020 WL 583812, at *3 (Del. Ch. Feb. 6, 2020). As the

court in *Creative Rsch. Mfg. v. Advanced Bio-Delivery LLC*, 2007 WL 286735, at *7 (Del. Ch.

Jan. 30, 2007) explained:

> Equitable rescission, or cancellation, is a form of remedy that
> provides equitable relief beyond a judicial declaration of contract
> invalidity or award of money or property and seeks to restore the
> plaintiff to his original condition. Typically, it requires the court to
> "cause an instrument, document, obligation or other matter affecting
> plaintiff's rights and/or liabilities to be set aside and annulled, thus
> restoring plaintiff to his original position and reestablishing title or
> recovering possession of property.

(footnotes and internal quotations omitted).  Importantly, the "party seeking rescission bears the burden of establishing that the court can restore the status quo between the parties."  *Id.* Equitable rescission "requires putting each party in as close to the position they would have been in but for the creation of the contract."  *Creative*, 2007 WL 286735, at *8.

The Tribunal finds that Respondent has failed to establish the necessary elements to support a claim for recission.  While Respondent alleges in conclusory fashion that the LFA was the product of mutual mistake, it fails to put forth any facts in support of such conclusory allegation, and such allegation of mutual mistake in rejected as not supported by the evidence. Moreover, in this case it would be impossible to put the parties back to the position they were in prior to the LFA being executed because Mr. McPherson has filed for bankruptcy and therefore may not voluntarily return the $310,000 he withdrew from the escrow account.  Finally, as Camac correctly argues, "recission would be an inappropriate remedy in this case and would reward McPherson for breaching the LFA."  Claimant's Post-Hearing Reply Br. at 21.

Respondent also seeks to introduce a new affirmative defense of acquiescence, arguing that even if Mr. McPherson's actions constituted a breach of the LFA, that "Camac's prolonged silence and inaction after such alleged breach amounts to acquiescence and serves as a defense to Camac's claims."  Respondent's Post-Hearing Br. at 34.  The Tribunal concludes that this newly asserted affirmative defense is also procedurally defective under Rule 6(b).  Moreover, the Tribunal also rejects this newly asserted affirmative defense on the merits.  The LFA was entered into effective January 4, 2018.  Camac asserted that Mr. McPherson was in material breach of the LFA in its letter of June 1, 2020.  *See* Exhibit 176.  Camac filed its Statement of Claim and

36

Demand for Arbitration on September 30, 2020. The facts show that any claim of acquiescence is without merit.

## VII.    Remedy

An injured party's claim for damages for breach of contract under Delaware law depends on whether the breaching party committed a partial breach or a total breach.[11]  A total breach is one that "touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract or affect[s] the purpose of the contract in an important or vital way." *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*,  2020 WL 7024929, at *101 (Del. Ch. Nov. 30, 2020). In the case of a total breach, "the [injured] party is discharged from further performance and is entitled to substantial damages." *Id.; accord Medicalgorithmics S.A. v. AMI Monitoring, Inc.*, 2016 WL 4401038, at *23–24 (Del. Ch. Aug. 18, 2016) ("A party is excused from performance under a contract if the other party is in material breach thereof.)

With respect to the amount of compensatory damages, Delaware follows the Restatement and recognizes that "the standard remedy for breach of contract is based upon the reasonable expectations of the parties ex ante. This principle of expectation damages is measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract." *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001) (internal quotation omitted).

Another important issue relevant to the calculation of damages is a determination of the date when the damages accrue. For breach of contract claims, "the wrongful act is the breach,

---

[11]  A partial breach is one that is "relatively minor and not of the essence." *Stable VIII LLC*, 2020 WL 7024929, at *101.

and the cause of action accrues at the time of breach." *In re Mobilactive Media, LLC*, 2013 WL 297950, at *10 (Del. Ch. Jan. 25, 2013).

Camac contends that it is entitled to damages in the amount of $5,950,000.[12] In support, it relies on the Funder's Entitlement provision set forth in the LFA as representing "a negotiated aggregate amount McPherson owed Camac with respect to the Cases." Claimants Post-Hearing Br. at 46. Under the LFA, the amount of the Funder's Entitlement varies (and increases) based upon the year in which Mr. McPherson pays it. In short, the longer it takes Mr. McPherson to make this payment, the higher the amount. It also should be remembered that Mr. McPherson is only obligated to pay the Funder's Entitlement out of Litigation Proceeds from the Cases. Camac bears this risk. If Mr. McPherson does not recover Litigation Proceeds, Camac does not get paid its Funder's Entitlement.

The Funder's Entitlement is as follows:

- $1,370,000 if Funder's Entitlement is paid in full during the calendar year 2018
- $2,000,000 if Funder's Entitlement is paid in full during the calendar year 2019
- $3,000,000 if Funder's Entitlement is paid in full during the calendar year 2020
- $4,200,000 if Funder's Entitlement is paid in full during the calendar year 2021
- **$5,950,000 if Funder's Entitlement is paid in full during the calendar year 2022**
- $8,650,000 if Funder's Entitlement is paid in full during the calendar year 2023 or thereafter

---

[12]  The Tribunal notes that Respondent did not address Claimant's request for damages in Respondent's Post-Hearing Brief or Post Hearing Reply Brief.

LFA at p. 2 (emphasis added).

Camac's claim for $5,950,000 is based on the assumption that damages should be calculated as if Mr. McPherson was paying the Funder's Entitlement during calendar year 2022. The year 2022 was apparently chosen by Camac as the date to calculate damages because that is the year in which the merits hearing in this arbitration was held. But because Mr. McPherson to date has not received any Litigation Proceeds from the Cases, no payment of the Funder's Entitlement is due under the LFA.

The issue before the Tribunal is to determine damages to Camac for Mr. McPherson's breach of the LFA. It is the ruling of the Arbitrator that the more appropriate date upon which to calculate damages is the date of Mr. McPherson's material breach of the contract. See *In re Mobilactive Media* ("For breach of contract claims, "the wrongful act is the breach, and the cause of action accrues at the time of breach.")

In this case, Camac sent notice of breach to Mr. McPherson in its letter dated June 1, 2020. *See* Exhibit 176. In that June 1 Letter, Camac asserted, *inter alia*, that Mr. McPherson was in breach of the LFA because of his failure to have used the amounts designated in the LFA to pay his tax obligations. The June 1 Letter stated in relevant part:

> "Use of Proceeds" in the Agreement states that $689,171 shall be used to pay various of your tax obligations that were presented during the diligence process. As you recall, we firmly indicated to you that we would not engage in funding unless you used the money to pay your tax obligations in full. Rather than use those funds to pay your obligations, you failed to pay any taxes for two [additional] years, which could have subjected (or may still subject) you to fines, interest, and penalties, which may endanger the Funder's Entitlement as a result of any potential tax lien.

Exhibit 176 at p. 1.  As previously noted, the Tribunal has held that Mr. McPherson's failure for almost 2 years to use the designated funds deposited in the LFA escrow account to pay his back taxes was a material breach of the LFA.

Accordingly, it is the finding of the Tribunal that the appropriate date from which to assess damages is June 1, 2022.  On that date, the amount that Mr. McPherson owed as the Funder's Entitlement under the LFA was $3 million.  It is therefore the ruling of this Tribunal that Camac's expectation damages for breach of the LFA is $3 million.  However, pursuant to the terms of the LFA, Camac would only be entitled to payment out of Litigation Proceeds from the Cases.  In other words, Mr. McPherson did not have a personal obligation to pay the Funder's Entitlement.  Camac's expectation that it would receive the Funder's Entitlement was limited to receiving a portion of the Litigation Proceeds from the Cases and was non-recourse to Mr. McPherson.

It is the ruling of the Tribunal that the fact that Mr. McPherson breached the LFA does not serve to transform a non-recourse obligation into a personal obligation of Mr. McPherson.  The economics of the deal, specifically the exceptionally high potential return to Camac on its investment, were based on the fact that the obligation to pay the Funder's Entitlement was not guaranteed by Mr. McPherson.  The fact that Mr. McPherson breached the LFA does not change that fact.  Accordingly, it is the ruling of the Tribunal that Camac's right to be paid $3 million is

limited to funds which Mr. McPherson receives that qualify as Litigation Proceeds from the Cases.[13]

In addition, in light of McPherson's material breach of the LFA, it is the ruling of tis Tribunal that Camac no longer has any obligation to continue to perform under the LFA. "A party is excused from performance under a contract if the other party is in material breach thereof." *Medicalgorithmics* 2016 WL 4401038, at *23–24; accord *AB Stable VIII LLC* , 2020 WL 7024929, at *101 (in the case of a total breach, "the [injured] party is discharged from further performance"). Accordingly, the Tribunal rules that Camac is entitled to the release and return of the $690,000 remaining in the LFA's escrow account.

Finally, interest "is awarded in Delaware as a matter of right." *Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482, 485 (Del. 2011). Delaware courts award pre-judgment interest at the statutory rate, which is "5% over the Federal Reserve discount rate." *Miller v. Trimont Glob. Real Est. Advisors LLC*, 2022 WL 610820, at *23 (D. Del. Feb. 28, 2022); 6 Del. C. Ann. § 2301(a). Delaware courts also award post-judgment interest on the same basis. *Id.*

Accordingly, the Tribunal rules that Camac is entitled to pre-award simple interest on the $3 million damages awarded starting on June 1, 2020 at the interest rate of 5% over the Federal Reserve discount rate. Camac is also entitled to post-award simple interest on the $3 million

---

[13]  What, if any, effect there is on Camac's right to this payment in light of the fact the Mr. McPherson has filed for bankruptcy under Title 11 of the Bankruptcy Code is not before this Tribunal and any such issue is within the exclusive jurisdiction of the Bankruptcy Court.

41

damages awarded, plus the pre-award interest that has accrued up to the date of this Award, at the interest rate of 5% over the Federal Reserve discount rate until payment is made.

**VIII.   The Parties' Requests For An Award of Attorney's Fees**

Camac and Mr. McPherson have both requested any award of attorneys' fees as costs. Camac has requested that it be awarded reimbursement of its attorneys' fees in the amount of $315,979.34 and costs of $26,571.44.  *See* Claimant Camac Fund's Petition For An Award For Its Attorneys' Fees and Costs, dated August 11, 2022 (together with supporting declarations); E-mail, dated September 9, 2020, re: supplemental submission as to costs.

Mr. McPherson has requested that he be award attorneys' fees and costs in the total amount of $513,762. Mr. McPherson has not objected to the amount of attorneys' fees and costs requested by Camac.  *See* Respondent's Reply Regarding Attorneys' Fees and Interest on Awarded Damages, dated August 18, 2022.

Rule 47(d)(ii) of the AAA Commercial Rules provides, in part, that the "award of the arbitrator(s) may include… an award of attorneys' fees if all parties have requested such an award." Here, both parties have requested an award of their attorney's fees.

It is the ruling of this Tribunal that Camac's request for an award of attorneys' fees and costs in the amount of $342,550.78 is granted.

**IX.    THE FINAL AWARD**

Accordingly, for all the reasons set forth above, the Arbitrator makes the following Final Award in this arbitration:

1.    Camac's claim for breach of the LFA is granted   Camac is entitled to be paid $3 million in compensatory damages, but recovery of such damages is limited to funds Mr. McPherson receives as Litigation Proceeds from the Cases.

42

2.  Camac is entitled to the release and return of the $690,000 remaining in the LFA's escrow account maintained by Mr. Wood's law firm.

3.  Camac's claim for unjust enrichment is denied.

4.  Camac's claim that Mr. McPherson violated the implied obligation of good faith and fair dealing is denied.

5.  All of Mr. McPherson's Counterclaims are denied.

6.  Camac is entitled to pre-award simple interest on the $3 million in compensatory damages, with interest accruing starting on June 1, 2020, at the interest rate of 5% over the Federal Reserve discount rate. Camac is also entitled to post-award simple interest on the $3 million compensatory damage award, plus all accrued pre-award interest, at the interest rate of 5% over the Federal Reserve discount rate from the date of the Award until payment is made.

7.  Camac's request for an award of attorneys' fees and costs in the amount of $342,550.78 is granted.

8.  The administrative fees and expenses of the American Arbitration Association totaling $24,425.00 shall be borne $24,425.00 by John McPherson, and the compensation and expenses of the arbitrator totaling $71,961.25 shall be borne $71,961.25 by John McPherson. Therefore, John McPherson has to pay Camac an amount of $52,155.63.

9.  This Award is in full settlement of all claims and counterclaims submitted in this arbitration. Any claim or counterclaim not specifically referred to above is denied.

Dated:  September 13, 2022

Steven H. Reisberg, Arbitrator

I, Steven H. Reisberg, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

Dated:  September 13, 2022

Steven H. Reisberg